**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| ARLENE HARJO, | No. CV 16-1113 JB/WPL |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT** |
| CITY OF ALBUQUERQUE, | |
| Defendant. | |

**INTRODUCTION**

1.      The City of Albuquerque operates a massive vehicle forfeiture program: Every year, the City seizes over 1,000 cars and brings in over $1 million in revenue. Between 2010 and 2014, the City seized over 8,300 cars—approximately one car for every 66 residents in the City—and collected over $8.7 million.

2.      Arlene Harjo became caught in the City's forfeiture program in April 2016, when the City seized her two-year-old silver Nissan Versa. Arlene lent this car to her son, Tino, when he told her he was planning to take a midday trip to the gym. Tino lied; he drove to see his girlfriend in Clovis, NM. On the way home, Tino was stopped for allegedly drinking and driving, and police seized Arlene's car. Arlene, already upset that her son took advantage of her trust, then faced the possible loss of her practically brand-new car in a civil forfeiture action commenced by the City. Arlene did not dispute that Tino did something wrong, but she did not see why *she* should lose her car as a result.

3.      Arlene broke no laws, but the City treated her like a criminal. The City seized her car and held it for over 240 days, or approximately eight months. In an attempt to get her vehicle

1

back, Arlene was forced to request an administrative hearing (at a cost of $50) where she was required to prove her own innocence. At the hearing, Arlene found herself confronted by a supposedly neutral hearing officer who acted as an advocate for the City—advancing theories, not based on evidence in the record, as to why Arlene should be punished for Tino's actions.

4.      Finally, after nearly eight months of forfeiture proceedings, the City belatedly realized Arlene's car was outside city limits at the time that it was seized—and therefore not even potentially subject to forfeiture. Notably, the City made this discovery only after Arlene filed a lawsuit challenging the legality of the City's forfeiture program. The City was not so punctilious about the location of the seizure when it initiated forfeiture proceedings.

5.      The City's program is driven by a pernicious—and unconstitutional—profit incentive. Forfeiture revenues go to pay the salaries of the very same officials charged with seizing and forfeiting cars. Even program employees whose salaries are not directly paid by forfeiture revenues depend on those funds to pay for equipment and other expenses. This financial arrangement gives rise to an incentive to take property from people who have done nothing wrong and to pursue forfeiture in inappropriate cases—like Arlene's.

6.      The City's program is also contrary to state law. The New Mexico Legislature abolished civil forfeiture in 2015. *See* An Act Relating to Forfeiture, House Bill 560 (2015) (hereinafter, "Forfeiture Reform Law"). Yet, despite those reforms, the City continues to take property using civil forfeiture.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1441, as this case was removed to this Court after being initially filed in state court. This Court has subject matter jurisdiction over Plaintiff's two federal constitutional causes of action (Counts II and III) under

28 U.S.C. § 1331 because both raise questions of federal law. This Court also has supplemental

jurisdiction over Plaintiff's state-law cause of action (Count I) under 28 U.S.C. § 1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant

City of Albuquerque is located within this judicial district.

## THE PARTIES

9.      Plaintiff Arlene Harjo is a resident of Albuquerque and a victim of Albuquerque's

unlawful and unconstitutional civil forfeiture program. Arlene's car was seized by the City

although she personally did nothing wrong, and Arlene was required to prove her own innocence

to get her vehicle back. Although the City presented no evidence that Arlene was in any way at

fault, the City's supposedly neutral hearing officer denied her claim of innocence. Then, after

nearly eight months of forfeiture proceedings, the City realized the car was outside city limits

when it was seized and therefore not subject to forfeiture.

10.     Defendant City of Albuquerque is a municipal corporation organized under the

laws of the State of New Mexico.

## ALBUQUERQUE'S VEHICLE FORFEITURE PROGRAM

11.     The City of Albuquerque operates a massive vehicle forfeiture program, which

seizes over 1,000 cars and brings in over $1 million in revenue every year.

12.     This program operates using *civil* (as opposed to *criminal*) forfeiture. This means

that property owners do not have to be convicted of a crime to lose their property. Instead,

Albuquerque can forfeit property based only on a showing of "probable cause" to believe a crime

has occurred. Revised Ordinances of Albuquerque (ROA) 1994, § 7-6-5(D). Moreover, the

alleged crime need not be committed by the person who owns the vehicle; Albuquerque can take

property based on a crime allegedly committed by another person entirely, so long as the vehicle was somehow involved in the offense. § 7-6-2.

13.     Albuquerque's vehicle forfeiture program is commonly associated with DWI offenses, but, in fact, the program encompasses a broader spectrum of alleged violations of the criminal laws, including any "felony offense" that was "perpetrated by the use of a firearm," ROA 1994, § 7-9-3, and prostitution offenses, § 7-14-2.

14.     Albuquerque's forfeiture program generates revenue both through auctions of forfeited vehicles and through settlement agreements whereby property owners agree to make monetary payments to avoid the forfeiture of their vehicles.

15.     Revenue generated by Albuquerque's forfeiture program is returned to the program's budget—including to pay the salaries of the very city attorneys who seek the forfeitures. *See* ROA 1994, §§ 7-6-5(E), 7-9-3(F), 7-14-5(F). Money collected through the forfeiture program is distributed to other purposes only if there is any surplus left over after paying the expenses of the forfeiture program.

16.     The City's forfeiture program is financially dependent on the maintenance of a high level of vehicle seizures, settlements, and forfeitures, as revenues generated by these activities make up a significant portion of the program's budget. On information and belief, revenues from auctions of forfeited vehicles and settlement agreements with owners of seized vehicles make up close to or even more than 100% of the forfeiture program's budget.

17.     The City plans for vehicle forfeitures in its annual budget. The City's 2016 budget, for instance, included as a "performance measure" for the upcoming year a target to conduct 1,200 vehicle seizure hearings, to release 350 vehicles under agreements with the property owners, to immobilize 600 vehicles, and to sell 625 vehicles at auction. The City

budgeted as a "performance measure" that it would earn $615,000 in 2016 auctioning forfeited vehicles, while other program revenues would be generated through settlement agreements.

18.     The City specifically plans for salaries to be paid out of the proceeds of vehicle forfeitures. The City's 2016 budget, for instance, anticipated that $512,000 would be transferred from the fund that receives vehicle forfeiture revenues to pay the salaries of "two paralegals, two attorneys, two DWI seizure assistants and one DWI seizure coordinator." This arrangement creates a serious appearance of impropriety, as well as a direct financial incentive for city officials to seize property even in marginal cases.

19.     In addition to salaries, the City uses revenues from its vehicle forfeiture program to pay expenses associated with program personnel. On information and belief, the City uses forfeiture revenues to pay for equipment, vehicles, travel, training, facilities, and other purchases that benefit program personnel. Because forfeiture revenues increase the amount of money available to spend, program personnel directly benefit from increased forfeiture revenues.

20.     City officials working in the forfeiture program also make personal use of seized cars. Officials drive cars around town during the day and even take them home at night. In 2014, for instance, press reports emerged that at least three city officials had been driving seized cars—including a seized Cadillac Escalade—for personal use.

21.     Practically everyone associated with the City's vehicle forfeiture program benefits from forfeiture revenues in some form. On information and belief, police officers, attorneys, and administrative hearing officers all make use of equipment and facilities purchased using forfeiture revenues.

22.     The City makes it difficult for an individual to contest a forfeiture. To prevent forfeiture of the property, an owner has only a few days following the seizure and notice of

forfeiture to submit an initial request for an administrative hearing. In DWI and prostitution cases, this period is ten days. ROA 1994, §§ 7-6-5(D)(7), 7-14-5(D)(7). In cases involving a firearm felony offense, this period is only four days. § 7-9-3(C)(7).

23.  In order to request an administrative hearing, an owner is required to pay a $50, non-refundable fee to the City. ROA 1994, §§ 7-6-5(F), 7-14-5(G).

24.  Prior to a hearing, property owners generally meet with a city attorney who will attempt to settle the case. Many property owners are offered the immediate return of their property, but only if they sign an agreement to have the car immobilized for a period of weeks or months and to pay hundreds or even thousands of dollars to the City.

25.  At an administrative hearing, an administrative hearing officer is charged to "determine whether the law enforcement officer had probable cause to seize the vehicle" and whether the property owner has established an "innocent owner" defense. ROA 1994, § 7-6-5(D). Hearing officers are selected by the mayor; they can be either employees or individuals hired on a contract basis. § 2-7-8-5. Either way, the hearing officer's salary is paid by the City.

26.  One of these hearing officers—Albuquerque's Chief Hearing Officer Stanley Harada, who was the hearing officer in Arlene Harjo's case—designed the City's program in his former role as a city attorney and has subsequently been a prominent defender of the program when it has attracted criticism. The Chief Hearing Officer has been quoted in the media on several occasions speaking in defense of the program.

27.  The City's Chief Hearing Officer spoke at the 2014 Santa Fe Vehicle Forfeiture Conference, an event at which city attorneys from across New Mexico gathered to discuss the topic of vehicle forfeiture. Video of this event is available online. *See* Video: Santa Fe Vehicle Forfeiture Conference (Sept. 10, 2014), https://www.youtube.com/watch?v=HHrgsda5g3c.

28.     City attorneys at the Santa Fe Vehicle Forfeiture Conference spoke in revealing terms about the profit incentive underlying civil forfeiture. An attorney charged with running a vehicle forfeiture program in Las Cruces, for instance, was captured on video stating that "we always try to get, every once in a while, maybe a good car" and recounting how the city had seized "a 2008 Mercedes, brand new, just so beautiful." According to that same attorney: "We thought, damn. We have a 2008 Mercedes Benz. This is going to go to auction. This is going to be great. We put all our junk out there and this is going to be the big seller."

29.     At the conference, the same Las Cruces attorney expressed admiration that the City of Philadelphia had seized $4 million in one year through civil forfeiture and stated, "Just think what you could do as a legal department [with that much money]. We could be czars. We could own the city. We could be in the real estate business."

30.     Although the City's Chief Hearing Officer spoke at the Santa Fe Vehicle Forfeiture Conference, he did not repudiate comments by other speakers or in any way suggest that he viewed them as inappropriate.

31.     During the Santa Fe Vehicle Forfeiture Conference, the City's Chief Hearing Officer stated that Albuquerque's "ordinance was written specifically" to provide that money raised through the forfeiture program must be used to fund the program. The Chief Hearing Officer stated that this "allowed me to resist former mayors wanting to transfer it all to the general fund."

32.     The City's Chief Hearing Officer was asked during the conference how much revenue is generated by Albuquerque's program. He responded: "I think [city officials] would rather not talk about those numbers because then it starts becoming more of a bullet-point for people that are trying to fight the program."

33.     During the conference, the City's Chief Hearing Officer made clear that he approaches hearings with the presumption that the individuals involved are guilty until proven otherwise. He stated that a hearing "allows the offender to challenge the constitutional sufficiency of the stop and the arrest and more importantly it allows the alleged innocent owners—and I say alleged, until they go through the hearing they are considered 'alleged'—to have the opportunity to make their case very quickly."

34.     The City's Chief Hearing Officer also stated that he sees it as his role at a hearing to anticipate and respond to arguments of property owners. He stated that "there's going to be a certain number of defense lawyers involved," as well as "non-lawyer claimants" who "wander in with their own motions trying to argue like a lawyer," and that in his view a hearing officer should be "able to articulate the theory and the counterarguments." Notably, the Chief Hearing Officer did not mention any need to respond to arguments presented by the City's attorneys.

35.     At an administrative hearing, the City need only establish "probable cause" to believe a crime has occurred. ROA 1994, §§ 7-6-5(D), 7-9-3(C), 7-14-5(E). Because hearings are "informal" and not subject to the rules of evidence, the City can satisfy this burden using evidence that would not be admissible in a court of law. § 7-6-5(D).

36.     At the Santa Fe Vehicle Forfeiture Conference, the City's Chief Hearing Officer stated that—in the more than seven years he has worked as a hearing officer—he has found that the government lacked probable cause *only twice*. On information and belief, the Chief Hearing Officer has overseen thousands of hearings during that period of time.

37.     While the City need only establish probable cause to believe that a crime has occurred, an individual (like Arlene) whose car was used by a third party to commit an alleged offense faces a higher burden of proof to establish a so-called "innocent owner" defense. A

property owner must "demonstrate[ ] by a *preponderance of the evidence* that the owner or co-owner *could not have reasonably anticipated* that the vehicle could be used" in the commission of the offense. ROA 1994, § 7-6-7 (emphasis added). Only after the owner has made this showing by a preponderance of the evidence does the burden shift to the City to rebut that showing of innocence. *Id.*; *see also* §§ 7-9-3(G); 7-14-7(A).

38.     Even if the hearing officer finds in *favor* of the property owner on an innocent owner defense, the City can still impose substantial fees. In a DWI case, the City will impose a tow fee so long as the hearing officer "finds probable cause to seize." ROA 1994, § 7-6-5(D). In addition, "storage fees shall be waived or imposed at the discretion of the hearing officer." *Id.* In other words, an owner who did nothing wrong and prevails at the hearing may still be charged hundreds or even thousands of dollars in towing and storage fees to recover his or her property.

39.     Storage fees accumulate at a rate of $10 per day throughout the proceedings. City attorneys inform property owners of that fact, in an effort to encourage property owners to settle rather than challenging the forfeiture of their car.

40.     At the Santa Fe Vehicle Forfeiture Conference, the City's Chief Hearing Officer stated that he uses storage fees to pressure property owners not to seek a continuance of the hearing until after their underlying criminal trial: "I also tell them that $10 a day is accumulating, so if they want to wait for six months or a year until their felony case goes to trial . . . ." This shows both that the City is aware of the leverage provided by the $10 daily storage fees and that the City uses this leverage to gain a litigation advantage, such as by forcing property owners to litigate their civil forfeiture case before their criminal trial and thus making it more difficult for property owners to preserve their Fifth Amendment right against self-incrimination.

9

41.     If the hearing officer finds against the owner at the conclusion of the hearing, the City will initiate civil forfeiture proceedings in the Second Judicial District Court. *See* ROA 1994, §§ 7-6-5(D), 7-9-3(C), 7-14-5(E). The owner must then affirmatively intervene as a claimant in those judicial proceedings to protect his or her property interest. If the property owner fails to intervene, the property will be forfeited by default.

42.     When property owners appear *pro se* in district court, the City serves property owners with extensive discovery requests. Many of these requests seek information that is plainly irrelevant to the merits, such as the property owner's salary or wages for every job held over the last five years, whether the property owner owns their home or rents (and, if the property owner rents, the name and address of their landlord), and detailed information on any "improvement(s)" made by the property owner to the vehicle (including "replacement and/or new audio and/or video equipment" and "navigation equipment"). The City includes a "Disclaimer" along with these discovery requests, under which the property owner would disclaim any ownership interest in the vehicle, as well as a letter inviting the property owner to sign this Disclaimer as an alternative to responding to the intrusive discovery requests.

43.     If an owner intervenes in a judicial forfeiture proceeding and prevails in court, Albuquerque's ordinance for DWI cases provides that the owner shall be charged a tow fee so long as the Court finds that there was probable cause to seize the vehicle and that "[r]easonable storage fees may be assessed by the District Court." ROA 1994, § 7-6-7(E). In other words, a claimant who fights the City all the way to the end of the process and prevails in a court of law *still* may be forced to pay significant fees.

10

## NEW MEXICO'S FORFEITURE REFORM LAW

44.    In early 2015, the State of New Mexico enacted historic legislation to end the practice of civil forfeiture in the State. *See* An Act Relating to Forfeiture, House Bill 560 (2015). The law—referred to here as the Forfeiture Reform Law—was passed by a unanimous House of Representatives on March 17, 2015, and by a unanimous Senate on March 21, 2015. Governor Susana Martinez signed the bill into law on April 10, 2015.

45.    The Legislature's unanimous endorsement of the Forfeiture Reform Law was motivated by widespread outrage at the practice of civil forfeiture in New Mexico. This outrage was spurred, in large measure, by press reports that relayed comments by city attorneys as well as the City's Chief Hearing Officer at the Santa Fe Vehicle Forfeiture Conference. Comments from the Santa Fe Conference were revealing for the public because they pointed to the profit motive inherent in civil forfeiture.

46.    In order to address abuses associated with civil forfeiture, the Forfeiture Reform Law abolishes civil forfeiture in New Mexico; requires that all forfeitures occur after a *criminal* conviction; and ends the profit incentive inherent in civil forfeiture by requiring that proceeds from forfeitures be deposited in the state's general fund.

47.    The Forfeiture Reform Law prominently declares that one of its purposes is to "ensure that *only criminal forfeiture* is allowed in this state." NMSA 1978, § 31-27-2(A)(6) (2015) (emphasis added). In order to achieve this purpose, the Forfeiture Reform Law amended New Mexico's Forfeiture Act, NMSA 1978, Sections 31-27-1 to -11 (2002, as amended through 2015), to add a new section setting the conditions under which "[a] person's property is subject to forfeiture." § 31-27-4(A) (2015). Specifically, the Forfeiture Reform Law states that a

person's property is "subject to forfeiture" only if "the person was arrested for an offense to which forfeiture applies" *and* "the person is convicted by a criminal court." § 31-27-4(A)(1)-(2).

48.    The Forfeiture Reform Law not only requires that the government obtain a criminal conviction, but also requires that the crime have been committed by *an owner* of the property. When the government initiates forfeiture proceedings, the government is required to prove "by clear and convincing evidence" that "the criminal prosecution of the owner of the seized property resulted in a conviction." NMSA 1978, § 31-27-6(G)(2) (2015). If the government fails to show that the person who committed the offense is "an owner of the property," then the property "shall be delivered to the owner" and "the owner shall not be subject to any charges by the state for storage of the property." § 31-27-6(F).

49.    The Forfeiture Reform Law seeks to eliminate the perverse financial incentive created by civil forfeiture. At the conclusion of forfeiture proceedings, the Forfeiture Reform Law provides that the forfeited property shall be disposed of at public auction and that proceeds from the auction shall be "deposited in the [state's] general fund." NMSA 1978, § 31-27-7(B) (2015). Under the Forfeiture Reform Law, law enforcement can no longer profit by seizing and forfeiting private property.

50.    The Legislature's statement of purpose confirms that the Forfeiture Reform Law was intended to apply to *all* forfeiture actions in New Mexico. The Forfeiture Reform Law lists as a purpose to "make uniform the standards and procedures for the seizure and forfeiture of property subject to forfeiture," NMSA 1978, § 31-27-2(A)(1) (2015), and also explains that the law is intended to "ensure that *only criminal forfeiture* is allowed in this state," § 31-27-2(A)(6) (emphasis added). That purpose would not be achieved if cities could circumvent the Forfeiture Reform Law by pursuing civil forfeiture under a municipal ordinance.

51.     The Forfeiture Reform Law became effective on July 1, 2015, yet the City of Albuquerque continues to operate its vehicle forfeiture program. Indeed, in the wake of the enactment of the Forfeiture Reform Law, the City approved $2.5 million in new bonds to purchase a larger parking lot to hold all the cars the City expects to seize. The cover analysis for the City Council bill approving these new bonds states that the "revenue source to pay the bonds will be revenues generated by the DWI Seizure program."

## SEIZURE OF ARLENE HARJO'S VEHICLE
## AND SUBSEQUENT FORFEITURE PROCEEDINGS

52.     Arlene Harjo lives in Albuquerque, where she works as a customer service representative for a major commercial airline. She has lived in Albuquerque since she was eight years old, and she has lived in New Mexico since she was two.

53.     Arlene gave birth to Tino Harjo, her son, in 1978 at University of New Mexico Hospital in Albuquerque. At the time, it was called the Bernalillo County Medical Center. Tino's dad left when Tino was just two years old, and for the most part Arlene raised Tino alone.

54.     Arlene began to allow Tino to borrow her car in early 2014, after Tino's own car broke down and he was not able to afford a replacement. Arlene only let Tino take the car with her permission, and she always asked where he was going. Tino used the car for short trips—for instance, to go to the store, to go to the gym, or to pick up his son. Tino would borrow Arlene's car a few times per week, and over the course of several years Tino borrowed Arlene's car well over one hundred times without any incident.

55.     While Tino did have prior drunk driving arrests, the most recent occurred seven years ago in 2009. At that time, Tino was arrested but not convicted. Tino's two DWI convictions occurred an *additional* eight years earlier, in 2001 and 1998. Because so much time

had gone by since Tino's last arrest, Arlene believed that she could trust Tino to drive her car notwithstanding his prior arrests.

56.     Arlene spoke with Tino on several occasions about the importance of not drinking and driving, in order to be sure that Tino understood he absolutely could not drink and drive. Tino assured Arlene he would not drink and drive. He also told Arlene he understood that, if he were found drinking and driving, he could face very significant criminal consequences because of his prior arrests. In Tino's words, drinking and driving was "not an option for me." Based on these conversations, Arlene believed that Tino would not drink and drive.

57.     A lot changed in Tino's life during the seven years following his last DWI arrest. In 2011, Tino graduated from ITT Technical University with an Associate's degree in Electrical Engineering. In 2012, Tino purchased a home with a girlfriend. And in early 2013, Tino became a father. Tino and his girlfriend separated not long after their son was conceived, but Tino has nonetheless been committed to seeing his child.

58.     Arlene, from observing Tino's behavior, had reason to think he would *not* drink and drive. On occasions when Tino went to a bar, Arlene knew that the bar was just down the road and that Tino went there and back on foot. On the other occasions that Arlene was aware of Tino drinking, she saw he was drinking at home. Arlene had not observed Tino drinking and driving and had no reason to think that Tino would do anything of the sort.

59.     On Saturday, April 23, 2016, around 2 o'clock in the afternoon, Tino asked if he could borrow Arlene's car to take a trip to the gym with a friend. Tino had borrowed the car for similar trips in the past, always without incident. Arlene gave Tino permission to take the car and expected that Tino would return within a few hours.

60.     Tino did not return as expected, and Arlene began to worry. She went to the house of Tino's friend, and the friend told her that Tino had not gone to the gym. Instead, the friend told her, Tino had taken the car for a long trip to Clovis, NM, to visit with a girlfriend who had moved away from Albuquerque. Arlene was up late worrying about Tino, and when she finally went to sleep he still had not returned home.

61.     Finally, the next morning, Arlene got a call from Tino saying he had been arrested for drunk driving and had spent the night in jail. Arlene was shocked. Seven years had passed since Tino's last arrest for drunk driving. Tino had assured Arlene he would not drink and drive, and Arlene did not think he would engage in that kind of behavior.

62.     The City sent Arlene a notice that it was moving to forfeit her car, a nearly brand-new 2014 Nissan Versa. To avoid the automatic forfeiture of her car, Arlene was forced to pay a $50 fee to request an administrative hearing. Arlene navigated this process *pro se* because she could not afford legal representation.

63.     When Arlene showed up at the City's administrative hearing office, she was almost immediately put in touch with a lawyer for the City. The lawyer offered to return the car to Arlene if she paid $4,000 and agreed to boot the car for 18 months. Arlene could not afford $4,000 or to be without her car for that long, so she refused the City's offer.

64.     The city attorney who made this settlement offer to Arlene has his salary paid through forfeiture revenues.

65.     Because Arlene turned down the City's settlement offer, she received a hearing before the City's Chief Hearing Officer.

66.     The City called the arresting officer as a witness to testify that Tino was driving drunk. The City did not call any other witnesses and did not seek to show that Arlene—the owner of the car—had done anything wrong.

67.     The city attorney prosecuting the case asked if the seizure occurred "in the city of Albuquerque," and the arresting officer responded, "Yes, it did. It was at milepost 170."

68.     The seizure did in fact occur at mile marker 170 on Interstate 40, but mile marker 170 is located *outside* city limits.

69.     The city attorney prosecuting the case, and the hearing officer deciding it, could have determined that the City lacked jurisdiction to forfeit Arlene's car if they had only looked at a map. The city attorney and hearing officer, however, made no effort to independently verify the officer's testimony that the seizure occurred within city limits.

70.     The city attorney who elicited the officer's testimony regarding the location of the seizure has his salary paid by forfeiture revenues.

71.     When the time came for Arlene to present her defense, she told the Chief Hearing Officer that the car was in her name and that she had no reason to think that Tino would drink and drive.

72.     The City's attorney, in an attempt to rebut Arlene's showing of innocence, asked Arlene if she was aware of Tino's past DWI arrests—the most recent of which occurred seven years ago. Arlene said that she was aware but again explained that she had no reason to think that would happen again. She pointed out that Tino had been driving for years without any incidents, and she also explained that they had spoken about the issue of drinking and driving and that Tino had assured her it would not happen again. Apart from the mere fact of Tino's years-old arrests,

the City offered no evidence whatsoever to rebut Arlene's testimony or to prove that Arlene was guilty of any wrongdoing justifying the forfeiture of her car.

73.     At this point in the hearing, the Chief Hearing Officer became Arlene's chief antagonist. In an extended colloquy with Arlene, the Chief Hearing Officer began assuming facts that were not in the record—some of which were not even true. For instance, although Tino's 2009 arrest occurred while he was driving his Durango, and Arlene had no control over Tino's use of that car, the Chief Hearing Officer told her that she had "trusted [Tino] in '09, too, and he violated your trust then."

74.     The Chief Hearing Officer told Arlene that the "point" of the forfeiture proceedings was to tell her, "don't trust [Tino] until he starts showing you he can be trusted." Arlene told the Chief Hearing Officer that she believed she could trust Tino when she lent him the car, as so many years had gone by without incident, and the Chief Hearing Officer cut her off to say: "well, your trust was misplaced."

75.     At another point during this extended dialogue, the Chief Hearing Officer faulted Arlene for not "communicating" with Tino because she did not know he was planning to go to Clovis. Arlene informed the Chief Hearing Officer that she had in fact asked Tino where he was going but Tino had lied. At that point, the Chief Hearing Officer abandoned the theme of communication and told Arlene: "well, that means you shouldn't trust him." Of course, Arlene learned that Tino had lied only *after* the DWI incident occurred, so it would be entirely unreasonable to expect Arlene to take that into account at the time when she decided to let Tino borrow her car.

76.     Given the paucity of the evidence presented by the City, the Chief Hearing Officer had no factual basis for his assumptions about what happened in 2009, the extent to

which Arlene could or could not trust Tino, or the extent to which Arlene was or was not communicating with her son prior to the events in question.

77.     Following the Chief Hearing Officer's decision, the City filed an action in state trial court on June 10, 2016, seeking a final order of forfeiture. Arlene was forced to intervene as a claimant to avoid the automatic forfeiture of her car. Lacking resources to pay an attorney, Arlene was once again forced to proceed *pro se*.

78.     The City's complaint in the state-court forfeiture action alleged that the seizure occurred "in Albuquerque." Notably, however, it also alleged that the seizure occurred at "I-40/MM170." As noted above, mile marker 170 on Interstate 40 is located outside the city limits. Once again, the city attorney filing the forfeiture action failed to independently verify that the seizure occurred within the city limits, although he could have done so by looking at a map.

79.     The city attorney who signed the City's forfeiture complaint has his salary paid by forfeiture revenues.

80.     After the City filed its forfeiture complaint, Arlene obtained *pro bono* legal representation from the Institute for Justice ("IJ"). IJ filed an amended answer and counterclaims in Arlene's forfeiture case, and IJ also filed a new legal action on Arlene's behalf challenging the legality of the City's forfeiture program.

81.     On December 12, 2016, IJ served the City by email with a Motion for Judgment on the Pleadings in Arlene's forfeiture case, arguing that the City's entire program is unlawful under New Mexico's Forfeiture Reform Law. Due to a problem with the state court's electronic filing system, the motion was not actually filed with the court until December 15. The motion asked the court to both order the return of Arlene's car and enter an injunction shutting down the City's entire civil forfeiture program.

18

82.     On December 16, 2017, an attorney for the City contacted Arlene's attorneys at IJ to say that the City had now discovered that Arlene's car was located outside city limits at the time that it was seized. The City subsequently argued that Arlene's Motion for Judgment on the Pleadings was rendered moot by this development. In other words, because the City admitted that it acted illegally by seeking to forfeit Arlene's car, the City argued that the court in Arlene's forfeiture case no longer had jurisdiction to decide whether its program violated the Forfeiture Reform Law.

83.     The city attorney who contacted Arlene's attorneys to announce this development, and who subsequently argued that it rendered Arlene's claims moot, has his salary paid by forfeiture revenues.

84.     The City's initial failure to realize that the car was seized outside city limits was a direct and proximate result of the fact that forfeiture revenues are used to fund the City's forfeiture program. City officials did not attempt to verify the location of the seizure at the outset of the case, when they had a financial interest in forfeiting the car. City officials only attempted to verify the location of the seizure after Arlene challenged the legality of the City's *entire* forfeiture program, at which point the City had a financial interest in making the case go away.

85.     On December 22, 2016, the City finally returned Arlene's car to her possession. The City held Arlene's car in its impound lot for over 240 days, or approximately eight months.

86.     The City did not perform any maintenance on Arlene's car during the nearly-eight month period that it held the car. The vehicle was damaged by sitting unused in an impound lot without regular maintenance. Among other things, the car battery died and had to be replaced.

87.     The City's actions also damaged Arlene by increasing the outstanding balance of the loan that she took out to purchase the car. Arlene's lender, Kirtland Federal Credit Union,

was forced to incur legal fees as a result of the City's actions, as Kirtland had to intervene in the forfeiture action as a claimant to preserve its interest in the vehicle. Kirtland added its legal fees to the outstanding balance of Arlene's loan, meaning Arlene will ultimately have to pay those amounts with interest.

88.     Lastly, the City's actions damaged Arlene because she was deprived of the use of her vehicle during the entire nearly-eight month period that it was in the City's possession, although she continued to make loan payments on the car during that entire time. Arlene's car depreciated in value while in the City's possession, although Arlene was not able to make any use of the car during that time.

### <u>COUNT I</u>:
### Violation Of The Forfeiture Reform Law

89.     Paragraphs 1-71 are hereby incorporated by reference.

90.     The City of Albuquerque subjected Arlene to its vehicle forfeiture ordinance notwithstanding that the City's ordinance is preempted by New Mexico's Forfeiture Reform Law. The City's actions are thus contrary to the Forfeiture Reform Law.

91.     The City's actions are contrary to the Forfeiture Reform Law in numerous respects. The City has proceeded against Arlene's property notwithstanding that Arlene has not been accused—much less convicted—of any crime. The City placed the burden on Arlene to prove her own innocence, whereas the Forfeiture Reform Law places the burden on the government to prove that the property owner is guilty of an offense. And the City also has threatened to impose significant storage fees on Arlene, whereas the Forfeiture Reform Law provides that all storage fees are to be borne by the government.

92.     The Forfeiture Reform Law binds the City of Albuquerque. Continued enforcement of Albuquerque's civil forfeiture ordinance "would circumvent and thereby frustrate

the Legislature's intent" in the Forfeiture Reform Law to end the practice of civil forfeiture in the State of New Mexico. *ACLU v. City of Albuquerque*, 1999-NMSC-044, ¶ 13, 128 N.M. 315; *see also Prot. and Advocacy Sys. v. City of Albuquerque*, 2008-NMCA-149, ¶ 48, 145 N.M. 156.

93.     As a direct and proximate result of the City's policy and practice of disregarding the Forfeiture Reform Law, Arlene has suffered injury, including but not limited to the unjust taking of her property.

94.     In addition, because the Forfeiture Reform Law applies to the City's program, Arlene is entitled to compensation for "any damages" incurred as a result of the City's unlawful attempt to forfeit her vehicle. NMSA 1978, § 31-27-10(B) (2015).

95.     Arlene incurred damages as a direct and proximate result of the City's violation of the Forfeiture Reform Law, including, but not limited to, loss of a $50 hearing fee, damage to her car while in the City's possession, an increase in the balance of her auto loan, and loss of the use of her car for approximately eight months during which the value of the car depreciated even as Arlene continued to make loan payments for a car she could not drive.

**COUNT II:**
**42 U.S.C. § 1983**
**Unlawful Profit Incentive In Violation**
**Of The Fourteenth Amendment**

96.     Paragraphs 1-77 are hereby incorporated by reference.

97.     The City of Albuquerque's policy and practice of retaining money generated by seizing and forfeiting vehicles injects a personal and institutional interest, financial and otherwise, into enforcing civil forfeiture that brings irrelevant and impermissible factors into the investigative, prosecutorial, and administrative-judicial decisionmaking process and thereby creates actual bias, the potential for bias, and/or the appearance of bias.

98.     On information and belief, this bias, risk of bias, and/or appearance of bias infects nearly every aspect of the City's forfeiture process. This financial bias affects the city attorneys who serve as prosecutors, the police officers who serve as witnesses, and even the administrative hearing officers who serve as judges. Prosecutor, witness, and judge are thus financially aligned against the property owner.

99.     The city attorneys who prosecute forfeiture cases and make the decision whether to proceed with forfeiture cases have their salaries paid through forfeiture revenues. This creates a direct financial incentive to vigorously pursue forfeitures even in cases where prosecutorial discretion would otherwise counsel in favor of leniency.

100.    The officers who investigate cases and serve as witnesses also benefit from forfeiture revenues, which are used to pay police salaries and to pay for equipment and facilities used by the police department's DWI enforcement program. When officers testify as witnesses, their testimony is therefore infected by a financial interest.

101.    The hearing officers who oversee the City's administrative hearings also benefit from forfeiture revenues. On information and belief, hearing officers use office equipment paid for through forfeiture revenues, work in office facilities paid for through forfeiture revenues, and receive administrative assistance from individuals whose salaries are paid by forfeiture revenues.

102.    As a direct and proximate result of the City's policy and practice of retaining forfeited property and its proceeds, Arlene has suffered injury to her constitutional rights, including but not limited to the unjust taking of her property.

103.    Arlene also incurred damages as a direct and proximate result of the City's policy and practice of retaining forfeited property and its proceeds, including, but not limited to, loss of a $50 hearing fee, damage to her car while in the City's possession, an increase in the balance of

her auto loan, and loss of the use of her car for approximately eight months during which the value of the car depreciated even as Arlene continued to make loan payments for a car she could not drive.

**COUNT III:**
**42 U.S.C. § 1983**
**Failure To Afford A Meaningful**
**Opportunity To Be Heard In**
**Violation Of The Fourteenth Amendment**

104.    Paragraphs 1-84 are hereby incorporated by reference.

105.    The Due Process Clause of the Fourteenth Amendment guarantees a right to a meaningful post-deprivation hearing to challenge the seizure of property. The post-deprivation procedures provided by the City of Albuquerque fall short of this requirement.

106.    The City's procedures are designed to channel property owners into agreements to give up property. Simply to request a hearing, property owners must pay a $50 fee to the City. Then, even before property owners see a judge, attorneys for the City attempt to pressure property owners to agree to pay significant sums of money to recover their property. Property owners who insist upon a hearing are then faced with storage fees that accumulate at a rate of $10 per day. Even property owners who prevail and successfully recover seized property can be forced to pay significant storage fees. The result is to reduce or even eliminate the financial incentive for many property owners to contest a forfeiture.

107.    The City's procedures deny property owners access to a neutral decisionmaker. The City's administrative law judges are not neutral arbiters, but rather are integral parts of the City's forfeiture program and thus infected by a financial incentive to bring in forfeiture revenue to keep that program running.

108.    When property owners go to court, the City also discourages property owners from standing on their rights by serving them with voluminous meritless discovery requests. The City includes a "disclaimer" of all right to the vehicle along with these discovery requests, presenting the property owner with a false choice between giving up title to the vehicle or submitting to unlawful discovery.

109.    As a direct and proximate result of the City's unconstitutional civil forfeiture procedures, Arlene has suffered injury to her constitutional rights, including but not limited to the unjust taking of her property.

110.    Arlene also incurred damages as a direct and proximate result of the City's unconstitutional civil forfeiture procedures, including, but not limited to, loss of a $50 hearing fee, damage to her car while in the City's possession, an increase in the balance of her auto loan, and loss of the use of her car for approximately eight months during which the value of the car depreciated even as Arlene continued to make loan payments for a car she could not drive.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Arlene Harjo respectfully requests that the Court:

A.    Declare Revised Ordinances of Albuquerque 1994, Chapter 7, Article 6 preempted by the Forfeiture Reform Law (2015's House Bill 560);

B.    Declare Revised Ordinances of Albuquerque 1994, Chapter 7, Article 6 unconstitutional under the Fourteenth Amendment to the United States Constitution;

C.    Permanently enjoin the City of Albuquerque from applying Revised Ordinances of Albuquerque 1994, Chapter 7, Article 6 to forfeit property;

D.    Award Plaintiff Arlene Harjo $1 in nominal damages for the violation of her constitutional rights;

E.      Award Plaintiff Arlene Harjo restitution of the $50 hearing fee charged by the City;

F.      Award Plaintiff Arlene Harjo compensation for damages suffered as a result of the City's violations of state and federal law, including, but not limited to, compensation for damage to her vehicle while in the City's possession, for the increase in the balance of her auto loan, and for the lost use of the vehicle over the approximately eight months that it was in the City's possession, including for depreciation in the car's value and for loan payments that Arlene continued to make during the time that she could not drive the vehicle;

G.      Award Plaintiff Arlene Harjo her reasonable costs and attorney fees in bringing the instant action; and

H.      Enter such other legal or equitable relief as the Court may deem proper.

Dated: January 23, 2017                    Respectfully submitted,


  /s/ Arash "Asher" Kashanian              /s/ Robert Everett Johnson

Arash "Asher" Kashanian                Robert Frommer*
525 Figueroa St.                       Robert Everett Johnson*
Albuquerque, NM 87123                  INSTITUTE FOR JUSTICE
Tel:  (631) 805-0027                   901 North Glebe Road, Suite 900
Fax:  (505) 212-0279                   Arlington, VA  22203
asherkashanian@gmail.com               Tel: (703) 682-9320
                                       Fax: (703) 682-9321
                                       Email: rjohnson@ij.org

                                       *  Admitted *Pro Hac Vice*

                        *Attorneys for Plaintiff Arlene Harjo*