# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ARLENE HARJO,

      Plaintiff,

vs.                                                              CIV 16-1113 JB/JHR

CITY OF ALBUQUERQUE,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant City's Motion for Judgment on the Pleadings and Memorandum in Support, filed June 7, 2017 (Doc. 44)("Motion"). The primary issues are: (i) whether the Court must dismiss the Motion, because the parties have developed a factual record; (ii) whether Defendant City of Albuquerque's motor vehicle seizure and forfeiture ordinance, Article 6, §§ 7-6-1 to 7 ("Forfeiture Ordinance"), which funds the City of Albuquerque's vehicle forfeiture program,[1] violates the Fourteenth Amendment to the Constitution of the United States of America by creating an unlawful profit incentive for the City of Albuquerque and its employees; (iii) whether the City of Albuquerque's Forfeiture Ordinance violates the Fourteenth Amendment, because it places the burden of proof on property owners to prove their innocence to recover their seized property; and (iv) whether the Court should dismiss Plaintiff Arlene Harjo's state law claim under 28 U.S.C. § 1367's novelty prong, which requires the Court to consider whether the New Mexico Forfeiture Act, N.M. Stat. Ann. §§ 31-27-1 to 11

---

[1] When the Court refers to the vehicle forfeiture program throughout, it means the institutions and structures required to carry out the Forfeiture Ordinance including, among other things, the city police officers who seize the cars, the city officials who prosecute the forfeitures, the judges who preside over forfeiture proceedings, and the property and buildings that hold the proceedings and secure the vehicles.

("NMFA"), preempts the Forfeiture Ordinance. The Court concludes that it will not deny the entire Motion, merely because the parties have developed a record, as rule 12(c) of the Federal Rules of Civil Procedure requires the Court to treat the Motion as it would any 12(b)(6) motion. Discovery's status does not bear on the 12(b)(6) analysis. The Court also concludes, however, that A. Harjo has stated a claim on which the Court can grant relief for both her unlawful profit incentive and procedural due process claims. The Court concludes that she has stated an unlawful profit incentive claim, because she has alleged that the vehicle forfeiture program is financially dependent on the revenues gained from seizing vehicles, and because she has alleged that City of Albuquerque employees use the seized vehicles for personal use. That city officials might depend on the revenues for their salary and that they use the seized cars for personal use "inject[s] a personal interest, financial or otherwise, into the enforcement process." Marshall v. Jerrico, Inc., 446 U.S. 238, 249-50 (1980)("Marshall"). The Court dismisses, however, her unlawful profit incentive claim to the extent that it contends that the City of Albuquerque violates due process by budgeting for and using funds it raises from forfeitures to pay for its costs. That a program pays for itself through its statute, at least in this case, does not inject a personal or institutional interest to such a degree that it implicates due process. The Court also concludes that A. Harjo has stated a procedural due process claim, because the Forfeiture Ordinance places the burden of proof on her to prove her innocence. Under Nelson v. Colorado, such a burden violates due process. See 137 S. Ct. 1249, 1256 (2017). To the extent that A. Harjo alleges, however, that there is an independent procedural due process violation because of the Forfeiture Ordinance's fees, the Court concludes that the risk of erroneous deprivation is not significant enough to raise constitutional concerns. Finally, the Court dismisses without

prejudice the remaining state law claim, because it raises a novel issue not yet considered by New Mexico appellate courts.

## FACTUAL BACKGROUND

The Court takes the facts from the First Amended Complaint, filed February 1, 2017 (Doc. 32)("Amended Complaint"). The same standards for evaluating a 12(b)(6) motion apply to a motion for a judgment on the pleadings. See Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1160 (10th Cir. 2000)("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under rule 12(b)(6)."). Thus, the Court accepts "all facts pleaded by the non-moving party as true and grants all reasonable inferences from the pleadings in that party's favor." Sanders v. Mountain America Federal Credit Union, 689 F.3d 1138, 1141 (10th Cir. 2012).

### 1.    The City of Albuquerque's Forfeiture Ordinance.

Under the City of Albuquerque's Forfeiture Ordinance, the City of Albuquerque may temporarily seize and subject cars to permanent forfeiture proceedings if, among other things: (i) the person operating the car is committing a DWI offense and that person has either "been arrested, summonsed or convicted" for a prior DWI offense, has committed a homicide, or has inflicted great bodily harm by vehicle while under the influence; or (ii) the person operating the car has a suspended or a revoked license as a result of a DWI arrest or conviction. 6 ROA §§ 7-6-2; 7-6-4.[2] Every year, the vehicle forfeiture program "seizes over 1,000 cars," and generates

---

[2]The city may also temporarily seize and subject a vehicle to forfeiture proceedings if: (i) the vehicle transports a person who committed a felony offense to or from the scene of a felony offense and the felony offense involved a firearm as defined in N.M. Stat Ann. § 30-7-16(C)(3), see 6 ROA § 7-9-3(A)(1); (ii) a felony offense occurred in or from the vehicle and involved a firearm as defined in N.M. Stat. Ann. § 30-7-16-(C)(3), see 6 ROA § 7-9-3(A)(2); (iii) a person younger than nineteen years of age unlawfully possesses a firearm, see 6 ROA § 7-

"over $1 million in revenue" through forfeited vehicle auctions and settlement agreements with owners. Amended Complaint ¶ 11, at 3. <u>See</u> <u>id.</u> ¶ 14, at 4. The auction and settlement agreements fund almost all of the vehicle forfeiture program. <u>See</u> Amended Complaint ¶ 16, at 4. For example, funds generated "pay the salaries of the very city attorneys who seek the forfeitures" and also bankroll "expenses associated with program personnel," such as "equipment, vehicles, travel, training, facilities, and other purchases." Amended Complaint ¶¶ 15, 19, at 4-5. Revenues from the vehicle forfeiture program fund other government programs and salaries only if there is a surplus after paying for the forfeiture program's expenses. <u>See</u> Amended Complaint ¶ 15, at 4.

Indeed, the City of Albuquerque plans for the vehicle forfeiture program to fund itself. <u>See</u> Amended Complaint ¶¶ 17-18, at 4-5. <u>See</u> <u>also</u> Amended Complaint ¶ 31, at 7 ("[T]he City's Chief Hearing Officer stated that Albuquerque's ordinance was written specifically to provide that money raised through the forfeiture program must be used to fund the program."). Accordingly, the vehicle forfeiture program is "financially dependent" on seizing a lot of cars. Amended Complaint ¶ 16, at 4. In 2016, for example, the budget "included as a performance measure . . . a target to conduct 1,200 vehicle seizure hearings, to release 350 vehicles under agreements with the property owners, to immobilize 600 vehicles, and to sell 625 vehicles at auction." Amended Complaint ¶ 17, at 4. From those targeted seizures, it "anticipated that $512,000" of the revenues generated would be used to pay "the salaries of two paralegals, two

---

9-3(A)(3); and (iv) "the motor vehicle's operator or any passenger has been arrested for a prostitution crime," 6 ROA §§ 7-14-2; 7-14-4. In addition, the city may temporarily seize and subject a vehicle to forfeiture proceedings if a person, within a four-year period, has at least three convictions of any of the following offenses: (i) drag racing; (ii) exhibition driving; (iii) using a vehicle as an instrument of threat or intimidation; (iv) playing excessively loud music; or (v) modifying their car's exhaust system. <u>See</u> 6 ROA §§ 7-10-3; 7-10-99(C)

attorneys, two DWI seizure assistants and one DWI seizure coordinator." Amended Complaint ¶ 18, at 5. In addition to drawing their salaries from the vehicle forfeiture program, forfeiture program officials take advantage of the seized cars for personal use. See Amended Complaint ¶ 20, at 5. "Officials drive cars around town during the day and even take them home at night." Amended Complaint ¶ 20, at 5. For example, in 2014, at least one city official was seen driving a seized Cadillac Escalade. See Amended Complaint ¶ 20, at 5. Almost all vehicle forfeiture program employees benefit personally from the vehicle forfeiture program, because "increased forfeiture revenues" leads to an increase in the amount of money available to spend on equipment, facilities, and training. Amended Complaint ¶¶ 19, 21 at 5.

Once the City of Albuquerque has seized a car, it sends a seizure notice informing the owner that he or she can contest the seizure at an administrative hearing. See Amended Complaint ¶ 22, at 5-6. See also 6 ROA § 7-6-5(D). The owner has only a few days to request a hearing once he or she receives the notice; in DWI cases, for example, the time period is ten days. See Amended Complaint ¶ 23, at 6. Before the hearing, city attorneys typically contact the owner to try to settle the case and offer immediate return of the owner's property, "but only if they sign an agreement to have their car immobilized for a period of weeks or months and to pay hundreds or even thousands of dollars to the city." Amended Complaint ¶ 24, at 6. See 6 ROA § 7-6-6.

The City of Albuquerque need only show "probable cause that a crime has occurred" to prevail at the administrative hearing. Amended Complaint ¶ 12, at 3. Moreover, the owner of the car need not have committed a crime to lose the car; "Albuquerque can take property based on a crime allegedly committed by another person entirely, so long as the vehicle was somehow involved in the offense." Amended Complaint ¶ 12, at 3-4. While the administrative hearing

process progresses, the City of Albuquerque assesses fees for towing and storing the vehicle. See Amended Complaint ¶¶ 38-39, at 8-9. Storage fees "accumulate at a rate of $10 per day," and city attorneys inform property owners of the fees "in an effort to encourage property owners to settle" rather than challenging the forfeiture. Amended Complaint ¶ 39, at 9. See Amended Complaint ¶ 40, at 9 ("[T]he City's Chief Hearing Officer stated that he uses storage fees to pressure property owners not to seek a continuance of the hearing until after their underlying trial."). These fees can accumulate into thousands of dollars. See Amended Complaint ¶¶ 38, at 9. Under the Albuquerque Municipal Code, the City of Albuquerque may still collect fees from the seized car's owners, even if the hearing officer finds in the owner's favor -- such as on an "innocent owner" defense.[3] Amended Complaint ¶¶ 38-39, at 9. See also 6 ROA § 7-6-5 (D)(8).

After a hearing officer makes a determination, the City of Albuquerque initiates civil forfeiture proceedings in the Second Judicial District Court, County of Bernalillo, State of New Mexico. See Amended Complaint ¶ 41, at 10. An owner may affirmatively intervene in the proceeding to protect his or her property at the district court level, but, even if the owner prevails there, he or she may still owe fees if the City of Albuquerque demonstrates that it had probable cause to seize the vehicle. See Amended Complaint ¶ 43, at 10 (citing 6 ROA § 7-6-7(E)). "In other words, a claimant who fights the City all the way to the end of the process and prevails in a court of law *still* may be forced to pay significant fees." Amended Complaint ¶ 43, at 10 (emphasis in original).

---

[3]An owner establishes an "innocent owner defense" through demonstrating, "by a preponderance of the evidence," that "the owner or co-owner could not have reasonably anticipated that the vehicle could be used in a manner constituting the nuisance(s) described by this article." 6 ROA § 7-6-7.

## 2.    **Plaintiff Arlene Harjo's Vehicle Seizure.**

In April, 2016, A. Harjo -- an Albuquerque resident -- lent her silver Nissan Versa to her thirty-eight year-old son, Tino Harjo.    See Amended Complaint ¶¶ 2, 53, at 1, 13.   A. Harjo frequently allowed her son to borrow her car and had done so many times over the years without incident.   See Amended Complaint ¶ 54, at 13.   A. Harjo was aware that her son had been arrested in 2009 for drunk driving, and that he had DWI convictions from 2001 and 1998, yet she had secured assurances from him that he would not drink and drive anymore.   See Amended Complaint ¶ 56, at 14.   On the day T. Harjo borrowed the Nissan Versa in April, 2016, T. Harjo told his mother that he needed the car for a midday gym workout, but, instead, he drove to see his girlfriend in Clovis, New Mexico.   See Amended Complaint ¶¶ 2, 59-60 at 1, 14-15.   As he was returning home, Albuquerque police officers stopped T. Harjo for allegedly drinking and driving and seized A. Harjo's car.  See Complaint ¶ 2, at 1.

The City of Albuquerque retained A. Harjo's vehicle and sent A. Harjo a notice of forfeiture.   See Amended Complaint ¶¶ 3, 62 at 1, 15.   A. Harjo requested an administrative hearing to recover her car -- at a $50.00 cost.   See Amended Complaint ¶¶ 3, 62 at 2, 15.   See also 6 ROA § 7-6-5(F).   A City of Albuquerque lawyer contacted A. Harjo and offered to return her car if A. Harjo paid $4,000.00 "and agreed to boot the car for 18 months."   Amended Complaint ¶ 63, at 15.   She refused, because she could not afford $4,000.00 nor could she last a year-and-a-half without a vehicle.   See Amended Complaint ¶ 63, at 15.

The City of Albuquerque subsequently held a hearing.   See Amended Complaint ¶ 65, at 15.   Harjo proceeded pro se, because she could not afford a lawyer.   See Amended Complaint ¶ 62, at 15.   At the administrative hearing, "the City presented no evidence that Arlene was in any way at fault"; instead, it offered only evidence that T. Harjo had been driving while drunk.

Amended Complaint ¶ 9, at 3.  See id. ¶ 66, at 16.  A. Harjo responded in her defense that it was her car, and "that she had no reason to think that Tino would drink and drive."  Amended Complaint ¶ 71, at 16.  The City of Albuquerque's attorney asked whether she knew about T. Harjo's DWI arrests and convictions, to which she explained that she was aware, but that it had been years since those incidents, and she had secured assurances from him that it would not happen again.  See Amended Complaint ¶ 72, at 16.  The hearing officer found for the City of Albuquerque and concluded that A. Harjo should not have trusted her son.  See Amended Complaint ¶¶ 73-75, at 17.  In so concluding, the hearing officer relied on evidence not in the record; for example, he told A. Harjo that she did not have good reason to trust her son, as she trusted him in 2009, when he had been arrested for another DWI, and he had betrayed her trust then too.  See Amended Complaint ¶¶ 9, 73, at 3, 17.  A. Harjo had not, however, been involved in the 2009 incident; it had happened in Durango, Colorado, and she had no control over T. Harjo's use of a car then.  See Amended Complaint ¶ 73, at 17.

The City of Albuquerque then filed an action in state court seeking a final order of forfeiture.  See Amended Complaint ¶ 77, at 18.  The City of Albuquerque subsequently discovered, however, that the seizure had occurred outside of the city limits, so it lacked jurisdiction to seize the car.  See Amended Complaint ¶¶ 4, 82, at 2, 19.  Accordingly, it returned to A. Harjo her car, but, during its near eight-month retention of the vehicle, the car had suffered damage resulting from disuse.  See Amended Complaint ¶¶ 85-88, at 19-20.  For example, the car battery had died, and A. Harjo had to purchase a replacement.  See Amended Complaint ¶ 86, at 19.  Moreover, because of the car's impoundment, A. Harjo suffered damages from the car's depreciation, and from legal fees that her car loan lender incurred and transferred to her loan

principal balance for defending its interest in the vehicle in the forfeiture action. <u>See</u> Amended Complaint ¶¶ 87-88, at 19-20.

<b><u>PROCEDURAL BACKGROUND</u></b>

A. Harjo filed suit in the Second Judicial District Court, County of Bernalillo, State of New Mexico, alleging that (i) the City of Albuquerque's Forfeiture Ordinance and vehicle forfeiture program violates the Fourteenth Amendment, because it creates an unlawful profit incentive for the City of Albuquerque and its employees; (ii) the City of Albuquerque's Forfeiture Ordinance also violates the Fourteenth Amendment by withholding from car owners a meaningful opportunity to be heard; and (iii) that the NMFA preempts the City of Albuquerque's Forfeiture Ordinance. <u>See</u> <u>Harjo v. City of Albuquerque</u>, D-202-CV-2016-05395 (Second Judicial Court, County of Bernalillo, State of New Mexico), filed in federal court on October 6, 2016 (Doc. 1-1)("Complaint"). The City of Albuquerque removed the case to federal court on the basis of federal-question jurisdiction. <u>See</u> Notice of Removal ¶ 4, at 1, filed October 6, 2016 (Doc. 1)("Notice of Removal").[4] A. Harjo subsequently amended her Complaint, but alleges the same claims as she did in her original Complaint. <u>See</u> Amended Complaint ¶¶ 89-110, at 20-24. In short, she alleges that: (i) the vehicle forfeiture program's self-funding violates due process, because it generates an incentive for vehicle forfeiture program officials to "vigorously pursue forfeitures" even where leniency might be appropriate, Amended Complaint ¶ 99, at 22; (ii) the City of Albuquerque's pre-hearing fees, its pre-hearing negotiation tactics, and that the vehicle forfeiture program pays the hearing officers who hear the forfeiture cases deprives owners of

---

[4]Because A. Harjo brings her claim under 42 U.S.C. § 1983, the Eleventh Amendment provides no immunity to the City of Albuquerque as a municipality. <u>See</u> <u>Monell v. Dep't of Social Servs. of City of New York</u>, 436 U.S. 658, 690 n.54 (1978)("Nor is there any basis for concluding that the Eleventh Amendment is a bar to municipal liability.").

their due process right to be meaningfully heard, <u>see</u> Amended Complaint ¶¶ 105-08, at 23-24; and (iii) the NMFA preempts the Forfeiture Ordinance, because the NMFA "places the burden on the government to prove that the property owner is guilty of an offense," Amended Complaint ¶ 91, at 20. <u>See generally</u> Amended Complaint ¶¶ 89-110, at 20-24.

1.      **The Motion.**

The City of Albuquerque argues that the NMFA does not preempt the Forfeiture Ordinance, because the NMFA "only applies if the seizure or forfeiture was undertaken pursuant to laws that specifically apply the Forfeiture Act," and the Forfeiture Ordinance does "not specifically apply the Forfeiture Act." Motion at 3 (citing N.M. Stat. Ann. § 31-27-2(B)(1); 6 ROA §§ 7-6-1 to 7). It follows, according to the City of Albuquerque, that, "on its face, the Forfeiture Act does not preempt the Nuisance Vehicle Ordinance." Motion at 4. It also argues that finding preemption would be inconsistent with the state constitutional command that "home rule municipalit[ies]" shall "exercise all legislative powers and perform all functions not expressly denied by general law or charter." Motion at 4 (citing N.M. Const., Art X § 6(D)). The City of Albuquerque adds that "the Legislature has vested municipalities with broad powers to regulate nuisances," so the NMFA does not preempt the Forfeiture Ordinance, which is premised on nuisance regulation. Motion at 4.

The City of Albuquerque also argues that, if the Court is not inclined to dismiss A. Harjo's preemption argument, the Court should decline supplemental jurisdiction, because this issue raises "a novel or complex issue of State law." Motion at 5 (citing 28 U.S.C. § 1367(C)(1)). The preemption issue is novel, according to the City of Albuquerque, because no New Mexico appellate court has decided it, and the issue is currently on appeal. <u>See</u> Motion at 6 (citing <u>Espinoza v. City of Albuquerque</u>, No. D-202-CV-2015-04156 (Second Judicial Court,

County of Bernalillo, State of New Mexico)). It adds that, "in the interest of avoiding duplicate rulings on an evolving issue of state law, the Court may decline to exercise supplemental jurisdiction over Count I." Motion at 6.

The City of Albuquerque argues that the Fourteenth Amendment unlawful profit incentive claim fails, because self-funding forfeiture programs are common in the United States and, "by their very nature, provide a means of revenue to municipalities . . . to finance their costs of operation." Motion at 7. Thus, according to the City of Albuquerque, A. Harjo's allegations that the vehicle forfeiture program generates a million dollars in revenue and funds the program's costs, such as salaries, do not "sustain a due process challenge." Motion at 7. It argues that a successful due process challenge needs allegations that "city officials . . . directly benefited financially from vehicle forfeitures," but the Amended Complaint lacks those key allegations, such as an allegation that salaries are dependent on "the number of vehicles seized or successful prosecutions." Motion at 8. The City of Albuquerque also contends that A. Harjo's arguments fails, because there are no allegations that city officials "gain use of forfeited vehicles as a result of the outcome of forfeiture proceedings," nor assertions that "individual[s] participating in the forfeiture program decide[] how to allocate the revenues collected." Motion at 9. The City of Albuquerque concludes that it prevails on this claim, because A. Harjo's allegations are nothing more than a contention that a self-funding forfeiture program is unconstitutional, and self-funding, alone, cannot amount to a constitutional violation. See Motion at 10.

The City of Albuquerque also avers that the vehicle forfeiture program, the Forfeiture Ordinance, and the associated administrative hearing do not deprive A. Harjo of a meaningful opportunity to be heard. It contends that the post-deprivation hearing is sufficiently prompt, as it

occurs within twenty days of the seizure.  See Motion at 15.  The City of Albuquerque adds that

pre-hearing fee assessments do not violate due process.  See Motion at 15-16 (citing Goichman

v. City of Aspen, 859 F.2d 1466, 1468 (10th Cir. 1988); Ross v. Duggan, 402 F.3d 575, 586-87

(6th Cir. 2004)). Finally, the City of Albuquerque argues that an innocent owner defense goes

further than the Constitution requires.  See Motion at 16 (citing Bennis v. Michigan, 516 U.S.

442, 446 (1996)("[A]n owner's interest in property may be forfeited by reason of the use to

which the property is put, even if the owner was unaware it would be put to such use.")).

      **2.**      **The Response.**

A. Harjo responds that the City of Albuquerque's arguments fail on both procedural and

substantive grounds.  See Plaintiff's Response to Defendant's Motion For Judgment on the

Pleadings at 2, filed June 26, 2017 (Doc. 48)("Response").   She argues that the City of

Albuquerque's arguments fail on procedural grounds, because discovery has already been

conducted, so a more "demanding standard applies" to a judgment on the pleadings.  Response at

7 (citing Grajales v. Puerto Rico Ports Auth., 682 F.3d 40, 46 (1st Cir. 2012)("[O]nce the parties

have invested substantial resources in discovery, a district court should hesitate to entertain a

Rule 12(c) motion that asserts a complaint's failure to satisfy the plausibility requirement.").

A. Harjo contends that the parties have "engaged in extensive discovery" including "disclosure

of an expert witness report," "multiple rounds of written discovery," and "four depositions."

Response at 2, 6.   Thus, according to A. Harjo, "the Court should enter judgment on the

pleadings only if the City can meet its high burden to show no plausible claim to relief on the

merits and can separately demonstrate unusual circumstances that would justify disregarding the

factual record developed by the party."  Response at 8.

A. Harjo also argues that the case is best decided on the facts, rather than the pleadings, because the Court will then be able to consider "details of the [forfeiture] program's finances" such as "how much money is retained by the program, how that compares to the program's entire budget, and what proportion of program employees' salaries are paid using forfeiture proceeds." Response at 8 (citing Marshall v. Jerrico, Inc., 446 U.S. at 250-52). She contends that these cases are better decided on the facts, because civil forfeiture programs are grounded in fact issues that typically "turn on the details of the particular statutory and financial schemes at issue." Response at 9 (citing Sourovelis v. City of Philadelphia, 103 F. Supp. 3d 694, 709 n.10 (E.D. Pa. 2015)(Robreno, J.)). She adds that a judgment on the pleadings is also inappropriate, because "only a relatively small amount of discovery remains outstanding." Response at 10. She contends, however, that if the Court is inclined to dismiss on the pleadings, it should dismiss without prejudice so that she can "file an amended complaint incorporating new facts uncovered during discovery." Response at 10.

A. Harjo argues that the vehicle forfeiture program's "policy and practice of retaining money generated by seizing and forfeiting vehicles" unconstitutionally "injects a personal and institutional interest, financial and otherwise, into enforcing civil forfeiture." Response at 11. She contends that her allegations that the vehicle forfeiture program "is financially dependent" on forfeiture revenues and that key program personnel salaries come from the forfeiture revenues create an unconstitutional profit incentive for the program. Response at 11-12. She adds that, contrary to the City of Albuquerque's contention that she must allege a "direct, pecuniary benefit" to prevail, "financial pressure to fund the government can also violate due process." Response at 12. She also argues that the proportion of the program's budget that the forfeitures fund is relevant to the due process inquiry and that a due process violation exists where

enforcement revenues make up half of the budget.  <u>See</u> Response at 13-14 (citing <u>Ward v.</u> <u>Village of Monroeville</u>, 409 U.S. 57, 58 (1972)).  It follows, according to A. Harjo, that, because the City of Albuquerque's forfeiture program funds almost "100% of the forfeiture program's budget," the City of Albuquerque's vehicle forfeiture program violates due process.  Response at 14.  She also contends that the vehicle forfeiture program violates due process, because the City of Albuquerque "plans for vehicle forfeitures in its annual budget, sets annual targets . . . for revenues from auctioning forfeited vehicles, and specifically plans for salaries [of program personnel] to be paid out of the proceeds of vehicle forfeitures."  Response at 14.

A. Harjo also argues that she has alleged a direct benefit to officials as the City of Albuquerque contends is necessary for a due process claim.  <u>See</u> Response at 15.  According to A. Harjo, her allegation that "forfeiture revenues go to pay the salaries of the attorneys who file forfeiture cases" satisfies the direct benefit requirement.  Response at 15.  She concedes that she "has not alleged that the salaries of these officials vary up or down depending on the exact amount of revenue generated," but she argues that she has established that "the City's ability to pay those salaries *at all* depends on the maintenance of the revenue stream."  Response at 15 (emphasis in original).  She concludes accordingly that the Court should deny the City of Albuquerque's Motion as to the unlawful profit incentive claim.  <u>See</u> Response at 16.

A. Harjo argues that the Forfeiture Ordinance violates due process, "because the City places the burden on property owners to prove their own innocence."  Response at 16.  She also contends that the Forfeiture Ordinance is unconstitutional, because the "City uses mounting storage fees to pressure property owners into settlements," and, because the hearing officers "face[] institutional pressure to generate forfeiture revenues," as those revenues generate their salary.  Response at 16.  In so arguing, A. Harjo rejects the City of Albuquerque's reliance on

Bennis v. Michigan, because, according to A. Harjo, even Bennis v. Michigan respects "the principle of innocent until proving guilty," which is missing from this case. Response at 17. She adds that Nelson v. Colorado, 137 S. Ct. 1249 (2017) demonstrates that the City of Albuquerque's Forfeiture Ordinance violates her due process rights. See Response at 17. According to A. Harjo, Nelson v. Colorado stands for the principle that "forcing people to prove their innocence g[i]ve[s] rise to an unacceptable risk of erroneous deprivation," and, thus, A. Harjo "surely has stated a claim that people who have never been convicted of anything cannot be put to such a burden." Response at 17 (alterations added). She also argues that the due process violation's egregiousness is magnified here, because the storage fees and the cost of retaining a lawyer were prohibitive to A. Harjo. See Response at 19 (citing Nelson v. Colorado, 137 S. Ct. at 1257).

A. Harjo contends that the City of Albuquerque's Forfeiture Ordinance violates the NMFA. See Response at 21. A. Harjo agrees with the City of Albuquerque, however, that, "[t]here is no reason" for the Court "to weigh in on Plaintiff's state-law claim, as it involves an unsettled issue of state law that is currently the subject of ongoing litigation in the state courts." Response at 21. Nevertheless, she argues that, if the Court is inclined to weigh in on the state law claims, the City of Albuquerque's Forfeiture Ordinance violates the NMFA, because the NMFA's stated purpose is to "ensure that *only criminal forfeiture* is allowed in this state," and it amends state law so that "forfeiture shall occur only following a criminal conviction." Response at 22 n.11 (citing N.M. Stat. Ann. §§ 37-27-2(A)(6); 31-27-4(A))(emphasis in Response). It follows, according to A. Harjo, that allowing the City of Albuquerque to conduct civil forfeiture contradicts the New Mexico Legislature's intent. See Response at 22 n.11. She concludes that there is no reason for the Court to delay consideration of her federal claims, because, even if the

state court finds in her favor, it will not resolve A. Harjo's federal claims "for retrospective relief based on the past violation of her constitutional rights" nor for the nominal damages she alleges. Response at 22-23 n.12. She concludes that the Court should decide the federal issues and then partially remand the state law issues if they remain unresolved. <u>See</u> Response at 23.

**3.  <u>The Reply</u>.**

The City of Albuquerque replies that its Motion is not subject to a higher pleading standard. <u>See</u> Defendant's Reply Supporting Motion for Judgment on the Pleadings at 1, filed July 7, 2017 (Doc. 51)("Reply"). According to the City of Albuquerque, the case on which A. Harjo relies to argue that a higher standard is applicable in fact sets forth nothing more than the usual 12(b)(6) standard. <u>See</u> Reply at 1 (citing <u>Grajales v. Puerto Rico Ports Authority</u>, 682 F.3d at 44 ("When . . . a motion for judgment on the pleadings . . . is employed as a vehicle to test the plausibility of a complaint, it must be evaluated as if it were a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6)")). It adds that the factual record is, accordingly, irrelevant. <u>See</u> Reply at 2.

The City of Albuquerque repeats its argument that, to state a due process claim, it is insufficient to allege "a municipality uses forfeiture proceeds as a means to finance the program's costs or even to obtain additional resources." Reply at 2. It adds that "institutional pressure to generate revenue" alone is insufficient to state a constitutional violation without an allegation of "direct, pecuniary benefit." Reply at 3. The City of Albuquerque argues that direct pecuniary interests exist when, for example, an official is compensated above his or her regular salary based on the conviction or forfeiture numbers, but here, according to the City of Albuquerque, officials' "salaries do not vary based on revenue generated." Reply at 3. It also avers that, while a direct pecuniary benefit is not always necessary, there must be a possibility

that officials will "be tempted to forego applying the rules of law in order to obtain a conviction." Reply at 3-4. It follows, according to the City of Albuquerque, that there is no due process violation here, because A. Harjo does not allege that the hearing officers "have any responsibility for the City's budget," or control how much money is allocated to the vehicle forfeiture program or to their salaries. Reply at 4. The City of Albuquerque argues that A. Harjo's allegations "must present something other than institutional gain," and she does not make such an allegation, so her due process claim fails. Reply at 4. It also argues that "[t]here is nothing unconstitutional about budget forecasts that include revenue estimate[s] . . . from forfeitures." Reply at 8. The City of Albuquerque avers that program expenses, which the forfeitures fund, are indirect benefits, and that there is no allegation that officials have an incentive to prosecute more to receive more indirect benefits. See Reply at 8-9. The City of Albuquerque also argues that the officials participating in the vehicle forfeiture program have little to no control over how many vehicles are seized and, thus, have almost no ability to "directly influence forfeiture revenue." Reply at 9. According to the City of Albuquerque, even the hearing officer has little control over the forfeiture, because, ultimately, "it is a state court judge who determines whether a vehicle is forfeited." Reply at 9.

The City of Albuquerque also avers that A. Harjo's burden to prove her innocence does not violate due process. See Reply at 10. It contends that, because the City of Albuquerque has the initial burden of proof to show probable cause, there is no due process violation for requiring the owner to prove his or her innocence. See Reply at 10. It adds that the innocent owner is an affirmative defense, and "a defendant always has the burden to prove any affirmative defense." Reply at 10. It adds that at least one analogous statute, the Civil Asset Forfeiture Reform Act, 18 U.S.C. §§ 983, 985; 28 U.S.C. §§ 2466-67 ("CAFRA"), which requires an owner to prove his or

her innocence, is constitutional.  See Reply at 10 (citing United States v. 2121 Celeste Road SW, 189 F. Supp. 3d 1208, 1254-55 (D.N.M. 2016)(Browning, J.)).

The City of Albuquerque argues that, because A. Harjo does not contest its argument on the state-law claim, dismissal of Count I is warranted.  See Reply at 5-6.  It also argues that A. Harjo does not dispute that the Court should dismiss the claim for lack of subject-matter jurisdiction, so Count I should also be dismissed on that ground.  See Reply at 6.

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The Complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is

insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555.

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). See Gallegos v. Bernalillo Cty. Board of Cty. Comm'rs, __ F. Supp. 3d __, 2017 WL 4402422, at *9 (D.N.M. 2017)(Browning, J.).

"When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" <u>Brokers' Choice of America, Inc. v. NBC Universal, Inc.</u>, 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting <u>Alexander v. Oklahoma</u>, 382 F.3d 1206, 1214 (10th Cir. 2004)). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, <u>see</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," <u>Jacobsen v. Deseret Book Co.</u>, 287 F.3d at 941; and (iii) "matters of which a court may take judicial notice," <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. at 322. <u>See</u> <u>also</u> <u>Brokers' Choice of America, Inc. v. NBC Universal, Inc.</u>, 861 F.3d 1081, 1103 (10th Cir. 2017)(holding that the district court did not err by reviewing a seminar recording and a TV episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." <u>Van Woudenberg v. Gibson</u>, 211 F.3d 560, 568 (10th Cir. 2000), <u>abrogated on other grounds by</u> <u>McGregor v. Gibson</u>, 248 F.3d 946, 955 (10th Cir. 2001).

In <u>Gee v. Pacheco</u>, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other

cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished). In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the Defendant's attach in their briefing. See Mocek v. City of Albuquerque, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the Defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v. Crabtree, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court, in Crabtree, determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a

complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents. <u>See</u> 2012 WL 3656500, at *22-23; <u>Mocek v. City of Albuquerque</u>, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer to in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. <u>See Genesee Cty. Emps.' Retirement Sys. v. Thornburg Mortg. Secs. Trust 2006-3</u>, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.); <u>Mata v. Anderson</u>, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute"); <u>S.E.C. v. Goldstone</u>, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge).

## <u>LAW REGARDING JUDGMENT ON THE PLEADINGS</u>

"After the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A "[j]udgment on the pleadings should not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'" <u>Park Univ.</u>

Enters., Inc. v. Am. Cas. Co. of Reading, Pa., 442 F.3d 1239, 1244 (10th Cir. 2006)(quoting United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000)). The same standards for evaluating a 12(b)(6) motion apply to a motion for a judgment on the pleadings. See Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d at 1160 ("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under rule 12(b)(6)."). Thus, a court accepts "all facts pleaded by the non-moving party as true and grants all reasonable inferences from the pleadings in that party's favor." Sanders v. Mountain America Federal Credit Union, 689 F.3d at 1141. All of the nonmoving parties' allegations are deemed true, and all of the movants' contrary assertions are deemed false. See Nat'l Metro. Bank v. United States, 323 U.S. 454, 456-57 (1945); Ramirez v. Dep't of Corr., 222 F.3d 1238, 1240 (10th Cir. 2000); Freeman v. Dep't of Corr., 949 F.2d 360, 361 (10th Cir. 1991).

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. A plaintiff must "nudge his claims across the line from conceivable to plausible" to survive a

motion to dismiss.  Bell Atl. Corp. v. Twombly, 550 U.S. at 570.  "Thus, the mere metaphysical

possibility that some plaintiff could prove some set of facts in support of the pleaded claims is

insufficient; the complaint must give the court reason to believe that this plaintiff has a

reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC

v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in
> a complaint: if they are so general that they encompass a wide swath of conduct,
> much of it innocent, then the plaintiffs "have not nudged their claims across the
> line from conceivable to plausible." The allegations must be enough that, if
> assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for
> relief.

> This requirement of plausibility serves not only to weed out claims that do
> not (in the absence of additional allegations) have a reasonable prospect of
> success, but also to inform the defendants of the actual grounds of the claim
> against them.  "Without some factual allegation in the complaint, it is hard to see
> how a claimant could satisfy the requirement of providing not only 'fair notice' of
> the nature of the claim, but also 'grounds' on which the claim rests."  [*Bell Atl.
> Corp. v. Twombly*, 550 U.S. at 555, 127 S. Ct.] at 1965 n.3.  *See Airborne Beepers
> & Video, Inc. v. AT & T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007)("[A]t
> some point the factual detail in a complaint may be so sketchy that the complaint
> does not provide the type of notice of the claim to which the defendant is entitled
> under Rule 8.").  The Twombly Court was particularly critical of complaints that
> "mentioned no specific time, place, or person involved in the alleged
> conspiracies."  127 S. Ct. at 1971 n.10.  Given such a complaint, "a defendant
> seeking to respond to plaintiffs' conclusory allegations . . . would have little idea
> where to begin."  *Id.*

Robbins v. Oklahoma, 519 F.3d 1242, 1247-48 (10th Cir. 2008).

A court must convert a motion to dismiss into a motion for summary judgment if

"matters outside the pleading are presented to and not excluded by the court," and "all

parties . . . [are] given reasonable opportunity to present all material made pertinent to such a

motion by Rule 56."  Fed. R. Civ. P. 12(d).  Facts subject to judicial notice may be considered

without converting a motion to dismiss into a motion for summary judgment.  See Grynberg v.

Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)(citing 27A Federal

Procedure, Lawyers' Ed. § 62:520 (2003)). Furthermore, when considering a motion to dismiss, "the court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001). A court may consider documents to which the complaint refers if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity. See Jacobsen v. Deseret Book Co., 287 F.3d 936, 941-42 (10th Cir. 2002). If, however, a complaint does not reference or attach a document, but the complaint refers to the document, and the document is central to the plaintiff's claim, the defendant may submit an "indisputably authentic copy to the court to be considered on a motion to dismiss." GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997). See 5A Charles Alan Wright & Arthur Miller, Federal Practice & Procedure § 1327, at 438-39 (3d ed. 2004)("[W]hen the plaintiff fails to introduce a pertinent document as part of her pleading . . . the defendant may introduce the document as an exhibit to a motion attacking the sufficiency of the pleading.").

## LAW REGARDING JUDICIAL NOTICE

Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (f). "Adjudicative facts are simply the facts of the particular case." United States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Advisory Committee Notes to rule 201). A court has discretion to take judicial notice of such facts, regardless whether requested. See Fed. R. Evid. 201(c). On the other hand, if a party

requests that the court take judicial notice of certain facts, and supplies the necessary information to the court, judicial notice is mandatory. <u>See</u> Fed. R. Evid. 201(d). Also, if the parties timely request an opportunity to be heard, the Court must grant such an opportunity "as to the propriety of taking judicial notice and the tenor of the matter noticed." Fed. R. Evid. 201(e). That judicial notice may be taken during any stage of the judicial proceeding includes the motion to dismiss stage. <u>See</u> 21 B C. Wright & K. Graham, Jr., Fed. Prac. & Proc. Evid. § 5110, at 294 & n.17 (2d ed. 2005). Moreover, while ordinarily, a motion to dismiss must be converted to a motion for summary judgment when the court considers matters outside the Complaint, <u>see</u> Fed. R. Civ. P. 12(d), matters that are judicially noticeable do not have that effect, <u>see</u> <u>Duprey v. Twelfth Judicial Dist. Court</u>, 760 F. Supp. 2d 1180, 1193 (D.N.M. 2009)(Browning, J.)(citing <u>Grynberg v. Koch Gateway Pipeline Co.</u>, 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)). Also, when considering a motion to dismiss, "the court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." <u>Van Woudenberg v. Gibson</u>, 211 F.3d 560, 568 (10th Cir. 2000) <u>abrogated on other grounds by</u> <u>McGregor v. Gibson</u>, 248 F.3d 946, 955 (10th Cir. 2001). The documents judicially noticed, however, should not be considered for the truth of the matters asserted therein. <u>See</u> <u>Tal v. Hogan</u>, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006). The Court has previously judicially noticed news publications and public filings with the Securities and Exchange Commission. <u>See</u> <u>S.E.C. v. Goldstone</u>, 952 F. Supp. 2d at 1219-20; <u>In re Thornburg Mortg., Inc. Securities Litig.</u>, 2009 WL 5851089, at *3-4. <u>See</u> <u>also</u> <u>Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs</u>, __ F. Supp. 3d __, 2017 WL 4402422, at *18-19 (D.N.M. 2017)(Browning, J.)(ruling that the Court may take judicial notice of state court orders); <u>A.M ex rel. Youngers v. New Mexico Dep't of Health</u>, 117 F. Supp. 3d 1220, 1232 n.6 (D.N.M. 2015)(Browning, J.).

<u>**LAW REGARDING SUPPLEMENTAL JURISDICTION**</u>

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. 546, 552 (2005). Federal courts "possess only that power authorized by Constitution and statute." <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994). Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction. <u>See</u> 28 U.S.C. §§ 1331-32. Section 1367 additionally grants the federal courts power to hear claims over which the court lacks original jurisdiction, if those claims are part of the same constitutional case as claims over which the court has original jurisdiction. <u>See</u> 28 U.S.C. § 1367(a).

1.     <u>**Congressional Authority to Exercise Supplemental Jurisdiction**</u>.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. at 552. The Supreme Court of the United States has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines, pendent jurisdiction and ancillary jurisdiction; section 1367's passage codified those jurisdictional forms, and also allowed courts to hear cases under pendent-party jurisdiction, which the Supreme Court had previously disallowed in <u>Finley v. United States</u>, 490 U.S. 545 (1989). Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact." <u>United Mine Workers v.</u>

Gibbs, 383 U.S. 715, 725 (1966).  Supplemental jurisdiction gives federal courts the flexibility to hear a cause of action after the introduction of third parties, whose insertion into the litigation does not have the support of any independent grounds for federal jurisdiction, when those parties share a common interest in the outcome of the litigation and are logical participants in it.  See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 375 n.18 (1978).

In 1988, the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  See James v. Chavez, 2011 WL 6013547, at *5 (D.N.M. Nov. 21, 2011)(Browning, J.).  In response to the Committee's findings regarding pendent, ancillary, and pendent-party jurisdiction, Congress codified the doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence."  Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

**2.    The District Courts' Discretion to Exercise Supplemental Jurisdiction.**

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing

City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction.  383 U.S. at 726.

Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)     the district court has dismissed all claims over which it has original jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity. . . ."  Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164. Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changes the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar–Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Exec. Software N. Am. v. U.S. Dist. Ct., 24 F.3d

1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of *Gibbs* in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087 (9th Cir. 2008); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c). . . ."); Bonadeo v. Lujan, 2009 WL 1324119, at *9 (D.N.M. Apr. 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists."). At least one other district court in the Tenth Circuit besides this Court has reached the same conclusion. See Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should presume to decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)). That conclusion is consistent with the Supreme Court's statement that

> [n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726 (footnote omitted).

The Tenth Circuit has recognized that a district court does not abuse its discretion when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it has dismissed all claims over which it has original jurisdiction." Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).[5]  The Court has previously stated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies.  See Armijo v. New Mexico, 2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it.").  The Court has consistently declined to exercise supplemental jurisdiction when it dismisses all of a case's federal claims with prejudice. See, e.g., McGarry v. Bd. of Cty. Comm'rs for Cty. of Lincoln, __ F. Supp. 3d __, 2018 WL 1128968, at *27 (D.N.M. 2018)(Browning, J.)("The only remaining claim before the Court is McGarry's NMTCA claim. . . .  The Court declines to exercise supplemental jurisdiction over that claim."); Parrish v. Roosevelt Cty. Board of Cty. Comm'rs, 2017 WL 6759103, at *20 (D.N.M. December 31, 2017)(Browning, J.)("The Court declines to exercise supplemental jurisdiction over Parrish's remaining state-law breach-of-contract claim."); Martinez v. Guadalupe Cty, 200 F. Supp. 3d 1216, 1265 (D.N.M. 2016)(Browning, J).  The Court has also, however, declined to dismiss state-law claims when it dismisses a party's federal claims without

---

[5]Muller v. Culbertson is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . .  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Muller v. Culbertson, Mountain States Media, LLC v. Adams Cty., Nard v. City of Okla. City, Douglas v. Norton, and Wallin v. Dycus have persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

prejudice.  See Young v. City of Albuquerque, 77 F. Supp. 3d 1154, 1189 (D.N.M. 2014)(Browning, J.)("[T]he Court would normally remand those [state law] claims to state court. To give the Plaintiffs an opportunity to amend the Complaint to add federal claims against Dear and any other individuals, however, the Court will not remand the state-law claims to state court at this point.").

### 3.    Whether an Issue is Novel.

Under 28 U.S.C. § 1367(c)(1), a district court "may decline to exercise supplemental jurisdiction over a claim" if "the claim raises a novel or complex issue of state law."  28 U.S.C. § 1367(c)(1).  What makes a state law issue novel is unclear from binding Tenth Circuit caselaw.  See, e.g., Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1236-37 (10th Cir. 1997)(not distinguishing between "novel" and "complex" and dismissing a state law claim on § 1367(c)(1) grounds and because no federal law claims remained); Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995)(dismissing a state law claim as novel and complex, merely because a plaintiff alleged a violation of the Kansas Risk Management Act, Kan. Stat. Ann. §§ 65-4921 to 4940).[6]  A discernible test for novelty is also not apparent from studying Professors Charles Alan Wright and Arthur Miller's Federal Practice and Procedure. See generally 13D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure

---

[6]The Tenth Circuit concluded that the issue was novel and complex without elaborating a test, writing:

> However, we do not have to decide whether the court insufficiently took the extent of the pretrial proceedings into consideration because there is an independent reason for dismissing Ms. Anglemyer's pendent state claims.  In her complaint (Count III), she alleged the hospital violated the Kansas Risk Management Act.  We believe the Kansas courts are the appropriate forum to decide this novel and complex issue of state law.

Anglemyer v. Hamilton Cty. Hosp., 58 F.3d 533, 541 (10th Cir. 1995).

§ 3567.3, at 417-421 nn. 60-61 (3d. ed. 2008)(collecting cases).  The only general rule that Professors Wright and Miller recognize for the novelty test is that, "[a]s a general matter, common law contract and tort claims do not present novel or complex questions of state law." 13D Wright & Miller, supra § 3567.3, at 417 n.60.  See, e.g., Blakely v. United States, 276 F.3d 853 (6th Cir. 2002)("This case does not present complex or novel issues of state law.  It involves a fraud claim.").  But cf. Wallin v. Dycus, 224 F. App'x 734, 740 (10th Cir. 2007)(unpublished), as amended nunc pro tunc (March 5, 2008)(affirming a district court for dismissing a state law claim as novel, because it required the court to determine whether Colorado law recognized that a jailer owed a duty of care to protect a prisoner's health in tort).  Otherwise, they acknowledge a hodgepodge of different factors that federal courts have found operative when considering whether a claim is novel.  See, 13D Wright & Miller, supra § 3567.3, at 417 n.60 (citing Dream Palace v. Cty. of Maricopa, 384 F.3d 990, 1022 (9th Cir. 2004)(determining a state issue was novel, because it concerned "issues of the balance of power between state and local authorities in Arizona"); Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 927 (9th Cir. 2001)(concluding novelty existed, because it raised "an issue of first impression as to how [a state law] provision is to be applied"); Doe v. Sundquist, 106 F.3d 702, 708 (6th Cir. 1997)(concluding an issue was novel, because it involved interpretation of the state constitution and a new state statute); Wilson v. PFS, LLC, 493 F. Supp. 2d 1122, 1126 (S.D. Cal. 2007)(Hayes, J.)(determining an issue novel or complex, because there is conflicting state law interpretations of the law); Kadetsky v. Egg Harbor Tp. Bd. of Educ., 164 F. Supp. 2d 425, 437 (D.N.J. 2001)(Orlofsky, J.)(concluding an issue novel, because it turned on "application of a recent change in New Jersey state law"); Rockey v. Courtesy Motors, Inc., 199 F.R.D. 578, 596 (W.D. Mich. 2001)(Scoville, M.J.)(concluding an issue is novel, because "there is not a single

published state-court opinion on point")).  <u>See</u> <u>also</u> 13D Wright & Miller, <u>supra</u> § 3567.3, at 416

("Occasionally, a court appears to decline supplemental jurisdiction simply because the

supplemental claim involves questions of state law.").  Some courts, however, have bucked one

or more of these factors.  <u>See</u> <u>e.g.</u>, <u>Schwarm v. Craighead</u>, 233 F.R.D. 655, 659 (E.D. Cal.

2006)(Shubb, J.)(exercising supplemental jurisdiction, even though California courts had not yet

interpreted the statute at issue, because "the court here faces a single unexceptional question of

statutory interpretation"); <u>Hunter by Conyer v. Estate of Baecher</u>, 905 F. Supp. 341, 343 (E.D.

Va. 1995)(Clarke, J.)("It is true that state caselaw concerning the [Virginia Residential Landlord

and Tenant Act, Va. Code Ann. §§ 55-248.2 to 248.50] generally and in the lead paint context

specifically is sparse.  Nevertheless, the lack of caselaw does not make the VRLTA unintelligible

to this Court.").  Perhaps recognizing that what is novel is unfixed, Wright and Miller note that

"each case is decided on its own facts."  13D Wright & Miller, <u>supra</u> § 3567.3, at 417-18.  <u>See</u>

<u>id.</u> at 400 n.27 (citing Karen Nelson Moore, <u>The Supplemental Jurisdiction Statute: An Important</u>

<u>but Controversial Supplement to Federal Jurisdiction</u>, 41 Emory L.J. 31, 62-63 (1992)("In

particular, it may be relatively easy for a district judge to conclude that a novel or complex issue

of State law is involved and to exercise essentially unreviewable discretion to dismiss such a

claim.")).

　　　　This uncertainty does no good for litigants.  <u>Cf.</u> <u>Teague v. Lane</u>, 489 U.S. 288, 332

(1989)(Brennan, J., dissenting)(noting that "predictability in the law" permits "litigants and

potential litigants" to act with knowledge, and with assurance that "they will not be treated

unfairly as a result of frequent or unanticipated changes in the law").  A judicial decision

whether a claim is novel should not be like reading a fresh novel every time. The Court, accordingly, deems it prudent to outline a test for 28 U.S.C. § 1367(c)(1)'s novelty requirement.[7]

28 U.S.C. § 1367(c)(1) is rooted in the seminal <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715 (1966)("<u>Gibbs</u>"). In that case, the Supreme Court created a two-part test for what was then known as pendent jurisdiction. <u>See Gibbs</u>, 383 U.S. at 725. The test's first consideration turned on constitutional concerns -- the federal court's subject matter jurisdiction over the state claim. <u>See Gibbs</u>, 383 U.S. at 725. To satisfy that constitutional requirement, the Supreme Court determined that "the state and federal claims must derive from a common nucleus of operative fact." <u>See Gibbs</u>, 383 U.S. at 725. The test's second-part turned on more pedestrian but nonetheless crucial practical concerns. <u>See</u> 383 U.S. at 726. The "justification" in exercising jurisdiction "lies in considerations of judicial economy, convenience and fairness to litigants." 383 U.S. at 726. Thus, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties by procuring for them a surer-footed

---

[7]28 U.S.C. § 1367(c)(1)'s novelty and complexity requirements are separate tests -- that is, "novel or complex" is disjunctive, so it should not be read as "novel and complex." 28 U.S.C. § 1367(c)(1). <u>See</u> <u>Ameritox, Ltd. v. Millennium Laboratories, Inc.</u>, 803 F.3d 518, 536 n.27 (11th Cir. 2015). The United States Court of Appeals for the Eleventh Circuit has written:

> Additionally, § 1367(c)(1) grants district courts the discretion to decline to exercise supplemental jurisdiction if the claim raises a novel *or* complex issue of State law. Thus, even if the claims were not complex -- and they are complex -- the claims' novelty would be sufficient to vest the District Court with discretion.

<u>Ameritox, Ltd. v. Millennium Laboratories, Inc.</u>, 803 F.3d at 536 n.27. That conclusion is also supported by the plain meaning of both words. Novel, as explored below, generally means new or perhaps notably new. <u>See infra</u>, 36-37. Complex on the other hand, typically means complicated, involved, intricate, or not easily analyzed. <u>See</u> <u>Oxford English Dictionary</u> (online ed. 2018)(defining complex as "consisting of parts or elements not simply co-ordinated, but some of them involved in various degrees of subordination; complicated, involved, intricate; not easily analysed or disentangled"). Something can easily be new without being complicated. With these divergent meanings, it is unlikely that Congress meant for those words to be read together to form one test.

reading of applicable law." Gibbs, 383 U.S. at 726 (citing Strachman v. Palmer, 177 F.2d 427, 437 (1st Cir. 1949)(Macgruder, C.J., concurring)("Federal courts should not be overeager to hold on to the determination of issues that might be more appropriately left to settlement in state court litigation.")). The Supreme Court's thought is that state courts either are more adept at adjudicating state law matters or as a matter of respecting our federal system, state sovereigns -- where possible, convenient, and just -- should decide state law matters. See Gibbs, 383 U.S. at 726.

28 U.S.C. § 1367 supersedes Gibbs, at least in part. See Wright & Miller supra, § 3567.3, at 400 ("These statutory factors do not completely mesh with the examples provided in Gibbs."). See also Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546 (2005). The underlying practical considerations animating Gibbs, however, appear to remain intact. See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164 ("Seeking to vindicate values of economy, convenience, fairness, and comity underlying the judicially-created doctrine of pendent jurisdiction, Congress granted statutory authority to district courts to hear claims that form part of the same case or controversy."). The Court proceeds, accordingly, with those considerations of economy, convenience, fairness, and comity in mind.

Black's Law dictionary does not define novel. See Black's Law Dictionary 1169 (9th ed. 2009). It is more a colloquial word than a legal word. Novel means new. See Pacific Operators Offshore, LLP v. Valladolid, 565 U.S. 207, 223 (2012)(Scalia, J., dissenting)("Substantial nexus is novel legalese with no established meaning in the present context."); School Dist. of Abington Tp. v. Schempp, 374 U.S. 203, 304 (1963)("The principles which we reaffirm and apply today can hardly be thought novel or radical. They are, in truth, as old as the Republic itself."). In this context, however, the Court concludes that novel cannot mean only new, because such a

meaning would make supplemental jurisdiction completely discretionary and § 1367(c) plain language does allow that expansive meaning. See 28 U.S.C. § 1367(c). Every case is new in some way. There are, at least, always new parties and new facts, and thus the legal analysis is also new for every case, as how the law applies to those facts must be new. See McGarry v. Board of Cty Comm'rs for Cty. of Lincoln, __ F. Supp. 3d __, 2018 WL 1128968, at *12 n.13 (D.N.M. 2018)(Browning, J.)("Cases differ. Many cases, such as this one, have so many facts that are unlikely to ever occur again in a significantly similar way."). Thus, if newness, alone, is the test, the Court would always or almost always have discretion to decline supplemental jurisdiction, which cannot be the test. See supra, Moore, The Supplemental Jurisdiction Statute: An Important but Controversial Supplement to Federal Jurisdiction, 41 Emory L.J. at 62-63.

Novel does not just mean new, however. See Oxford English Dictionary (online ed. 2018)(defining novel as "interestingly new or unusual") available at http://www.oed.com/ view/Entry/128758?rskey=g8PS24&result=2&isAdvanced=false#eid; Merriam-Webster, (online ed. 2018)(defining novel as "original or striking especially in conception or style") available at https://www.merriam-webster.com/dictionary/novel?src=search-dict-hed. Novel, accordingly, is not necessarily just new, but new and noteworthy. Some of the cases construing novel have attuned to that noteworthy component. See Dream Palace v. Cty. of Maricopa, 384 F.3d at 1022 (determining a state issue was novel, because it concerned "issues of the balance of power between state and local authorities in Arizona"); Doe v. Sundquist, 106 F.3d at 708 (concluding an issue was novel, because it involved interpretation of the state constitution). As the state's controlling document, interpreting a state constitution, especially on a matter that a state court had not yet considered, would matter a great deal to that sovereign. Similarly, adjudicating a new issue which upsets the balance of power between the state and local authorities would be of

great importance to that state.  In contrast, a regular tort claim, albeit with new issues, might be of less concern to the state, especially if the litigants are private actors.  To be sure, a district court's ruling is binding only on the parties and can be only persuasive authority in subsequent cases.  That does not mean, however, that state courts would not want to decide the issue first.  A first reasoned decision in an area of law can act as a powerful anchor to a position or a legal rule, requiring litigants opposed to that position to overcome it -- both in court and in settlement negotiations.

With those thoughts in mind, the Court concludes that a state law issue is novel when it is: (i) new; and (ii) concerns a notable state matter.  This test is subject to a bit of a sliding scale. If a case merely has new facts, but the Court is equipped with settled caselaw, the Court is unlikely to determine that there is a novel issue even if it involves a high-stakes state matter.  For example, if the Court is confronted with a state constitutional issue that involves fairly original facts, the Court will not deem the issue novel if the Supreme Court of New Mexico has interpreted the state constitutional provision at issue.  The Court is also unlikely to conclude an issue is novel, merely because there are no state court cases interpreting a relevant statute.  While such a scenario might be sufficiently new under the first prong of the Court's test, any given state statute does not necessarily concern a sufficiently notable state matter.  If, for example, statutory interpretation would require the court only to determine the rights or duties between private parties, such as when the Court is interpreting a statute like the Uniform Commercial Code, the Court is less likely to find the issue a notable state matter.  If, on the other hand, the outcome of the Court's statutory interpretation would greatly affect the balance of power between state and local authorities, the Court is more likely to determine that a matter is notable.

The Court deems that this test is appropriate, as it not only accounts for 28 U.S.C. § 1367(c)(1)'s meaning of novel, but also respects the federalism and comity considerations articulated in Gibbs. See 383 U.S. at 726 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties by procuring for them a surer-footed reading of applicable law."). The state sovereign would be less concerned with a federal court deciding a state issue that has limited impact on a state law's application or meaning, but would be more concerned if the federal court's determination skews the state's jurisprudence on a significant state issue for years to come. Those considerations are especially significant when the issue is currently being litigated in state courts. Rhines v. Weber, 544 U.S. 269, 274 (2005)(defining comity as the principle that "one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigations, have had an opportunity to pass on the matter"). The Court, accordingly, adopts for the forgoing test.

## LAW REGARDING UNLAWFUL PROFIT INCENTIVE

"The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." Marshall, 446 U.S. 238, 242 (1980). "This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process." Marshall, 446 U.S. at 242. Due process does "not permit any procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused." Marshall, 446 U.S. at 242. See Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 877-880

(2009)("Due process requires an objective inquiry into whether the contributor's influence on the election under all the circumstances would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true."); Ward v. Village of Monroeville, 409 U.S. at 60. "Plainly, that possible temptation may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." Ward v. Village of Monroeville, 409 U.S. at 60. "It is sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes." Gibson v. Berryhill, 411 U.S. 564, 579 (1973). See Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 824 (1986)(concluding that there was a due process violation where an Alabama justice received $30,000.00 from a case in which he was a class plaintiff and decided an issue on appeal).

The Supreme Court has recognized several factors that bear on whether a law, procedure, or program unconstitutionally biases an official: (i) whether the amount of penalties or prosecutions affects an official's salary; (ii) the official's authority over allocating the penalty funds; (iii) the percentage of the budget that the fees and penalties constitutes; and (iv) whether surplus funds are allocated to the program or to other programs. See Marshall, 446 U.S. at 245-46, 250-41. See also Ward v. Village of Monroeville, 409 U.S. at 58 (concluding that a mayor's impartiality was sufficiently compromised to violate due process when a substantial portion of the "village income is derived from the fines, forfeitures, costs, and fees imposed by him in his mayor's court").

The test for impartiality is less strict when the official performing the duty "act[s] in a prosecutorial or plaintiff-like capacity." Marshall, 446 U.S. at 248.

> Our legal system has traditionally accorded wide discretion to criminal prosecutors in the enforcement process, and similar considerations have been

found applicable to administrative prosecutors as well. . . .  In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law.  The constitutional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated if it is the prosecutor, and not the judge, who is offered an incentive for securing civil penalties.

Marshall, 446 U.S. at 248-49 (internal citations omitted).  Although held to a lower standard, the due process clause still imposes "limits on the partisanship of administrative prosecutors." Marshall, 446 U.S. at 249.  "A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions."  Marshall, 446 U.S. at 249-50.  Such personal interest can take the form of economic profit, or "the prospect of institutional gain as a result of zealous enforcement efforts."  Marshall, 446 U.S. at 250.

## LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due-process rights were violated: (i) "Did the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii)

"Was the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972). "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)). The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Regarding the meaning of the "liberty" guaranteed by the Fourteenth Amendment, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576. These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 . . . [(1970)]. See Flemming v. Nestor, 363 U.S. 603, 611 . . . [(1960)]. Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 . . . [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 . . . [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576–77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings

that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976). The Supreme Court has explained that

> the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545(footnote omitted).

The United States Court of Appeals for the Second Circuit has stated:

> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." <u>Hamdi v. Rumsfeld</u>, 542 U.S. 507, [529] . . . (2004)(quoting <u>Mathews v. Eldridge</u>, 424 U.S. at 335, 96 S. Ct. 893). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" <u>Id.</u> (quoting <u>Mathews v. Eldridge</u>, 424 U.S. at 335, 96 S. Ct. 893).

<u>United States v. Abuhamra</u>, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose. <u>See</u> <u>Mathews v. Eldridge</u>, 424 U.S. at 335. For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate." <u>Clark v. City of Draper</u>, 168 F.3d at 1189. <u>See</u> <u>Spielman v. Hildebrand</u>, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.").

The Court has previously considered procedural due process violations several times. For example, in <u>A.M. through Youngers v. New Mexico Department of Health</u>, the Court concluded that the New Mexico Department of Health violated due process when it afforded a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it afforded her no process for deprivation. <u>See</u> <u>A.M. through Youngers v. New Mexico Department of Health</u>, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.). The Court has also concluded that a tenured city employee was not denied due process when the city fired him,

because the city afforded him a hearing.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").  See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d 1180, 1215 (D.N.M. 2009)(Browning, J.)(denying a due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers."); Camuglia v. City of Albuquerque, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.) aff'd Camuglia v. City of Albuquerque, 448 F.3d 1214, 1220-21 (10th Cir. 2006)("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

## LAW REGARDING FEDERAL PREEMPTION

Article VI, clause 2, of the Constitution provides that the United States of America's laws "shall be the Supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Consistent with the Supremacy Clause, the Supreme Court has "long recognized that state laws that conflict with federal law are 'without effect.'"  Altria Group, Inc. v. Good, 555 U.S. 70, 75 (2008)("Altria II")(quoting Maryland v. Louisiana, 451 U.S. 725, 746 (1981)). The Supreme Court has summarized the following situations in which preemption is likely to be found:

> Pre-emption may be either expressed or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.  Absent explicit pre-emptive language, we have recognized at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a

physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. 88, 98 (1992).

As noted, preemption may be express or implied. See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98. When faced with express preemption -- where a statute expressly states that it preempts certain areas of state law -- a court must determine the scope of the preemption that Congress intended. See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)(stating that "the purpose of Congress is the ultimate touch-stone in every pre-emption case"). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." Altria II, 555 U.S. at 77. When the preemption clause's text is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption." Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005). Preemption arguments are analyzed under rule 12(b)(6), 12(c), or 56. See Fisher v. Halliburton, 667 F.3d 602, 609 (5th Cir. 2012); Harris v. Kellog Brown & Root Servs., Inc., 724 F.3d 458, 464 n.1 (3d Cir. 2013).[8]

---

[8]There may be a conflict between the United States Courts of Appeals regarding which rule governs a district court's review of preemption arguments. The United States Court of Appeals for the Fifth Circuit has noted that preemption is not a jurisdictional question, so rule 12(b)(1) is inappropriate. See Fisher v. Halliburton, 667 F.3d 602, 609 (5th Cir. 2012). Instead, it has held that

> Federal preemption is an affirmative defense that a defendant must plead and prove. Unless the complaint itself establishes the applicability of a federal-preemption defense -- in which case the issue may properly be the subject of a Rule 12(b)(6) motion -- a defendant should ordinarily raise preemption in a Rule 12(c) motion for judgment on the pleadings or a Rule 56 motion for summary judgment.

Fisher v. Haliburton, 667 F.3d at 609. See Harris v. Kellog Brown & Root Servs., Inc., 724 F.3d 458, 464 n.1 (3d Cir. 2013)("[T]he appropriate procedural device for reviewing the § 2680(j) preemption argument is not a motion pursuant to Rule 12(b)(1), but rather a motion under either Rule 12(b)(6) or for summary judgment."). The United States Court of Appeals for the Sixth

Determining express preemption's scope entails scrutinizing the statutory text in light of two presumptions. First,

> [i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

Medtronic, Inc. v. Lohr, 518 U.S. at 485. Second, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case." Medtronic, Inc. v. Lohr, 518 U.S. at 485.

> Congress' intent, of course, primarily is discerned from the language of the preemption statute and the statutory framework surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not

---

Circuit has explained that preemption "does not normally concern the subject-matter jurisdiction of a court to hear a claim, which is what is relevant to the resolution of a Rule 12(b)(1) motion." Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 608 (6th Cir. 2004). See Boler v. Earley, 865 F.3d 391, 400 n.3 (6th Cir. 2017)("We have not found other comparable cases using a Rule 12(b)(1) motion to address statutory preemption of § 1983 claims; it appears that the district court incorrectly addressed this issue as jurisdictional."). "Rather, the doctrine generally concerns the merits of the claim itself." Trollinger v. Tyson Foods, Inc., 370 F.3d at 608. See also Metropolitan Edison Co. v. Pennsylvania Public Utility Com'n, 767 F.3d 335, 362 (3d Cir. 2014)(noting that "pre-emption arguments do not ordinarily raise issues of subject matter jurisdiction" but that "'[d]octrines of federal pre-emption . . . may in some contexts be controlling' over 'the general rule of finality of jurisdictional determinations.'")(quoting Durfee v. Duke, 375 U.S. 106, 114 (1963)).

The United States Court of Appeals for the Ninth Circuit, however, has affirmed a case's dismissal on preemption grounds under rule 12(b)(1) without comment as to the appropriateness of that rule to preemption arguments. See Cedars-Sinai Medical Center v. National League of Postmasters of U.S., 497 F.3d 972, 975 (9th Cir. 2007). The United States Court of Appeals for the Seventh Circuit has also dismissed a claim under rule 12(b)(1) on preemption grounds, but only where the federal law preempted the state law claim, and the federal law did not provide a private right of action. Slaney v. The Int'l Amateur Athletic Fed'n, 244 F.3d 580, 594-96 (7th Cir. 2001). The Tenth Circuit does not appear to have taken a definitive position on the issue. In Ryan v. Donley, 511 F. App'x 687 (10th Cir. Feb. 14, 2013), the Tenth circuit affirmed a district court's dismissal of a Whistleblower Protection Act, 5 U.S.C. §§ 1201-1209, claim pursuant to rule 12(b)(1) noting that "there can be no such claim, due to preemption by the Civil Service Reform Act." 511 F. App'x at 690. Dismissal for lack of subject matter under rule 12(b)(1) in that case appears proper, however, because the Civil Service Reform Act's "preemption" means that the Whistleblower Protection Act does not provide a private right of action, so there is no federal question jurisdiction. The Tenth Circuit has not otherwise commented on this issue.

only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

Medtronic, Inc. v. Lohr, 518 U.S. at 486.

Implied conflict preemption is found when it is impossible for a private party to comply with both state and federal requirements, see English v. General Elec. Co., 496 U.S. 72, 78-79 (1990), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941). "Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." Hines v. Davidowitz, 312 U.S. at 67 (citing Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).

Obstacle preemption is one form of implied preemption. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000)(holding that preemption is appropriate where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); Pharm. Research and Mfrs. of Am. v. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J., concurring)("Obstacle pre-emption turns on whether the goals of the federal statute are frustrated by the effect of the state law."). The Supreme Court instructed that, in obstacle preemption cases, "there is no federal pre-emption in vacuo, without a constitutional text or a federal statute to assert it." P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503 (1988). See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98. A reviewing court must still "examine the explicit statutory language and the structure and purpose of the statute." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990). In 2000, the Supreme Court decided Geier v. Am. Honda Motor Co., 529 U.S. 861 (2000), which held, in a

five-to-four decision, that a federal regulation which permitted, but did not require, airbags to be installed in passenger vehicles preempted claims that a car was defective because it lacked an airbag.  See 529 U.S. at 874. The majority found: "The rule of state tort law for which petitioners argue would stand as an 'obstacle' to the accomplishment of [the federal regulation's] objective. And the statute foresees the application of ordinary principles of pre-emption in cases of actual conflict. Hence, the tort action is pre-empted."  529 U.S. at 886.  Justice Stevens, in dissent, expressed a desire to eliminate obstacle preemption. He argued that the presumption against preemption

> [s]erves as a limiting principle that prevents federal judges from running amok with our potentially boundless (and perhaps inadequately considered) doctrine of implied conflict pre-emption based on frustration of purposes -- i.e., that state law is pre-empted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

529 U.S. at 907-08 (Stevens, J., dissenting).

The Supreme Court has begun to back away from finding implied preemption based on an alleged conflict with the purposes underlying federal regulations.  In 2003, the Supreme Court issued a unanimous decision in Sprietsma v. Mercury Marine, 537 U.S. 51 (2002), rejecting implied conflict preemption of state law claims that a boat engine was defective because it lacked a propeller guard.  See 537 U.S. at 70.  In so doing, the Supreme Court considered and rejected an argument that the Coast Guard's decision not to adopt a regulation requiring propeller guards impliedly preempted state-law claims, which inflicted liability for lack of a propeller guard.  See 537 U.S. at 65.  It explained:

> The decision in 1990 to accept the subcommittee's recommendation to take no regulatory action left the law applicable to propeller guards exactly the same as it had been before the subcommittee began its investigation. Of course, if a state common-law claim directly conflicted with a federal regulation promulgated under the Act, or if it were impossible to comply with any such regulation without

incurring liability under state common law, pre-emption would occur. This, however, is not such a case.

537 U.S. at 65.

In Altria II, the Supreme Court again considered the implied preemption doctrine and rejected the defendants' obstacle-preemption argument that the FCLAA, preempted a similar state act, Maine's Unfair Practices Act, Me. Rev. Stat. Ann., Tit. 5, § 207 (2008). See 555 U.S. at 90-91. In Altria II, the plaintiffs filed suit against defendant cigarette manufactures for deceptively marketing their Marlboro and Cambridge Light cigarettes as containing lower tar and nicotine to convey that their light cigarettes were less harmful than regular cigarettes. See 555 U.S. at 73. The Supreme Court concluded that the FCLAA, which forbids state law from requiring or prohibiting language with respect to cigarette advertising and promotion, presented no obstacle to the plaintiffs' lawsuit, because the federal law ultimately regulated warning labels, and did not regulate false or misleading statements. See 555 U.S. at 82-83. The Supreme Court also considered whether an FTC guidance statement, which noted that "a factual statement of the tar and nicotine content . . . would not violate the FTC Act," impliedly preempted the Plaintiffs' claims. 555 U.S. at 87. The Supreme Court contemplated and rejected the cigarette manufacturers' argument that the FTC's statement "authorized them to use descriptors" such as "light or low tar," because the FTC statements did not require that cigarette manufacturers disclose their tar and nicotine yields, and the United States "Government itself disavows any policy authorizing the use of light and low tar descriptors." 555 U.S. at 88. Moreover, the Supreme Court determined that an FTC consent order that prevents the cigarette manufacturers from using "light" and "low tar" descriptors, unless they are accompanied "by a clear and conspicuous disclosure of the cigarettes' tar and nicotine content" does not preempt the plaintiffs' claims, because "the decree only enjoined conduct," and "a consent order is in any

event only binding on the parties to the agreement." 555. U.S. at 589 n.13. The Supreme Court concluded, thus, that federal law and regulations did not preempt the plaintiffs' state-law claims. See 555 U.S. at 90.

In Wyeth v. Levine, 555 U.S. 555 (2009), six Justices of the Supreme Court, including Justices Breyer and Kennedy, who joined in the majority decision in Geier v. Am. Honda Motor Co. rejected the plaintiff's two implied preemption arguments -- impossibility preemption and obstacle preemption. See Wyeth v. Levine, 555 U.S. at 581. The Supreme Court held that

> it is not impossible for Wyeth to comply with its state and federal law obligations and that Levine's common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the [Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. §§ 301, 321, 331-337, 341-350, 361-364, and 381-399; 21 C.F.R. § 201.80(e)("FDCA")].

Wyeth v. Levine, 555 U.S. at 581. In so ruling, Justice Stevens, writing for the majority, narrowly limited Geier v. Am. Honda Motor Co. to its facts, noting that the decision in that case is based on the substantive regulation's "complex and extensive" history at issue. 555 U.S. at 566. The Supreme Court rejected obstacle preemption, stating: "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history." 555 U.S. at 609. Justice Stevens quoted Justice O'Connor's explanation in Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 109 (1989): "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them." Wyeth v. Levine, 555 U.S. at 575 (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. at 166-67).

Of particular import for the current status of implied obstacle preemption is Justice Thomas'

concurring opinion in Wyeth v. Levine, in which he wrote:

> I write separately, however, because I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court's "purposes and objectives" pre-emption jurisprudence. Under this approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law. Because implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.

555 U.S. at 583 (Thomas, J., concurring in the judgment). Justice Thomas continued:

> Under the vague and potentially boundless doctrine of purposes and objectives pre-emption . . . the Court has pre-empted state law based on its interpretation of broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law . . . Congressional and agency musings, however, do not satisfy the Art. I, § 7 requirements for enactment of federal law and, therefore, do not pre-empt state law under the Supremacy Clause.

555 U.S. at 587. Justice Thomas emphasized that, when analyzing the federal statutes' or

regulations' preemptive effect, "[e]vidence of pre-emptive purpose must be sought in the text

and structure of the provision at issue" to comply with the Constitution. 555 U.S. at 588 (citing

CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)).[9]

Moreover, the Supreme Court has put renewed emphasis on the presumption against

preemption. See Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005). "In areas of

---

[9]Justice Thomas, writing for the five-to-four majority in PLIVA, Inc. v. Mensing, 564 U.S. 604 (2011), recently concluded, however, that federal law preempted inconsistent state laws on generic drug labeling, because it was impossible to comply with both federal law and the states' law. See 564 U.S. at 617–618. The Supreme Court sought to reconcile Wyeth v. Levine, however, recognizing that the respective statutory schemes in each case are distinguishable. See PLIVA, Inc. v. Mensing, 564 U.S. at 626 ("It is beyond dispute that the federal statutes and regulations that apply to brand-name drug manufacturers are meaningfully different than those that apply to generic drug manufacturers.").

traditional state regulation, [the Supreme Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." Bates v. Dow Agrosciences, LLC, 544 U.S. at 449. If confronted with two plausible interpretations of a statute, the court has "a duty to accept the reading that disfavors pre-emption." Bates v. Dow Agrosciences, LLC, 544 U.S. at 449. See Wyeth v. Levine, 555 U.S. at 565; Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 518 (1992)(plurality opinion). In Arizona v. United States, 567 U.S. 387 (2012), the Supreme Court once again emphasized the importance of clear Congressional intent when applying obstacle preemption. See 567 U.S. at 398-99. The Supreme Court struck down provisions of an Arizona immigration law that would penalize aliens who sought, or engaged in, unauthorized employment, because it "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens." 567 U.S. at 406. With Justice Kagan taking no part in the consideration or decision of the case, writing for a five-to-three majority, which included Chief Justice Roberts and Justices Ginsburg, Breyer, and Sotomayor, Justice Kennedy wrote: "The correct instruction to draw from the text, structure, and history of [the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101] is that Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment." 567 U.S. at 406. The Supreme Court ruled that Congressional intent was clear; Congress had considered and rejected penalizing aliens who sought unauthorized employment. See 567 U.S. at 405. Federal immigration law therefore preempted the Arizona law that would have penalized aliens seeking unauthorized employment, because it would have created a penalty that Congress had clearly and intentionally omitted. See 567 U.S. at 407.

The Tenth Circuit has recognized federal preemption of state law in three categories: (i) when a federal statute expressly preempts state law ("express preemption"); (ii) where Congress intends to occupy a field ("field preemption"); and (iii) to the extent that a state law conflicts with a federal law ("conflict preemption").  Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States, 693 F.3d 1214, 1222 (10th Cir. 2012).  As the defendant in Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States, the United States invoked only conflict preemption to dismiss Colorado's claims against it.  See 693 F.3d at 1222.  "To avoid conflict preemption, 'it is not enough to say that the ultimate goal of both federal and state law is the same.  A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." Chamber of Commerce v. Edmondson, 594 F.3d 742, 769 (10th Cir. 2010)(quoting Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987)(alterations, citation omitted)).  In Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States, the state of Colorado created a schedule for the United States to follow in the destruction of hazardous waste stored in the state, in an attempt to prohibit the storage of hazardous waste within the state.  See 693 F.3d at 1223.  The Tenth Circuit held that the state statute creating this schedule conflicted with a federal statute, which mandated a deadline for the destruction of the materials.  See 693 F.3d at 1224.  The Tenth Circuit reasoned that allowing Colorado to set a deadline for the destruction of the materials would impede the flexibility with which Congress had intended in its deadline.  See 693 F.3d at 1224.  Because the Colorado deadline would interfere with the method that Congress had intended for the waste's disposal, the Tenth Circuit concluded that the state law is in conflict with the federal law, and therefore, that the federal law preempts Colorado's schedule. See 693 F.3d at 1224.

# ANALYSIS

The Court will not deny the entire Motion, merely because the parties have conducted discovery, because rule 12(c) requires the Court to treat the Motion as it would any 12(b)(6) motion.  Discovery's status does not bear on the 12(b)(6) analysis.  The Court concludes, however, that A. Harjo has stated a claim on which the Court can grant relief for both her unlawful profit incentive and procedural due process claims.  The Court concludes that she has stated an unlawful profit incentive claim, because she has alleged that the vehicle forfeiture program is financially dependent on the revenues gained from seizing vehicles, and because she has alleged that City of Albuquerque employees use the seized vehicles for personal use.  The Court dismisses, however, her unlawful profit incentive claim to the extent that it contends that the City of Albuquerque violates due process by budgeting for and using funds it raises from forfeitures to pay for its costs.  That a program pays for itself does not inject a personal or institutional interest to such a degree that it implicates due process.  The Court also concludes that she has stated a procedural due process claim, because the Forfeiture Ordinance places the burden of proof on A. Harjo to prove her innocence.  Under Nelson v. Colorado, such a burden violates due process.  See 137 S. Ct. at 1256.  To the extent that A. Harjo alleges, however, that there is an independent procedural due process violation, because Forfeiture Ordinance's fees, the Court concludes that the risk of erroneous deprivation is not significant enough to raise constitutional concerns.  Finally, the Court dismisses without prejudice the remaining state law claim, because it raises a novel issue not yet considered by New Mexico appellate courts.

# I. THE COURT WILL NOT DISMISS THE MOTION IN WHOLE OR IN PART, MERELY BECAUSE THE PARTIES HAVE DEVELOPED A FACTUAL RECORD.

The Court will not dismiss the Motion, in whole or in part, on the grounds which A. Harjo asserts -- namely, that the parties have developed a factual record. See Response at 8-9 (citing Sourovelis v. City of Philadelphia, 103 F. Supp. 3d 694, 709 n.10 (E.D. Pa. 2015)(Robreno, J.); Selman v. Delta Airlines, 2008 WL 6022017, at *16 (D.N.M. Aug. 13, 2008)(Browning, J.)). The rule 12(c) standard offers no exception for parties who have created a factual record. See Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d at 1160 ("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under rule 12(b)(6)."). If there is a material factual issue on a claim, however, the Court will deny the Motion as to that claim. See Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa., 442 F.3d 1239, 1244 (10th Cir. 2006)("Judgment on the pleadings should not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'")(quoting United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000)). Indeed, the two cases that A. Harjo cites stand for the proposition that dismissal is proper only if there is no factual dispute on a material issue. See Sourovelis v. City of Philadelphia, 103 F. Supp. 3d at 709 ("Defendants dispute Plaintiffs' factual allegations. . . . As this claim appears to be inherently a factual issue, resolution via a Rule 12(b)(6) motion would be improper."); Selman v. Delta Airlines, 2008 WL 6022017, at *16 ("The Court believes that the pleadings alone -- without reference to any evidence beyond the pleadings -- present issues of fact that are in dispute and that remain to be resolved."). Thus, the Court will not dismiss the Motion, in whole or in part, without considering each claim.

## II.    A. HARJO   HAS   PLAUSIBLY   ALLEGED   AN   UNLAWFUL   PROFIT INCENTIVE.

The Court discerns three unlawful profit incentive theories of liability from A. Harjo's Amended Complaint: (i) the vehicle forfeiture program funds itself, so is unconstitutional, see Amended Complaint ¶¶ 16-19, 32, 99-101, at 4-5, 7, 22; Response at 11; (ii) the vehicle forfeiture program is "financially dependent" on forfeiture revenues, so is unconstitutional, Amended Complaint ¶¶ 16, 19, at 4-5; see Response at 11, 15 and (iii) vehicle forfeiture program officials have an incentive to seize cars for personal use, so the program is unconstitutional, see Amended Complaint ¶ 20.  The Court concludes that the first theory does not state a claim upon which relief can be granted.  A program which uses funds it raises to finance its salary and other miscellaneous costs does not "inject[] a personal interest, financial or otherwise, into the enforcement process" to such a degree that it "raises serious constitutional questions."  Marshall, 446 U.S. at 249-50.  There is no personal benefit or harm here to an official when the program mechanically applies funds it raises to the costs it accrues.  Such a claim grows to constitutional proportions only when there are personal or institutional incentives to seize more cars or detriments when not enough cars are seized.  Accordingly, the second and third theories state claims upon which the Court can grant relief.  If the City of Albuquerque's vehicle forfeiture program is "financially dependent" on seizure revenues, i.e., officials' salaries are cut or officials are fired if not enough cars are seized, then the vehicle forfeiture program employees would have "a personal interest" in prosecuting more cases than legally permissible.  Having access to forfeited cars for personal use would also inject a personal interest in prosecuting forfeiture actions against, at the least, luxury vehicle owners.  Accordingly, the Court will not dismiss A. Harjo's unlawful profit incentive claim based on the latter two theories, but will dismiss the claim to the extent that it rests on the first theory.

## A. TAKEN ALONE, APPLYING FUNDS FROM FORFEITURE PROCEEDS TO THE VEHICLE FORFEITURE PROGRAM DOES NOT VIOLATE DUE PROCESS.

That the City of Albuquerque's vehicle forfeiture program budgets for and uses funds it raises from forfeitures to pay for its costs does not violate due process. The City of Albuquerque ordinance reads:

> When property is forfeited pursuant to this article, the Police Department shall sell the motor vehicle, and the proceeds shall be used to carry out the purpose and intent of this article. . . . Any proceeds that exceed the costs of administering this article shall be used for DWI enforcement, prevention and education.

6 ROA § 7-6-5(E). A. Harjo alleges that the City of Albuquerque "specifically plans for salaries to be paid out of the proceeds of vehicle forfeitures," and also plans for the vehicle forfeiture program to pay for equipment, vehicles, facilities, training, and travel. Amended Complaint ¶¶ 16-19, at 4-5. Thus, according to A. Harjo, because "the City plans for vehicle forfeitures in its annual budget" and that "personnel (including the attorneys who prosecute civil forfeiture cases) have their salaries paid by forfeiture revenues," so the program creates an unlawful profit incentive for city officials. Response at 11 (citing Amended Complaint ¶¶ 16-18, at 4-5).

The Court concludes that budgeting and allocating funds from forfeiture proceeds does not create an unlawful profit incentive. The City of Albuquerque's forfeiture officials are similar to prosecutors, so are held to the <u>Marshall</u> standard. <u>See</u> 446 U.S. at 248 ("The rigid requirements of *Tumey* [<u>v. Ohio</u>, 273 U.S. 510 (1927)] and *Ward* [<u>v. Monroeville</u>], designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity.").[10] Thus, a due process violation arises where there is a

---

[10]A. Harjo's Amended Complaint also alleges that the City of Albuquerque's administrative law judges benefit from forfeiture revenues, as the judges "use office equipment paid for through forfeiture revenues, work in office facilities paid for through forfeiture

"scheme injecting a personal interest, financial or otherwise, into the enforcement process."

Marshall, 446 U.S. at 249.  A personal interest may be personal "profit" or "the prospect of

institutional gain as a result of zealous enforcement efforts."  Marshall, 446 U.S. at 250.

Therefore, in Marshall, the Supreme Court concluded that there was no unlawful incentive for

prosecutorial-like officials to enforce the child labor provisions of the Fair Labor Standards Act,

29 U.S.C. §§ 201-219; the officials' salaries were "fixed by law," and there was no institutional

gain to be had from overzealous prosecution, because "the civil penalties collected" were "less

than 1% of the budget," a substantial portion of the civil penalties collected flowed to the

Treasury Department, and  more senior officials "decide[d] how to allocate civil penalties," such

that none of the enforcing officials had "assurances that the penalties they assess will be returned

to their offices at all."  Marshall, 446 U.S. at 250-51.

    Here,  officials  do  not  have  a  personal  financial  interest  in  prosecuting  more  cases,

pressuring  owners  into  unfavorable  settlement  agreements,  or  seizing  more  vehicles,  simply

_____

revenues,  and  receive  administrative  assistance  from  individuals  whose  salaries  are  paid  by
forfeiture revenues."  Amended Complaint at ¶ 101, at 22.  A. Harjo does not argue a distinction
between  the  city  attorneys  and  the  judges  in  her  Response.   See  Response  at  11-21.   The
standard, which applies to  judges or those acting in a judicial capacity is whether a procedure
"offer[s] a possible temptation to the average man as a judge to forget the burden of proof
required to convict the defendant, or which might lead him not to hold the balance nice, clear and
true  between  the  state  and  the  accused."   Marshall,  446  U.S.  at  242.   For  many  of  the  same
reasons explored below, the Court concludes that the City of Albuquerque's forfeiture judges
would not be tempted to forget the appropriate standard, merely because their staff and office
equipment are funded through forfeitures.  There would be no temptation to increase the number
of forfeitures when funds from the forfeitures are mechanically applied to, for example, fixed
salaries.  A temptation could arise if salaries or office accommodations were dependent on or
increased based on the number of forfeitures the administrative law judges found, but A. Harjo's
allegation  at  paragraph  101  of  the  Amended  Complaint  does  not  give  rise  to  that  inference,
especially  concerning  whether  salaries  are  increased,  as  excess  funds  must  be  allocated
elsewhere.  See 6 ROA § 7-6-5(E).  To the extent that she alleges that dependence, however, see
Amended Complaint ¶ 16, at 4, the Court concludes that there would be a temptation, and
discusses that below, see § 2.B.

because the program funds itself. Although the vehicle forfeiture program pays for the prosecuting attorneys' and their staff's salaries, that alone does not generate a "profit" incentive for the official. Marshall, 446 U.S. at 250. A profit incentive exists when the officials' level of enforcement can affect how much they are paid. See Marshall, 446 U.S. at 250. In Connally v. Georgia, 429 U.S. 245 (1978), the Supreme Court expanded on this principle in some length:

> The justice is not salaried. He is paid, so far as search warrants are concerned by receipt of the fee prescribed by statute for his issuance of the warrant, and he receives nothing for his denial of the warrant. His financial welfare, therefore is enhanced by positive action and is not enhanced by negative action.

429 U.S. at 250. That the forfeiture proceeds pay some or all of officials' salaries does not suggest that officials can increase their salary by prosecuting more cases or that their salary is decreased if they prosecute fewer cases. Thus, that the vehicle forfeiture program funds itself does not, alone, mean that it generates a personal profit incentive for those officials.

The Court also concludes that any institutional incentive to prosecute more cases created by the program funding itself does not reach a constitutional magnitude. An institutional incentive turns on three factors: (i) the proportion of funds raised that are returned to the program; (ii) prospects that assessing more penalties will result in more funding; and (iii) control that officials exert over the funds. See Marshall, 446 U.S. at 250-51; Ward v. Monroeville, In Marshall, for example, that the majority of penalties raised were returned to the Treasury Department and that the regional Department of Labor official at issue had little control over how funds were allocated prompted the Supreme Court to determine that there was no institutional incentive to assess unlawful penalties. See 446 U.S. at 250-51. Also significant to the Supreme Court was that the entity allocating additional funds to regional programs did so based on the expenses incurred and not on the amount of penalties assessed. See 446 U.S. at 251. Thus, even if the regional Department of Labor official assessed unjustifiable penalties,

those penalties "would be of no benefit to his office," because the unjustifiable penalty "would not produce an increase in the level of expenses" -- the measure by which the central authority allocated additional funds. Marshall, 446 U.S. at 251. In contrast, in Ward v. Monroeville, there was an unlawful institutional incentive, because penalties assessed financed a large proportion of the village's budget, and the mayor exerted considerable control over both how the funds were raised and spent, leading to a "possible temptation" that he may act as a "partisan to maintain the high level of contribution from the mayor's court." 409 U.S. at 58-60.

Here, unlike the program in Marshall, in which the majority of funds raised from penalties were returned to the treasury, the funds from the City of Albuquerque's forfeiture program finance nearly one-hundred percent of the forfeiture program's budget. See Amended Complaint ¶ 16, at 4. The Court still discerns no unconstitutional institutional pressure to prosecute, however, because excess funds collected must be allocated to other programs. See 6 ROA §§ 7-6-5(E), 7-9-3(F), 7-14-5(F); Amended Complaint ¶ 15, at 4. Thus, additional penalties assessed do not lead to an increase in the amount of funds the forfeiture program has to spend, so prosecutors, judges, or police officers would not feel pressure to prosecute more cases, find more forfeitures, or seize more cars to secure additional funding. Moreover, officials involved in the vehicle forfeiture program exert little control over how much money is budgeted to the vehicle forfeiture program or how that money is spent. The Albuquerque Mayor proposes the annual budget, a committee reviews it, and the Albuquerque City Council subsequently ratifies it after public hearings. See 11 ROA §§ 2-11-6, 2-11-8, 2-11-10 to 11. Although someone involved in the asset forfeiture program may submit budget proposals to the Mayor's office, the ultimate power to create the budget and allocate funds lies outside of the forfeiture program. See also Flora v. Southwest Iowa Narcotics Enforcement Task Force, __ F. Supp. 3d

__, 2018 WL 1150999, at *19 (S.D. Iowa 2018)(Gritzner, S.J.)(concluding that a forfeiture program unconstitutionally incentivized a forfeiture task force, because the task force receives a certain percentage of the funds collected from forfeiture and has control over how the funds are spent); Cain v. City of New Orleans, 281 F. Supp. 3d 624, 655 (E.D. La. 2017)(Vance, J.)("The Judges' dual role, as adjudicators who determine ability to pay and as managers of the OPCDC budget, offer a possible temptation to find that indigent criminal defendants are able to pay their court debts.").  Finally, even though it may be plausible that, if the vehicle forfeiture program raises more money one year, the Mayor and the City Council will grant the program more funds to spend the next year, such an inference does have constitutional implications in this case, because whether the Mayor or City Council will decide to grant such funds is outside the forfeiture program officials' control.  Thus, that the program funds itself does not create an institutional incentive for prosecutors to prosecute more cases or for officers to seize more vehicles.

**B.     THAT THE VEHICLE FORFEITURE PROGRAM IS FINANCIALLY DEPENDENT ON SEIZURES CREATES AN UNLAWFUL PERSONAL PROFIT INCENTIVE.**

Because it is plausible that the program's dependence on forfeiture revenues threatens officials' salaries, the vehicle forfeiture program violates due process.  A profit incentive exists when officials' level of enforcement can affect how much they are paid.  See Marshall, 446 U.S. at 250; Connally v. Georgia, 429 U.S. at 250 (1978). ("[The Justice's] financial welfare, therefore is enhanced by positive action and is not enhanced by negative action.  The situation, again, is one which offers a possible temptation to the average man.").  Here, the vehicle forfeiture program funds itself, and it is dependent on those funds.  See Amended Complaint ¶ 16, at 4.  The forfeiture funding, moreover, pays for the salaries of "two paralegals, two

attorneys, two DWI seizure assistants and one DWI seizure coordinator." Amended Complaint ¶ 18, at 5. Thus, a reasonable inference is that, if forfeiture revenues dwindle to certain levels, or disappear completely, the forfeiture officials would need to take a pay cut or lose their jobs. In Connally v. Georgia, even a small financial gain achieved through official action implicated due process. See 429 U.S. at 250 (concluding that a $5.00 fee for each warrant a justice of the peace issues is enough to present "a possible temptation to the average man," and that, thus, the statute granting that fee violates due process). The negative financial impact here, may be far greater for these employees than the five dollar per warrant boon in Connally v. Georgia, so, accordingly, they have personal financial incentives to increase prosecutions or to pursue more vigorously inequitable settlement agreements with owners.[11]

To be sure, it is possible that the City of Albuquerque might not cut these employees' pay or fire them. It might, for example, allocate funds from other revenue streams to keep paying for these city employees. Nevertheless, the Court must accept as true A. Harjo's allegation that the City of Albuquerque's vehicle forfeiture program is "financially dependent" on forfeiture revenues, Amended Complaint ¶ 16, at 4, which precludes an inference, at least at the pleading stage, that the City of Albuquerque might reallocate funds. Moreover, the City of Albuquerque's budgets[12] support a finding that the forfeiture program's revenue stream affects these officials'

_____

[11]The City of Albuquerque argues that city forfeiture attorneys and their staff cannot directly gain from their actions, because police officers seize the vehicles and state court judges determine whether the vehicle is properly forfeited. See Reply at 9. Its argument ignores the power city attorneys and their staff have in securing forfeiture funds through settlement negotiations.

[12]The Court judicially notices the City of Albuquerque's 2016, 2017, and 2018 budgets as government documents available on a governmental website. See New Mexico ex rel. Richardson v. Bureau of Land Management, 565 F.3d 683, 702 n.22 (10th Cir. 2009)(ruling that judicial notice was proper for information referenced on two federal agency's websites); O'Toole

salaries. In 2016, for example, the City of Albuquerque allocated $512,000.00 for forfeiture attorneys' and staff's salaries, but the salary allocation dwindled to $499,000.00 and $488,000.00 in 2017 and 2018 respectively. See City of Albuquerque FY/16 Approved Budget, at 53 (2016) available at http://documents.cabq.gov/budget/fy-16-approved-budget.pdf ("2016 Budget"); City of Albuquerque Approved Budget FY/17, at 55 (2017) available at http://documents. cabq.gov/budget/fy-17-approved-budget.pdf ("2017 Budget"); City of Albuquerque Approved Budget Fiscal Year 2018, at 55 (2018) available at http://documents.cabq.gov/budget/fy-18-approved-budget.pdf ("2018 Budget"). The budgeted salary decrease between 2016 and 2018 correlates with the city's expectation in fewer forfeiture sales. In 2016, the city had projected $615,000.00 in 2016 vehicle forfeiture sales, but, when drafting the 2017 budget, the city had revised that 2016 projection to $480,000.00. See 2017 Budget at 183. In 2017 it projected $500,000.00 in vehicle forfeiture sales, but reduced that projection to $491,000.00 when preparing the 2018 budget. See 2018 Budget at 178. The city expects 2018 vehicle forfeiture sales to reach only $450,000.00. See 2018 Budget at 178.[13] With a plausible effect on official salary correlated with a decrease in forfeiture revenue, the Court concludes that the vehicle forfeiture program plausibly violates due process, so it will not dismiss A. Harjo's unlawful profit incentive count to the extent that it is premised on this theory.

---

v. Northrop Grumman Corp., 499 F.3d 1218, 1215 (10th Cir. 2007)("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").

[13]The Albuquerque Journal has also recognized that, since 2010, the vehicle forfeiture program's revenue stream has consistently declined. See Ryan Botel, City's DWI Vehicle Seizures Plummet, Albuquerque Journal, October 18, 2017, at A1, A3 (noting that the program's revenue stream peaked at $1.81 million in 2010 and declined, by 2017, to $598,000.00). The Court declines to take judicial notice of these facts, as they are not beyond reproach. See Fed. R. Evid. 201. If, however, these Journal figures are accurate, then there is, in reality, a strong correlation between both successful forfeitures and the vehicle forfeiture program budget.

## C. OFFICIALS' PERSONAL USE OF SEIZED VEHICLES ALSO VIOLATES DUE PROCESS.

Having access to seized vehicles for personal use also violates due process. A. Harjo alleges that city officials have access to and drive seized cars around town for personal use and "even take them home at night." Amended Complaint ¶ 20, at 5. At least one city official was seen driving a seized Cadillac Escalade. See Amended Complaint ¶ 20, at 5.

The Court concludes that the potential personal use of seized vehicles impermissibly "injects a personal interest, financial or otherwise, into the enforcement process." Marshall, 446 U.S. at 249. The personal interest here is not financial. The Amended Complaint does not suggest that the officials have, for example, purchased seized cars at a discounted rate. Instead, the allegations suggest that city officials are granted use of the cars as one would a rental car. Nevertheless, personal use of vehicles -- especially luxury vehicles -- could sway city officials to pursue forfeiture claims for improper reasons, e.g., a desire to use a luxury vehicle to impress the neighbors, take someone on a fancy date, or, simply, cruise the City of Albuquerque's streets in style. See Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 878 (2009)(explaining that due process is not just concerned with "direct pecuniary interest[s]," but is also "concerned with a more general concept of interests that tempt adjudicators to disregard neutrality."); Flora v. Southwest Iowa Narcotics Enforcement Task Force, __ F. Supp. 3d __, 2018 WL 1150999, at *19 (concluding that the operative test is whether the incentive acting on the officials plausibly "distort[s] their judgment"). Use of non-luxury vehicles can also present an incentive for city officials to improperly pursue forfeiture claims. An official may need a second vehicle for the week or may need a car that can transport more than five people. The Court will, thus, not dismiss the A. Harjo's unlawful profit incentive count to the extent it is premised on officials' personal use of vehicles.

III.    **A. HARJO HAS STATED A PROCEDURAL DUE PROCESS CLAIM.**

Harjo contends that the Forfeiture Ordinance violates procedural due process in two ways: (i) the Forfeiture Ordinance's innocent owner defense places the burden of proof on the defendant to prove his or her innocence, which creates too great a risk of erroneous deprivation; and (ii) the storage and other fees assessed to seized cars also presents too great a risk of erroneous deprivation, because innocent owners may be tempted to accept settlement offers that they would not otherwise accept to avoid such fees. The Court concludes that the Forfeiture Ordinance's innocent owner defense violates due process, because innocent owners have a great interest in their vehicle, and there is a significant risk of erroneous deprivation flowing from placing the burden of proof on innocent owners. See Nelson v. Colorado, 137 S. Ct. at 1256-57. As to the storage fees, however, the fees do not create a risk of an erroneous deprivation that it raises due process concerns. The Court, thus, grants the Motion to the extent that it attacks A. Harjo's fee theory, but denies the Motion as to the innocent-owner-defense theory.

A.    **THAT THE OWNER MUST PROVE HIS OR HER INNOCENCE VIOLATES PROCEDURAL DUE PROCESS.**

The Forfeiture Ordinance requiring the vehicle owners to prove their innocence violates due process. Procedural due process has a two-step inquiry: (i) is there a protected liberty or property interest; and (ii) has the government provided an appropriate level of process to protect that interest. See Citizen Center v. Gessler, 770 F.3d 900, 916 (10th Cir. 2014). The City of Albuquerque concedes that there is a protected property interest at stake. See Motion at 11-12. Accordingly, the only element at issue is whether the process afforded appropriately protects that interest. To determine whether appropriate process is afforded, a court must balance three factors: "(A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake." Nelson v. Colorado,

137 S. Ct. at 1255 (citing <u>Mathews v. Eldridge</u>, 424 U.S. at 335).  <u>See</u> <u>United States v. James</u> <u>Daniel Good Real Property</u>, 510 U.S. 43, 56 (1993)(applying the <u>Matthews v. Eldridge</u> balancing test in a civil forfeiture case).   A neutral hearing "is of particular importance" where, as here, "the Government has a direct pecuniary interest in the outcome of the proceeding." <u>United States v. James Daniel Good Real Property</u>, 510 U.S. at 55-56.

   A. Harjo has an obvious and significant interest in her car.   "The private interest in the uninterrupted use of an automobile is substantial.   A person's ability to make a living and his access to both the necessities and amenities of life may depend upon the availability of an automobile when needed."   <u>Stypmann v. City and Cty. of San Francisco</u>, 557 F.2d 1338, 1342-43 (9th Cir. 1977).   <u>See</u>, <u>e.g.</u>, <u>Krimstock v. Kelly</u>, 306 F.3d 40, 61 (2d Cir. 2002)(Sotomayor, J.)("An individual has an important interest in the possession of his [or her] motor vehicle, which is often his [or her] most valuable possession.")(brackets in original); <u>Coleman v. Watt</u>, 40 F.3d 255, 260-61 (8th Cir. 1994)("Automobiles occupy a central place in the lives of most Americans, providing access to jobs, schools, and recreation as well as to the daily necessities of life."); <u>Miller v. City of Chicago</u>, 774 F.2d 188, 192 (7th Cir. 1985)("[T]he use of one's automobile is certainly an important interest.").   A. Harjo's car is no less important to her than any other American.   <u>See</u> Amended Complaint ¶ 63, at 15 ("Arlene could not afford . . . to be without her car for [18 months].").   Her interest, accordingly, weighs toward finding a due process violation.

   There is also a risk of erroneous deprivation, because the Forfeiture Ordinance requires the owners to prove their innocence.   <u>See</u> 6 ROA § 7-6-6(A).   Under the Forfeiture Ordinance, after police officers seize a vehicle, the owner may challenge the seizure via a hearing.   <u>See</u> 6 ROA § 7-6-5(D).   If a hearing officer determines that the police officer had probable cause to

seize the vehicle and the owner does not demonstrate, by the preponderance of the evidence, that he or she could "not have reasonably anticipated that the vehicle could be used in a manner constituting the nuisance(s)," the City of Albuquerque will promptly initiate a forfeiture proceeding in state court. 6 ROA §§ 7-6-5(D), 7-6-7(A). The Forfeiture Ordinance's requirement that A. Harjo prove her innocence creates a risk of erroneous deprivation.[14] As the Supreme Court recently explained, defendants are entitled to a presumption of innocence, even in civil proceedings, so a proof burden creates a risk of erroneous deprivation. See Nelson v. Colorado, 137 S. Ct. at 1256 ("But to get their money back, defendants should not be saddled with any proof burden. Instead, as explained *supra* at 1255-1256, they are entitled to be presumed innocent.").[15] The risk of erroneous deprivation caused by the proof burden is particularly acute here, because A. Harjo could not afford a lawyer for the hearing, so

---

[14]The Court notes that due process does not require an innocent owner defense. See Bennis v. Michigan, 516 U.S. at 446. However, once the state deems that owners are entitled to that defense, i.e. it would be erroneous to deprive an owner of their vehicle if the owner could not reasonably anticipate that the vehicle would be used in a manner constituting a nuisance, due process must ensure that there is not an undue risk of an erroneous deprivation. For that reason, the City of Albuquerque's reliance on Bennis v. Michigan is misplaced. Cf. United States v. James Daniel Good Real Property, 510 U.S. at 502 (evaluating an innocent owner's interest under Matthews v. Eldridge when the operative statute protects innocent owners).

[15]The Court notes that, in Nelson v. Colorado, the Supreme Court considered whether a proof burden, requiring a defendant to prove his innocence by clear-and-convincing evidence, created a risk of erroneous deprivation. 137 S. Ct. at 1256. Here, in contrast, A. Harjo need only prove her innocence by a preponderance of the evidence. See 6 COA § 7-6-7(A). Although the standard of proof is lower here, the Court still concludes that there is a risk of erroneous deprivation, as the Supreme Court determined that the "defendants should not be saddled with any proof burden." Nelson v. Colorado 137 S. Ct. at 1256. Nonetheless, all other things remaining equal, because the standard of proof is lower here than it was in Nelson v. Colorado, the risk of erroneous deprivation here is less than it was in Nelson v. Colorado. It is unclear, however, whether all other things are equal between Nelson v. Colorado and this case. For example, as the Court explores infra, an attorney did not represent A. Harjo at the seizure hearing, whereas the Supreme Court does not detail whether the defendants in Nelson v. Colorado had representation at their hearings.

represented herself.  See Amended Complaint ¶ 62, at 15.[16]  A pro se defendant not only must

navigate the hearing process and the legal requirements to prove his or her innocence, but also

faces an experienced city attorney on the other side whose practice expertise is likely focused on

the law at issue in the proceeding.  An innocent owner may, for example, make reasonable

mistakes about what he or she must prove, leading to an erroneous deprivation.

    The City of Albuquerque contends, however, that the probable cause burden it holds in

proving that the vehicle was involved in a DWI sufficiently mitigates the erroneous deprivation

risk.  See Reply at 10.  The Court disagrees, because probable cause is not that high of a burden;

it merely requires "a degree evidence to bring within a reasonable probability" that someone

intoxicated drove the car.  State v. Young, 2004-NMSC-015, ¶ 2, 90P.3d 477, 481. See United

States v. Wagoner County Real Estate, 278 F.3d 1091, 1097 (10th Cir. 2002)(concluding that

probable cause requires a nexus "between the property and the specified illegal activity.").  To

be sure, probable cause might be sufficient to temporarily seize a vehicle, but probable cause is

not that much of a safeguard when permanent deprivation of something as essential as a

person's vehicle is at risk.  Even if probable cause mitigates the risk to some extent, it does not

outweigh the risk of an erroneous deprivation that the burden of proof causes to an innocent

owner.[17]

---

[16]The Court concludes that owners proceeding pro se in these seizure hearings would not
be uncommon, as lawyers are either prohibitively expensive or are, at least, more expensive than
the settlement agreement the city attorney might offer to the owner.  There is also no statute or
ordinance that would shift attorneys' fees to the City of Albuquerque if the owner prevails.
Thus, the owner will either have to proceed pro se or pay an attorney.

[17]Although not this case, the Court is skeptical, even absent the burden of proof problems
associated with the innocent owner defense, that a probable cause showing is sufficient to satisfy
due process when a permanent deprivation of something as important as a person's vehicle is at
stake.  See Markadonatos v. Village of Woodridge, 760 F.3d 545, 568 (7th Cir. 2014)(en

The City of Albuquerque also contends that there is no issue with requiring the owner to prove his or her innocence, because it is an affirmative defense and a defendant "always has the burden to prove any affirmative defense." Reply at 10 (citing <u>Martin v. Ohio</u>, 480 U.S. 228, 233 (1987); <u>United States v. 2121 Celeste Road SW</u>, 189 F. Supp. 3d 1208, 1254-55 (D.N.M. 2016)(Browning, J.)(concluding that the innocent owner defense in CAFRA requires the owner to prove their innocence by a preponderance of the evidence). The difference between this affirmative defense and typical affirmative defenses, however, is that the government typically still has a robust burden of proving the defendant's guilt first. <u>See</u>, <u>e.g.</u>, 18 U.S.C. § 983(c) (stating that, under CAFRA, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture"); <u>Martin v. Ohio</u>, 480 U.S. at 233 (although there was an affirmative defense in the case, the jury was instructed nonetheless that "to convict it must find, in light of all the evidence, that each of the elements of the crime of aggravated murder has been proved by the State beyond reasonable doubt"). With the City of Albuquerque's forfeiture procedure, in contrast, the City of Albuquerque has only a probable-cause burden. <u>See</u> 6 COA §§ 7-6-1 to 7. Accordingly, the risk of an erroneous deprivation here is more likely than in most affirmative defense scenarios.

Finally, the government has an interest in seizing the car, because the car and its driver has put at risk the health and safety of other citizens. This interest would continue to exist even after the initial seizure, because there is evidence that the person driving the car has put the

banc)(Hamilton J., dissenting)("[P]robable cause is too low a bar to justify a *permanent* deprivation of property.")(emphasis in original); <u>United States v. $49,576.00 U.S. Currency</u>, 116 F.3d 425, 429 (9th Cir. 1997)("Finally, we observe that allowing the government to forfeit property based on a mere showing of probable cause is a constitutional anomaly. . . . We would find it surprising were the Constitution to permit such an important decision to turn on a meager burden of proof like probable cause.").

health and safety of others at risk by driving under the influence before, and, thus, may do so again. The government also has an interest in towing the vehicle, so that the car does not impede the flow of traffic or cause another accident. The City of Albuquerque's interest, however, in keeping the car after the initial seizure is not all that great when confronted with an innocent owner or an owner not involved in the DWI, because there is little to no evidence that the car is dangerous in that owner's hands -- at least the car is no more dangerous than a car is in anyone's hands. The Court concludes that this factor weighs slightly in the Government's favor. With two factors weighing toward finding a due process violation and one weighing only slightly towards the City of Albuquerque, the Court concludes that A. Harjo has stated a plausible procedural due process claim.

B.     **THE FEES CHARGED DO NOT VIOLATE PROCEDURAL DUE PROCESS.**

The fees that the Forfeiture Ordinance authorizes are not so egregious that they violate due process. Under the Forfeiture Ordinance, the City of Albuquerque may assess tow fees, car storage fees, and a hearing fee. See 6 ROA § 7-6-5(D)-(F). The hearing fee is $50.00, see 6 ROA § 7-6-5(F), the storage fees accumulate at $10.00 per day, see Amended Complaint ¶ 39, at 9, and the tow charge is unclear, although the tow fee must be charged to the owner if the hearing officer finds there was probable cause to seize the car, see 6 ROA § 7-6-5(D). A. Harjo contends that the fees imposed violate procedural due process, because the threat of exorbitant fees cause innocent owners to be tempted to accept settlement offers to which they would not otherwise agree. See Response at 19-20.

As A. Harjo's contention is a procedural due process argument, the same Matthews v. Eldridge balancing test applies. See 424 U.S. at 335. The governmental interest at stake is paying for the costs of storing a vehicle that, in the offenders' hands, creates a risk of harm to

others.  The property interest is slightly different than the above.  Although the property rights in the car are still at issue, the deprivation which the fees cause is not a permanent loss.  The fees cause a settlement agreement, which may result in a car being booted for a period, but the owner will not lose the vehicle via forfeiture if he or she settles.  See Amended Complaint ¶ 63, at 15 (alleging that a city attorney offered to return A. Harjo's car if she agreed to "boot the car for 18 months").  Thus, the property interest is not ownership of the car, but use of the car during a period in which the government boots it.  This interest is still significant, because loss of use of a car, even for a short period, can cause hardship on many Americans, see supra at 68, but the interest of the use of the car is less than the interest in ownership of the entire vehicle.

The risk of erroneous deprivation, however, is not that significant.  The Tenth Circuit has determined that pre-hearing penalties and fees do not necessarily present a significant risk of erroneous deprivation.  "[V]ehicle impoundment and the imposition of attendant penalty charges prior to any hearing may be appropriate *provided* the aggrieved party is afforded adequate notice of a post-deprivation hearing . . . and, if successful, the party may recover any fees or penalties assessed."  Summers v. State of Utah, 927 F.2d 1165, 1169 (10th Cir. 1991).  See Goichman v. City of Aspen, 859 F.2d 1466, 1477 (10th Cir. 1988).  Here, A. Harjo had notice that her car was impounded, see Amended Complaint ¶ 62, at 15, and the Forfeiture Ordinance requires that City of Albuquerque police notify owners, see 6 ROA § 7-6-5(D).  The fees are also recoverable.  See 6 ROA § 7-6-5(D).  Thus, the City of Albuquerque's scheme does not facially present an erroneous deprivation problem.  Although fee recovery is subject to the hearing officer's discretion, see 6 ROA § 7-6-5(D), the Court discerns no due process concerns, because the Tenth Circuit does not require that the fees be recoverable, but only that they "may" be recovered, Summers v. State of Utah, 927 F.2d at 1169.  That the tow fee must be imposed if the hearing

officer determines that there was probable cause to seize the vehicle, see 6 ROA § 7-6-5(D), also does not violate due process, because the "charge assessed [is] reasonably related to the costs of enforcement," and the car was never "exonerated" of the underlying DWI, Goichman v. City of Aspen, 859 F.2d at 1470. In other words, if a police officer has probable cause that a vehicle's driver is intoxicated, it is reasonable for the police officer to tow the vehicle from the road both for other citizens' protection and for the vehicle's safety; if the vehicle is left on the road unattended, another driver could hit the car. Because a hearing officer later affirms that there was probable cause for the DWI, it was still reasonable for the police officer to tow the car, so assessing a charge for the public's and the vehicle's safety also presents no due process concerns.

The Tenth Circuit's precedent is supported when analyzing the fees at issue in this case. A. Harjo's theory is premised on the idea that an owner will realize that storage fees will become so great over the adversarial process' duration that the owner will choose to enter a settlement agreement, even when the owner might be innocent, because settlement would be cheaper than fighting the seizure. Given the costs of litigation, this pressure to settle exists in almost every adversarial process. That pressure does not mean, however, that certain costs could not unconstitutionally coerce settlement. Nevertheless, the Court concludes that these fees do not unconstitutionally coerce a settlement, because the maximum fee assessed pre-hearing would be too slight to compel settlement, and, although the fees might become far more exorbitant post-hearing, the hearing, assuming that it affords a constitutional amount of process, would minimize the risk of an erroneous deprivation.

The Court estimates that pre-hearing fees would, at worst, amount to around $650.00-$750.00. After a car's seizure, the owner has ten days from the date that he or she receives notice of the seizure to request a hearing. See 6 ROA § 7-6-5(D)(7). If an owner requests a

hearing, the hearing officer must issue a written decision within twenty days, excluding weekends and holidays, from the date of receipt of the owner's hearing request. <u>See</u> 6 ROA § 7-6-5(D). Estimating for the time it takes to mail and receive notices, it would take about forty-four days from the seizure date to the hearing decision date. During that time, only $440.00 in storage fees would have accumulated and, coupled with the $50.00 hearing fee and estimating $200.00 for the towing fee, the total charges would be $690.00.[18]

While $690.00 is a significant amount of money to many Americans, it is not so much that it would unconstitutionally coerce many into settling as opposed to fighting the case, at least through the hearing process, especially when the storage fees -- the majority of the fees -- may be waived if the owner prevails at the hearing. A. Harjo's case is illustrative that the fees would not lead to coerced settlement agreement. The City of Albuquerque offered to settle for $4,000.00 and an eighteen month period in which her car would be booted. Faced with the threat of paying $690.00 in fees versus $4,000.00 to settle and a boot period, it is highly unlikely that the fees would coerce A. Harjo or anyone into settling pre-hearing. Perhaps a typical settlement agreement might be for less money and for a shorter boot period, but, regardless of the settlement offer, a charge between $650.00-$750.00 does not create a great risk of an erroneous deprivation.

---

[18]A. Harjo's case provides an example that fees would land at or near this amount. A. Harjo's car was seized on April 23, 2016. <u>See</u> Amended Complaint ¶ 59, at 14. The City of Albuquerque filed a forfeiture action in state court on June 10, 2016, which was some time after the hearing officer rendered a decision. <u>See</u> Amended Complaint ¶ 77, at 18. Between the seizure and the state court action forty-eight days elapsed. Storage fees amassing at $10.00 a day would equal $480.00, plus the $50.00 hearing fee would equal $530.00. Assuming, again, that towing fees would be around $200.00 for an in-city tow, the total fees A. Harjo amassed would be $730.00. This amount is likely more than the fees that A. Harjo faced on the day that the hearing officer issued his opinion, however, because it would take some time between the hearing opinion's date and the date the city attorneys filed a forfeiture action in state court.

Fees, of course, continue to accrue after the hearing, and can become excessive. The risk of an erroneous deprivation decreases significantly, however, once the owner has had a hearing.[19] "An adversarial hearing that occurs shortly after freezing assets would serve to diminish the risk of an erroneous deprivation at a meaningful time. There an impartial judge could weigh and consider each party's case and more reliably determine whether there exists a factual basis for forfeiture." United States v. Jones, 160 F.3d 641, 646-47 (10th Cir. 1998). See Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 171-72 (1951)(Frankfurter, J., concurring)("No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it."). Thus, the risk that fees charged after a hearing will pressure an owner into a settlement leading to an erroneous deprivation is also slim. The Court concludes, accordingly, that the fees do not create a procedural due process violation.

## IV. THE NMFA PREEMPTS THE FORFEITURE ORDINANCE, BUT THE ISSUE IS NOVEL SO THE COURT WILL DELINE TO EXERCISE JURISDICTION OVER THE CLAIM AND DISMISSES THE CLAIM WITHOUT PREJUDICE.

Both parties assert that the Court should dismiss A. Harjo's state law claim.[20] The Court discerns that the parties request the state claim's dismissal on two grounds. First, they contend that the Court should dismiss, because New Mexico appellate courts "have yet to consider" the

---

[19]The Court has already determined that this hearing process is unconstitutional, in part because the burden of proof placed on an owner creates a significant risk of erroneous deprivation. In this case, the fees might exacerbate the Forfeiture Ordinance's existing constitutional infirmities, but the fees do not create an independent constitutional violation.

[20]Although both parties request that the Court dismiss the remaining state law issue, the Court cannot dismiss a state law claim over which the Court otherwise has supplemental jurisdiction based solely on the parties' consent. See Bonadeo v. Lujan, 2009 WL 1324119, at *9 (D.N.M. Apr. 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists.").

issue.  Motion at 6.  See Response at 22 ("[T]his issue has not yet been addressed by the state appellate courts.").  They also both contend that the Court may dismiss the claim under 28 U.S.C. § 1367(c)(1).  See Motion at 5 ("A court may decline to exercise its jurisdiction over claims that 'raise[] a novel or complex issue of State law'")(alterations in Motion)(quoting 28 U.S.C. § 1367(c)(1)); Response at 23 (arguing that the Tenth Circuit had "instructed the district court to remand the plaintiff's state-law claim to state court on the ground that it raised a 'novel and complex issue of state law that is undecided by the [state] courts'")(alterations in Response)(quoting Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1237 (10th Cir. 1997)).  Although the parties invoke 28 U.S.C. § 1367(c)(1), neither specify whether they are arguing that the issue is novel or if they are arguing that it is complex.  Based on their arguments, however, that the state issue is new, that New Mexico appellate courts have not yet considered the issue,[21] and that novel means new, the Court concludes that they are invoking 28 U.S.C. § 1367(c)(1)'s novelty test and not the complexity prong.[22]

---

[21]See Motion at 6 ("The applicability of a state statute to a vehicle seized pursuant to a city ordinance or the issue of whether the state statute preempts a city ordinance, involve questions of state law, which New Mexico's appellate courts have yet to consider."); See Response at 22 ("[T]his issue has not yet been addressed by the state appellate courts.").

[22]If either party is invoking the complexity prong, the Court concludes that this issue is not sufficiently complex to qualify.   As the Court noted above, a district court may decline to exercise supplemental jurisdiction if a claim is novel or complex.  See Ameritox, Ltd. v. Millennium Laboratories, Inc., 803 F.3d at 536.  Other courts have determined a claim is complex if it requires a court to determine how several state or federal statutes interact or involve numerous unsettled state law issues.  See Ameritox, Ltd. v. Millennium Laboratories, Inc., 803 F.3d at 536 (concluding that determining whether federal statutes created nine state causes of action under various state consumer protection statutes is a complex issue); Schwarm v. Craighead, 233 F.R.D. 655, 659 (E.D. Cal. 2006)("Courts have considered claims to be complex when they address issues of first impression that are numerous or of constitutional magnitude.")(citing Fielder v. Credit Acceptance Corp., 188 F.3d 1031, 1037-38 (8th Cir. 1999)).  In contrast, this case is a straightforward statutory interpretation case.  Nor does this

The Court has determined above that what amounts to a novel issue has no settled legal test and has determined that a state law issue is novel if it is (i) new; and (ii) concerns a notable state law issue. See supra at 38. The Court would, normally, determine the jurisdictional issue first, before turning to the merits, but novelty is one of those issues, where the merits sometimes bear on whether there is a jurisdictional problem. Cf. Lopez v. Delta Int'l Machinery Corp., 2017 WL 3142028 at *39 n.42 (D.N.M. July 24, 2017)(Browning, J.)(noting that the false conflict doctrine in a choice-of-law analysis requires the Court to analyze the claims before determining whether there is a false conflict). Similarly, in the qualified immunity context, while the Court can decide the clearly established prong first, see Pearson v. Callahan, 555 U.S. 223, 236 (2009), sometimes it is difficult to determine whether the law is clearly established without the Court determining first whether there is a constitutional violation. In this case, to determine whether the issue is notable, it requires the Court to examine, at least to some extent, what effect a ruling would have -- for example, whether the Court's ruling would affect the balance of power between the state and local governments. Thus, the Court must dip its toe, at least a little bit, into the merits.

A. Harjo argues that the NMFA preempts the Forfeiture Ordinance, 6 ROA §§ 7-6-1 to 7, because the NMFA unequivocally states that "[t]he purposes of the Forfeiture Act are to: . . . ensure that only criminal forfeiture is allowed in this state." N.M. Stat. Ann. 31-27-2(A)(6) (emphasis added). See Response at 22 n.11. The City of Albuquerque counters that the NMFA's scope is limited to "laws that specifically apply the Forfeiture Act," N.M. Stat. Ann. § 31-27-2(B)(1), so the NMFA does not apply to the City of Albuquerque's civil vehicle

---

issue require the Court to decide any factual issues or hold a trial. The Court concludes, accordingly, that it is not complex.

forfeiture ordinances, because those ordinances do not "apply the Forfeiture Act," Motion at 3 (citing 6 ROA §§ 7-6-1 to 7).

"Under Article X, Section 6(D) of the New Mexico Constitution, '[a] municipality . . . may exercise all legislative powers and perform all functions not expressly denied by general law or charter." American Civil Liberty Union of New Mexico v. City of Albuquerque, 1999-NMSC-044, ¶ 10, 992 P.2d 866, 870 (quoting N.M. Const. art. X, § 6(D)("ACLU of New Mexico")). There must be an "express statement of the authority or power denied" to "preempt a home-rule ordinance." ACLU of New Mexico, 1999-NMSC-044, ¶ 10, 992 P.2d at 870. Originally, the Supreme Court of New Mexico interpreted the express-statement-of-power-denied requirement strictly. In Apodaca v. Wilson, 1974-NMSC-071, 525 P.2d 876 -- the first Supreme Court of New Mexico case to consider whether a state law preempted a home-rule ordinance -- the Supreme Court of New Mexico noted that "[a]n example of such specific denial of power" exists when a state law stated "unless otherwise provided by law, municipalities are prohibited from imposing an income tax." Apodaca v. Wilson, 1974-NMSC-071, ¶ 14, 525 P.2d at 881. Thus, preemption required a specific statement in the state law to the effect that state law prohibits municipalities from legislating in the area, akin to the express preemption test in federal preemption jurisprudence. See Medtronic, Inc. v. Lohr, 518 U.S. at 484-85. The Supreme Court of New Mexico subsequently and expressly relaxed Apodaca v. Wilson's requirement:

> We cannot take Gallup's position that N.M. Const. art. X Section 6(D) allows a municipality to disregard an express law of the Legislature unless the law specifically states "and no municipality may do otherwise." Therefore, any New Mexico law that clearly intends to preempt a governmental area should be sufficient without necessarily stating that affected municipalities must comply and cannot operate to the contrary.

Casuse v. City of Gallup, 1987-NMSC-112, ¶¶ 5-6, 746 P.2d 1103, 1104-05 (citing Apodaca v. Wilson, 1974-NMSC0071, ¶ 14, 525 P.2d at 881). Thus, while an express clause stating that a municipality cannot legislate in the field will still preempt a local law, a state law can also preempt a municipality's ordinance if New Mexico law "clearly intends to preempt a governmental area." Casuse v. City of Gallup, 1987-NMSC-112, ¶ 6, 746 P.2d at 1105 (emphasis added). See ACLU of New Mexico, 1999-NMSC-044, ¶ 10, 992 P.2d at 870. Thus, in Casuse v. Gallup, a New Mexico general law, which required that municipalities with over 10,000 people elect their officials from single-member districts, preempted a local City of Gallup law, which allowed at-large elections for city councilors. See Casuse v. City of Gallup, 1987-NMSC-112, ¶ 8, 746 P.2d at 573. The Supreme Court of New Mexico in Casuse v. City of Gallup did not provide extensive reasoning for its decision, but the Court concludes that the Supreme Court of New Mexico's decision is most like conflict preemption. See English v. General Elec. Co., 496 U.S. at 79 ("Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements."). In Casuse v. City of Gallup, it was impossible to comply with both laws -- the state law required single member districts, whereas the local law required an at-large election, and thus the state law triumphed over the local law. See Casuse v. City of Gallup, 1987-NMSC-112, ¶ 8, 746 P.2d at 573.

The Supreme Court of New Mexico, however, has also appeared to embrace a version of obstacle preemption. See City of Albuquerque v. New Mexico Public Regulation Com'n, 2003-NMSC-028, ¶ 7, 79 P.3d 297, 301 ("Local governments also cannot use their police power over street improvements or their home rule power to frustrate or violate established public policy."). See also English v. General Elec. Co., 496 U.S. at 78 ("Thus, the Court has found pre-emption . . . where state law stands as an obstacle to the accomplishment and execution of the

full purposes and objectives of Congress."). In <u>ACLU of New Mexico</u>, for example, the Supreme Court of New Mexico considered whether the State Children's Code, N.M. Stat. Ann. §§ 32A-1-1 to 32A-25-5 ("Children's Code"), preempts the City of Albuquerque's juvenile curfew ordinance, ROA §§ 12-1-1 to 12-5-9 ("Curfew"). 1999-NMSC-044, ¶ 1, 992 P.2d at 868. The Curfew made it unlawful for any person under seventeen years of age to remain in a public place during curfew hours and, if found in such a place, a person under seventeen could be fined in an amount up to $500.00 and imprisoned for ninety days. <u>See</u> <u>ACLU of New Mexico</u>, 1999-NMSC-044, ¶ 3, 992 P.2d at 868. The Curfew also allowed the City of Albuquerque police to take into custody those suspected of a curfew violation under what the City of Albuquerque called the STOP program. <u>See</u> <u>ACLU of New Mexico</u>, 1999-NMSC-044, ¶¶ 4-6, 992 P.2d at 868-69. When considering whether the Children's Code preempted the Curfew, the Supreme Court of New Mexico first assessed the Legislature's stated purpose with the Children's Code, noting that the law's purpose is "to provide for the care, protection and wholesome mental development of children" as well as "to provide judicial and other procedures . . . in which the parties are assured a fair hearing and their constitutional and other legal rights are recognized and enforced." 1999-NMSC-044, ¶¶ 11, 992 P.2d at 870. From that stated purpose, the Supreme Court of New Mexico concluded that the Children's Code preempted the Curfew. <u>See</u> 1999-NMSC-044, ¶ 10, 992 P.2d at 870. Although the stated purpose of the Children's Code's did not "prohibit municipalities from drafting ordinances that proscribe specific conduct of children which is unlawful if committed by adults," the Children's Code "control[led] the manner in which children may be taken into custody, taken into protective custody or adjudicated." 1999-NMSC-044, ¶¶ 11, 992 P.2d at 870. Thus, according to the Supreme Court of New Mexico, "[t]he Curfew, which attempts to criminalize behavior involving

juveniles, and the STOP program, which purportedly took children into protective custody, implicate the Children's Code procedures and protections."  1999-NMSC-044, ¶ 11, 992 P.2d at 870.  Thus, a state law preempts a local ordinance if the local ordinance interferes with the state law's objectives or purposes, much like federal obstacle preemption.  See English v. General Elec. Co., 496 U.S. at 78.[23]

In examining whether the NMFA preempts the Forfeiture Ordinance, the Court begins, as the Supreme Court of New Mexico did in ACLU of New Mexico, with the NMFA's stated purpose.  As A. Harjo argues, one of the NMFA's stated purposes is to "ensure that only criminal forfeiture is allowed in this state."  N.M. Stat. Ann. § 31-27-2(A)(6).  The 2015 Amendment added that purpose.  See 2015 N.M. Laws 152.  This purpose limiting forfeitures to criminal actions is expressly at odds with the City of Albuquerque's civil forfeiture ordinance.  The Court concludes that the 2015 Amendments new purpose is strong evidence of the New Mexico Legislature's intent to preclude municipalities from creating a civil forfeiture scheme.  See ACLU of New Mexico, 1999-NMSC-044, ¶ 10, 992 P.2d at 870.  In addition to the purpose A. Harjo identifies, the NMFA also states that one of its purposes is to "make uniform the standards and procedures for the seizure and forfeiture of property subject to forfeiture."  N.M. Stat. Ann. § 31-27-2(A)(1).  The New Mexico Legislature's desire for uniformity in the standards and procedures also suggests that it intends to supplant local forfeiture laws, which might have different standards and procedures.   Indeed such a conflict in procedures exists here in that,

[23]Showing implied federal obstacle preemption has become much more difficult in recent years.  See In re Santa Fe Natural Tobacco Company Marketing and Sales Practices and Products Liability Litig., __ F. Supp. 3d __, 2017 WL 6550897, at *25 (D.N.M. 2017)(Browning, J.)(detailing recent Supreme Court jurisprudence).  While that approach may be true for federal preemption, there is no indication that the Supreme Court of New Mexico has taken a similar one.

unlike the City of Albuquerque, which places the burden on the innocent owner, the State of New Mexico places the burden on "the state" to "prove by a clear and convincing evidence that an innocent owner had actual knowledge of the underlying crime giving rise to the forfeiture" for the state to prevail against an innocent owner. See N.M. Stat. Ann. § 31-27-7.1(D).

The Supreme Court of New Mexico has held several times, in addition to ACLU of New Mexico, that a statute's stated purpose must be considered in interpreting a statute and is evidence of the statute's proper interpretation. See Baker v. Hedstrom, 2013-NMSC-043, ¶ 15, 309 P.3d 1047, 1051 ("We must examine Plaintiffs' interpretation in the context of the statute as a whole including the purposes and consequences of the Act."). In Baker v. Hedstrom, for example, the Supreme Court of New Mexico concluded that it could not adopt the plaintiffs' interpretation of the statute, in part, because, "[i]n light of the Act's purpose, we can discern no reason why the Legislature" would adopt the plaintiffs' interpretation that "the Legislature would intend to cover individual medical professionals under the Act while excluding the business organizations that they operate under to provide healthcare." 2013-NMSC-043, ¶ 21, 309 P.3d at 1052-53. See Gonzalez v. Performance Painting, Inc., 2013-NMSC-021, ¶¶ 16-17, 303 P.3d 802, 805 ("Thus, a scheme in which a worker could refuse an employment opportunity in favor of receiving more benefits would directly contradict the Legislature's stated purpose. Accordingly, our Court of Appeals has correctly interpreted this section of the [Worker's Compensation Act]."); Tafoya v. Rael, 2008-NMSC-057, ¶ 16, 193 P.3d 551, 555 (applying the Construction Industries Licensing Act's stated purpose to guide its analysis.).

According to the City of Albuquerque, however, the NMFA's scope, which limits the NMFA's application "to laws that specifically apply the forfeiture act," N.M. Stat. Ann. § 31-27-2(B)(1), means that the NMFA does not apply to the City of Albuquerque's vehicle forfeiture

ordinances, as the ordinances do not "specifically apply the forfeiture act" -- i.e., the forfeiture

ordinance does not state anywhere that it is applying the NMFA. The NMFA's scope language,

upon which the City of Albuquerque relies, existed in the original 2002 statute, and the 2015

amendments did not alter that provision substantively. See 2002 N.M. Laws 4.[24] The Court

concludes that the City of Albuquerque's interpretation is unlikely, as it would write the

NMFA's amended purpose out of the statute. See Baker v. Hedstrom, 2013-NMSC-043, ¶ 15,

309 P.3d at 1051 ("If Plaintiffs' interpretations leads to absurdities, or if it conflicts with the

Legislature's purpose for enacting the MMA, then we cannot conclude that their interpretation

reflects legislative intent."). A municipality wishing to enact a civil forfeiture law could entirely

avoid the NMFA by, simply, not mentioning the NMFA, thus allowing non-criminal forfeitures

to continue in New Mexico despite the New Mexico Legislature's expressly stated purpose that it

wished to "ensure that only criminal forfeiture is allowed in this state." N.M. Stat. Ann. § 31-27-

---

[24]The Court notes that the 2015 Amendments changed the placement of some words and a colon, but it appears to have been a style change and did not alter the scope's meaning. A comparison of the two statutes is provided below:

    B. The Forfeiture Act applies to:

        (1)     seizures, forfeitures and dispositions of property subject to forfeiture pursuant to laws that specifically apply the Forfeiture Act

N.M. Stat. Ann. § 31-27-2(B)(1) (2002)

    B. The Forfeiture Act:

        (1)     applies to seizures, forfeitures, and dispositions of property subject to forfeiture pursuant to laws that specifically apply the Forfeiture Act.

N.M. Stat. Ann. § 31-27-2(B)(1) (2015).

2(A)(6).  Thus, reading the NMFA as the City of Albuquerque argues would render the amended

purpose superfluous, and the Court will not read the statute that way.[25]

---

[25]The interpretation that the NMFA preempts the Forfeiture Ordinance does not read out the language that the NMFA shall apply to laws "that specifically apply the forfeiture act." N.M. Stat. Ann. § 31-27-2(B)(1).  The most reasonable way to read N.M. Stat. Ann. § 31-27-2 so that all of its provisions have meaning is that: section (A) says that New Mexico shall have no more civil forfeiture proceedings; and section (B) says that the following rules apply to any forfeiture statute or ordinance that wants to use them.  At bottom, the NMFA is a procedural law.  It outlines: when property may be subject to forfeiture, see N.M. Stat. Ann. § 31-27-4(A)-(D); the amount of process a person must be afforded when their property is seized, see N.M. Stat. Ann. § 31-27-4(E); when and how the state can prosecute its forfeiture actions, see N.M. Stat. § 31-27-5; when and how owners can contest forfeitures, see N.M. Stat. Ann. § 31-27-6(A), (C); the proper venue for forfeiture actions, see N.M. Stat. Ann. § 31-27-6(B); how discovery works, see N.M. Stat. Ann. § 31-27-6(D); the standard of proof, see N.M. Stat. Ann. § 31-27-6(F); and affirmative defenses, see N.M. Stat. Ann. § 31-27-7.1.  New Mexico also has substantive forfeiture laws outlining what property may be seized.  For example, under certain conditions, "[a]ll firearms and bows and arrows may be subject to forfeiture."  N.M. Stat. Ann. § 17-2-20.1.  See, e.g., N.M. Stat. Ann. § 30-3-8.1 (stating that motor vehicles, under certain conditions, may be seized); N.M. Stat. Ann. § 30-45-7 (stating that computers, under certain conditions, may be seized).  Those substantive forfeiture laws state specifically that "[t]he provisions of the Forfeiture Act apply."  N.M. Stat. Ann. § 17-2-20.1(C).  See, e.g., N.M. Stat. Ann. § 30-3-8.1(B); N.M. Stat. Ann. § 30-45-7(B).  Thus, N.M. Stat. Ann. § 31-27-2(B)(1) still has meaning, even when construing the NMFA as preempting the Forfeiture Ordinance, in that it signals to the courts what substantive forfeiture laws are using the NMFA's procedural rules.  The New Mexico Legislature may, however, want some property to be subject to a different criminal forfeiture procedure.  In that case, that substantive forfeiture law would not contain the language that it is applying the NMFA, and that law would outline another procedure.

The NMFA still preempts the Forfeiture Ordinance, even though the Forfeiture Ordinance does not state that it is applying the NMFA, because the NMFA precludes any state statute or local ordinance from applying civil procedures to forfeiture proceedings.  In other words, the New Mexico Legislature is stating, through the NMFA, that it wants criminal procedures and protections, and not civil procedures and protections, to apply to citizens subject to forfeiture proceedings.  The Forfeiture Ordinance, thus, runs afoul of the NMFA, because it is using civil procedures.  Indeed, conflicting procedure is precisely what led the Supreme Court of New Mexico to conclude, in ACLU of New Mexico, that a state law preempted a local ordinance.  See ACLU of New Mexico, 1999-NMSC-044, ¶ 11, 992 P.2d at 870 ("The Curfew, which attempts to criminalize behavior involving juveniles, and the STOP program, which purportedly took children into protective custody, implicate the Children's Code procedures and protections.").

In addition, that the NMFA applies only to certain statutes does not prevent the NMFA from preempting city ordinances.  As discussed above, a city ordinance can be preempted if it stands as an obstacle to a state law's purposes and procedures or if it is impossible to comply with both laws. See ACLU of New Mexico, 1999-NMSC-044, ¶ 11, 992 P.2d at 870; Casuse v. City of Gallup, 1987-NMSC-112, ¶ 8, 746 P.2d at 573.  See also City of Albuquerque v. New Mexico Public Regulation Com'n, 2003-NMSC-028, ¶ 7, 79 P.3d 297, 301 ("Local governments also cannot use their . . . home rule power to frustrate or violate established public policy)(citing ACLU of New Mexico, 1999-NMSC-044, ¶ 13, 992 P.2d at 871).  The NMFA's procedures might apply only to certain statutes, but that does not mean a city's ordinances cannot interfere with the NMFA, and thus the NMFA still preempts those ordinances.  To take an extreme example, a city ordinance that says, the NMFA shall not apply within the City of Albuquerque city limits may not "apply" the NMFA, but it interferes with it, and the hypothetical city ordinance would be invalid under Casuse v. City of Gallup, 1987-NMSC-112, ¶ 8, 746 P.2d at 573, as it would be impossible to comply with both the city ordinance and the NMFA within the City of Albuquerque city limits.  Similarly, as the NMFA is a criminal forfeiture act, it would not apply to civil forfeiture ordinances, but that does not mean that the NMFA does not preempt civil forfeiture acts if the Legislature intends for the NMFA to establish that only criminal forfeitures are allowed in the state.

In arguing its position, the City of Albuquerque cites several judges from the Second Judicial District Court who have concluded that the NMFA does not preempt the Forfeiture Ordinance.  See Motion at 4-5 (citing City of Albuquerque v. Delgado, D-202-CV-201602199, Order Denying Defendant Derek Delgado's Motion to Dismiss Plaintiff's Complaint Pursuant to Rule 1-012(B)(6) ¶ 1, at 1, filed October 21, 2016 (Franchini, J.); Espinoza v. City of

Albuquerque, D-202-CV-201604156, Final Judgment and Order at 2, filed October 6, 2016 (Huling, J.); City of Albuquerque v. Ehrenstein, D-202-CV-201207538, Order on Claimant's Motion to Dismiss ¶¶ 4-5, at 1-2, filed June 15, 2016 (Butkus, J.); City of Albuquerque v. Belcher, D-202-CV-201507488 Judgment ¶ 8, at 2, filed April 21, 2016 (Malott, J.); City of Albuquerque v. Serna, D-202-CV-201506661, Order on Motion for Default ¶¶ 4-5, at 2, filed March 20, 2016 (Lopez, J.). The Court concludes that the Supreme Court of New Mexico would not follow those opinions, as all of the state judges' opinions are one to two sentence orders that assert, more as a conclusion, that the NMFA does not preempt the Forfeiture Ordinance. See City of Albuquerque v. Delgado, Order Denying Defendant Derek Delgado's Motion to Dismiss Plaintiff's Complaint Pursuant to Rule 1-012(B)(6) ¶ 1, at 1; Espinoza v. City of Albuquerque, Final Judgment and Order at 2; City of Albuquerque v. Ehrenstein, Order on Claimant's Motion to Dismiss at ¶¶ 4-5, at 1-2; City of Albuquerque v. Belcher, Judgment ¶ 8, at 2; City of Albuquerque v. Serna, Order on Motion for Default ¶¶ 4-5, at 2. The Court searched for letters that occasionally accompany these types of orders that explain the district judge's reasoning, but could find none. Moreover, in one of the cases, the state court noted that the car owner did not submit a brief supporting his contention that the NMFA preempted the Forfeiture Ordinance, see City of Albuquerque v. Belcher, Judgment at ¶ 7, at 2, and, in another case, the 2015 amendments to the NMFA had not yet taken effect, see City of Albuquerque v. Ehrenstein, Order on Claimant's Motion to Dismiss ¶¶ 1-2, at 1. Accordingly, the Court concludes that the Supreme Court of New Mexico would not follow those cases.

Although the Court concludes that the NMFA preempts the City of Albuquerque's forfeiture ordinance, the Court also concludes that this issue is novel as it is both new and notable. The issue is sufficiently new, because no New Mexico appellate courts have considered

the issue.  Although six state district courts have pondered the problem, the Court concludes that this issue still satisfies the new requirement, because all of those district court decisions occurred within the last two years.  The Court concludes that the issue is also sufficiently notable.  As the Court determines on the merits, the NMFA preempts the Forfeiture Ordinance.  Its determination bucks the trend amongst state district court judges who concluded that the NMFA does not preempt the Forfeiture Ordinance and the Court's ruling implicates the power local authorities have vis-à-vis the state.  See Mountain States Media, LLC v. Adams Cty., 389 F. App'x 829, 838 (10th Cir. 2010)(unpublished)("Plaintiffs ask the federal courts to interpret a local zoning ordinance in the first instances.  Zoning law is a uniquely local concern with which '[f]ederal courts should be reluctant to interfere.'")(quoting Norton v. Vill. of Corrales, 103 F.3d 928, 933 (10th Cir. 1996)).   Unlike the Court's federal constitutional rulings, which excise certain provisions of the Forfeiture Ordinance as unconstitutional, a preemption ruling invalidates all of the City of Albuquerque's Forfeiture Ordinance. Such a preemption ruling also suggests that city officials cannot pass any more civil forfeiture ordinances and it also has implications for local authorities throughout the state.  For example, in addition to the City of Albuquerque, the City of Santa Fe and the City of Las Cruces -- two of New Mexico's largest population centers outside the City of Albuquerque -- also have similar civil vehicle forfeiture ordinances.  See ROSF 24-9.1 to 9.9; ROLC 27-6.  The Court's ruling would call into doubt the state constitutionality of those ordinances, too.  Furthermore, local revenue is at issue.  Based on those considerations, the Court concludes that the state sovereign and its courts have a significant interest in this litigation, so the issue is notable.  Moreover, this precise issue is currently before the Court of Appeals of New Mexico in Espinoza v. City of Albuquerque, No. 35,908.  The comity doctrine, which animates the Court's considerations under 28 U.S.C. § 1367(c)(1), see Estate of Harshman v.

Jackson Hole Mountain Resort Corp., 379 F.3d at 1164, dictates that "one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigations, have had an opportunity to pass on the matter," Rhines v. Weber, 544 U.S. 269, 274 (2005). Given that this issue is new, it impacts local revenue and the power local authorities have vis-à-vis the state, and that it is before the Court of Appeals of New Mexico, the Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(1)'s novelty prong -- not because the Court wants to decline supplemental jurisdiction, but because it believes that refusing to decline it would amount to an abuse of discretion under Tenth Circuit precedent. See Mountain States Media, LLC v. Adams Cty., 389 F. App'x at 838. The Court, accordingly, will dismiss that claim without prejudice.[26]

---

[26]The Court must dismiss the state claim, as opposed to severing and remanding it, because the Court lacks the power to sever and remand claims over which it has supplemental jurisdiction. As the Court has previously determined, "federal statutes authorize partial remand of state-law claims only from a civil action where a federal question claim is joined to a state-law claim over which the court lacks subject-matter jurisdiction." Taylor v. L&P Building Supply of Las Cruces, Inc., 2015 WL 7603614, at *12 (Oct. 27, 2015)(Browning, J.)(citing 28 U.S.C. § 1441(c)). The removal statute supports that point; the Court "shall sever from the action all claims" that are "not within the original or supplemental jurisdiction of the district court," and "shall remand the severed claims to the State court from which the action was removed." 28 U.S.C. § 1441(c)(1)(B)-(2). Thus, the Court may, under 28 U.S.C. § 1441(c), sever and remand state claims over which it does not have supplemental or original jurisdiction. The Court concludes that it has supplemental jurisdiction over this state claim, because it arises from the same nucleus of operative facts as the federal claims i.e., A. Harjo's car seizure. Therefore, although it concludes it will decline to exercise that supplemental jurisdiction, see supra, at 89, the Court still has supplemental jurisdiction over the claim, so it cannot properly sever and partially remand under 28 U.S.C. § 1441(c).

The only other source of power that the Court could draw upon to sever and remand the claims would be Carnegie-Mellon University v. Cohill, 484 U.S. 343 (1988). See Salazar v. San Juan Cty. Detention Ctr., __ F. Supp. 3d __, 2017 WL 4620977, at *12 (D.N.M. 2017)(Browning, J.)(concluding that Carnegie-Mellon University v. Cohill grants district courts some independent power to remand cases). In that case, the Supreme Court considered whether a court could, after all federal claims in a removed case were dismissed, properly remand state claims over which the court had supplemental jurisdiction absent specific statutory authority. See Carnegie Mellon University v. Cohill, 484 U.S. at 345. The Supreme Court concluded that,

- 89 -

**IT IS ORDERED** that the requests in the Defendant City's Motion for Judgment on the Pleadings and Memorandum in Support, filed June 5, 2017 (Doc. 44), are granted in part and denied in part. Plaintiff Arlene Harjo's unlawful profit incentive claim is dismissed to the extent that it relies on the theory that, because the vehicle forfeiture program funds itself, it violates due process. A. Harjo's procedural due process claim is dismissed to the extent it relies on the theory that the fees imposed, alone, create a procedural due process violation. Finally, the Court dismisses the state law claim without prejudice. All other requests for relief are denied.

_____
UNITED STATES DISTRICT JUDGE

---

"when a district court may relinquish jurisdiction over a removed case involving pendant claims, the court has discretion to remand the case to state court." Carnegie-Mellon University v. Cohill, 484 U.S. at 351 (emphasis added). See Salazar v. San Juan Cty. Detention Ctr., __ F. Supp. 3d __, 2017 WL 4620977, at *12 (emphasizing that Carnegie-Mellon University v. Cohill grants courts the power to remand cases and not claims). Here, the Court would be severing and remanding a claim, which is unlike what the Supreme Court allowed in Carnegie-Mellon University v. Cohill, i.e., remanding a case. Moreover, the procedural posture is different; here, the federal claims are still live, whereas, in Carnegie-Mellon University v. Cohill, all federal claims had been resolved. The Court notes that some of the policy reasons that the Supreme Court found operative in Carnegie-Mellon University v. Cohill may be relevant here -- namely, "values of economy [and] convenience." 484 U.S. at 353. The state court will have to reprocess the case, and the litigants will have to bear the cost of refiling the case. Nonetheless, absent a specific grant of power from Congress or the Supreme Court, the Court cannot expand its remand power. Accordingly, the Court will dismiss the claim without prejudice.

*Counsel:*

Arash Kashanian
Law Offices of Arash Kashanian
Albuquerque, New Mexico

-- and --

Charles Brad Lane Cates
Law Offices of Charles Brad Lane Cates
Fairacres, New Mexico

-- and --

Justin Pearson
Institute for Justice
Miami, Florida

-- and --

Robert Frommer
Robert Johnson
Institute for Justice
Arlington, Virginia

      *Attorneys for the Plaintiff*

Jeffrey Butler Driggers
Kyle Jordan Hibner
Eric Jon Locher
Philomena M. Hausler
    Assistant City Attorneys
City of Albuquerque
City Attorney's Office
Albuquerque, New Mexico

-- and --

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

      *Attorneys for the Defendant*