# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ARLENE HARJO,

     Plaintiff,

vs.                                              CIV 16-1113 JB/JHR

CITY OF ALBUQUERQUE,

     Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Motion for Partial Summary Judgment and Supporting Memorandum, filed October 16, 2017 (Doc. 67)("MSJ"); (ii) the Defendant's Motion and Supporting Memorandum to Strike Declaration of Joseph T. Gardemal III in Support of Plaintiff's Motion for Partial Summary Judgment, filed October 30, 2017 (Doc. 73)("Motion to Strike"); and (iii) the Plaintiff's Motion for Modification and/or Reconsideration, filed April 27, 2018 (Doc. 97)("Motion"). The Court held a hearing on June 13, 2018. The primary issues are: (i) whether the City of Albuquerque's forfeiture attorneys and enforcement personnel have an unconstitutional institutional incentive to seize cars and prosecute forfeiture actions; (ii) whether the City of Albuquerque's forfeiture officials -- enforcement personnel, prosecutors, and administrative law judges -- have an unconstitutional personal incentive to seize cars, prosecute forfeiture actions, and conclude that vehicles are forfeiture eligible; (iii) whether the City of Albuquerque's forfeiture program[1] violates the Due

---

[1]When the Court refers to the forfeiture program, it means the institutions required to carry out the City of Albuquerque's motor vehicle seizure and forfeiture ordinance, <u>see</u> Revised Ordinances of Albuquerque §§ 7-6-1 to 7, including, the City of Albuquerque police officers who seize the cars, the City of Albuquerque officials who prosecute the forfeitures, the judges

Process Clause of the Fourteenth Amendment of the Constitution of the United States of America by placing the burden of proof on vehicle owners to prove that they have a right to keep their property; and (iv) whether the Court should strike the Declaration of Joseph T. Gardemal III (dated October 9, 2017), filed October 16, 2017 (Doc. 67-2)("Gardemal Decl."), as an improper expert opinion. The Court concludes that the City of Albuquerque has an unconstitutional institutional incentive to prosecute forfeiture cases, because, in practice, the forfeiture program sets its own budget and can spend, without meaningful oversight, all of the excess funds it raises from previous years. Thus, there is a "realistic possibility" that forfeiture officials' judgment "will be distorted by the prospect of institutional gain" -- the more revenues they raise, the more revenues they can spend. Marshall v. Jerrico, Inc., 446 U.S. 238, 251 (1980)("Marshall").

Independent from the institutional incentive, the Court concludes that, viewing the evidence in the light most favorable to the City of Albuquerque, forfeiture officials have no unconstitutional personal incentive, because their salary is not tied to forfeiture revenue. Therefore, the possibility that they would feel pressured to prosecute more cases or hold for the City of Albuquerque to maintain their income is too remote to implicate due process. The forfeiture program, however, violates procedural due process, because owners have to prove that their cars are not subject to civil forfeiture. Finally, the Court will not strike the Gardemal Decl. because the Gardemal Decl.'s relevant portions contain factual statements that arise from admissible evidence. Accordingly, the Court grants the MSJ in part and denies it in part, denies the Motion to Strike, and grants the Motion.

---

who preside over forfeiture proceedings, and the property and buildings that hold the proceedings and secure the vehicles.

## **FACTUAL BACKGROUND**

The Court draws the factual background from the parties' undisputed material facts in their summary judgment motion papers. See MSJ ¶¶ 1-70, at 3-15; Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment, ¶¶ 1-64, at 3-14, filed October 30, 2017 (Doc. 72)("MSJ Response"); Reply in Support of Plaintiff's Motion for Partial Summary Judgment, ¶¶ 7-60, at 3-6, filed November 13, 2017 (Doc. 77)("MSJ Reply"). While the parties dispute particular facts' materiality, there are few factual disputes. See, e.g., MSJ Response ¶¶ 4-5, 8, 14, at 3, 5.[2] The Court details those undisputed facts below.

1.      **The City of Albuquerque's Forfeiture Program.**

The City of Albuquerque's motor vehicle seizure and forfeiture ordinance, see Revised Ordinances of Albuquerque ("ROA") §§ 7-6-1 to -7 ("Forfeiture Ordinance"), provides that a vehicle is "subject to immediate seizure and forfeiture . . . if it is . . . [o]perated by a person in the commission of a DWI offense" and the driver has at least one prior DWI arrest, summons, or conviction. MSJ ¶ 1, at 3 (citing ROA § 7-6-2(A)). See MSJ Response ¶ 1, at 3 (not disputing this fact). The Forfeiture Ordinance also provides for forfeiture based on other violations, including any "felony offense" involving the "use of a firearm." MSJ ¶ 2, at 3 (citing ROA § 7-9-3). See MSJ Response ¶ 2, at 3 (not disputing this fact). If somebody other than the alleged offender owns the seized vehicle, the owner bears the burden to "demonstrate[] by a preponderance of the evidence that the owner . . . could not have reasonably anticipated that the

---

[2]In several places, the City of Albuquerque disputes Harjo's facts' materiality, but not their veracity. See MSJ Response ¶¶ 4-5, 8, 14, 19, 24, 33, 39-40, 43-46, 53-56, 61, 63-70 at 3, 5-9, 11, 13-14. A dispute of a fact's materiality does not create a dispute of the fact's veracity. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Accordingly, the Court considers those facts' materiality infra in its analysis.

vehicle could be used" to commit the alleged offense.  MSJ ¶ 3, at 3 (citing ROA § 7-6-7(A)).

See MSJ Response ¶ 3, at 3 (not disputing this fact).

Vehicles seized under the Forfeiture Ordinance "are brought for intake to the City's DWI

Seizure Unit."  MSJ ¶ 4, at 3 (citing Deposition of Shane Rodgers at 11:20-23 (taken August 2,

2017), filed October 16, 2017 (Doc. 67-8)("Rodgers Depo."); id. at 12:23-13:15).  See MSJ

Response ¶ 4, at 3 (not disputing this fact).  The DWI Seizure Unit is housed within the City of

Albuquerque Police Department and "consists of two uniformed officers and five civilian

employees."  MSJ ¶ 4, at 3 (citing Deposition of Donovan Rivera at 7:10-10:7 (taken May 17,

2017), filed October 16, 2017 (Doc. 67-11)("D. Rivera Depo.")).  See MSJ Response ¶ 4, at 3

(not disputing this fact).  The DWI Seizure Unit works closely with the "City's Legal

Department, where two city attorneys are assigned to handle vehicle forfeiture cases."  MSJ ¶ 4,

at 3 (citing Rodgers Depo. at 19:20-20:21; Legal Department Safe City Strike Force Division, at

1, filed October 16, 2017 (Doc. 67-20)).  See MSJ Response ¶ 4, at 3 (not disputing this fact).

When Pepe Hernandez, a DWI Seizure Unit employee, "conducts an investigation into

[an] alleged drunk driver," his "investigation consists mostly" of electronic database searches.

MSJ ¶ 5, at 3 (citing Rodgers Depo. at 13:10-12; D. Rivera Depo. 46:9-12; Deposition of Pepe

Hernandez at 8:4-15 (taken August 2, 2017), filed October 16, 2017 (Doc. 67-13)("Hernandez

Depo.")).  See MSJ Response ¶ 5, at 3 (not disputing this fact).  As part of this investigation,

Hernandez is responsible "for verifying that the seizure occurred inside the city limits."  MSJ ¶ 6,

at 4 (citing D. Rivera Depo. at 45:16-46:1).  See MSJ Response ¶ 6, at 4 (not disputing this fact).

"About once a year," Hernandez determines that a vehicle "is not subject to forfeiture because it

was seized outside city limits."  MSJ ¶ 6, at 4 (citing Hernandez Depo. 13:19-14:2).  See MSJ

Response ¶ 6, at 4 (not disputing this fact).  There is "no type of different investigation if the

vehicle is owned by somebody other than the alleged drunk driver."  MSJ ¶ 7, at 4 (citing D. Rivera Depo. at 12:6-13).[3]  No one from the City of Albuquerque Police Department contacts the owner to "conduct an interview prior to proceeding with the forfeiture" and no one from that department "investigates to determine whether the owner might have a valid innocent owner defense."  MSJ ¶ 7, at 4 (citing Rodgers Depo. at 15:2-16:10; Hernandez Depo. at 20:9-21:25).[4]

"When a vehicle is seized, the owner has ten days to pay a $50 fee to request an administrative hearing."  MSJ ¶ 8, at 4 (citing ROA §§ 7-6-5(D), (F)).  See MSJ Response ¶ 8, at 3, 5 (not disputing this fact).  If the owner does not request a hearing, which happens about sixty times a month, "the vehicle is deemed abandoned and sold at auction."  MSJ ¶ 8, at 4 (citing D. Rivera Depo. at 35:21-24; Deposition of Lacresia Rivera at 20:3-18 (taken May 16, 2017), filed October 16, 2017 (Doc. 67-12)("L. Rivera Depo.")).  See MSJ Response ¶ 8, at 3, 5 (not

---

[3]The City of Albuquerque purports to dispute this fact to the extent that the fact "impl[ies] the City makes no attempt to determine whether there is a basis for an innocent owner defense prior to instituting forfeiture proceedings."  MSJ Response ¶ 7, at 4-5.  To support its dispute, the City of Albuquerque notes that, before instituting forfeiture proceedings, a City of Albuquerque hearing officer must consider, if offered, any "innocent owner defense."  MSJ Response ¶ 7, at 4.  The Court concludes that there is no genuine dispute, because Harjo's asserted fact does not imply that the City of Albuquerque "makes no attempt to determine if there is a basis for the innocent owner defense."  MSJ Response ¶ 7, at 4 (emphasis added).  Her fact merely asserts that the typical DWI Seizure Unit employee does not undertake any different investigation if the vehicle owner is not the alleged drunk driver.  Even if there was an implication with Harjo's asserted fact, the Court would reject it, as it must "resolve all reasonable inferences . . . in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party."  Payne v. Tri-State Careflight, LLC, 2016 WL 6396214, at *8 (D.N.M. Oct. 25, 2016)(Browning, J.)(citing Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999)).  The Court concludes, accordingly, that this fact is undisputed.

[4]The City of Albuquerque purports to dispute this fact for the same reason explored, supra, n.3.  See MSJ Response ¶ 7, at 4-5.  The Court concludes that the fact is undisputed for much the same reasons explored supra, n.3.  Harjo's assertion that no one from the City of Albuquerque Police Department interviews owners or conducts an investigation into an innocent owner defense does not imply that no one attempts to ascertain the validity of an innocent owner defense before instituting forfeiture proceedings.  Likewise, if there is an implication, the Court must reject it for the reasons stated supra, n.3.  Accordingly, the Court concludes that this fact is undisputed.

disputing this fact). Vehicle owners may bid for their vehicles at auction -- even if the owner was the one driving the car when the offense occurred -- and "the City is aware that owners sometimes choose to buy back their vehicle rather than contest the forfeiture." MSJ ¶ 9, at 4 (citing Rodgers Depo. at 63:13-17; L. Rivera Depo. at 24:7-10). See MSJ Response ¶ 9, at 5 (not disputing this fact).

If the owner requests a hearing, "a city attorney conducts settlement negotiations with the owner or her representative" before the hearing. MSJ ¶ 10, at 4 (citing Rodgers Depo. at 19:20-20:3). See MSJ Response ¶ 10, at 5 (not disputing this fact). During settlement negotiations, the City of Albuquerque's forfeiture attorneys exercise "discretion about what kind of settlement offer to make." MSJ ¶ 10, at 4 (citing Rodgers Depo. at 21:11-22). See MSJ Response ¶ 10, at 5 (not disputing this fact). "City attorneys can offer a broad range of settlement terms," ranging from a $500 payment, with no boot requirement, "to a $5,100 payment and a requirement to boot the car for two years." MSJ ¶ 11, at 4 (citing D. Rivera Depo. at 42:13-43:6; L. Rivera Depo. at 35:4-10). See MSJ ¶ 11, at 5 (not disputing this fact). In making settlement offers, "city attorneys are guided by a matrix setting forth approved settlement offers for various circumstances," but those attorneys have discretion to part from the matrix. MSJ ¶ 12, at 5 (citing Rodgers Depo. at 36:3-6; D. Rivera Depo. at 62:5-63:2). See MSJ Response ¶ 12, at 5 (not disputing this fact). For example, "a city attorney could exercise discretion to make a favorable settlement offer if he felt the owner had a valid innocent owner defense." MSJ ¶ 12, at 5 (citing Rodgers Depo. at 23:5-25:25). See MSJ Response ¶ 12, at 5 (not disputing this fact).

If the owner does not settle, "the case proceeds to a hearing before the City's administrative hearing officer." MSJ ¶ 13, at 5 (citing Rodgers Depo. at 19:20-20:3). See MSJ Response ¶ 13, at 5 (not disputing this fact). "The hearing officer is responsible for determining

whether the owner has proved" his or her innocence, and a "number of factors" go into that decision, including "the number of prior incidents and the time elapsed" since the most recent incident. MSJ ¶ 14, at 5 (citing ROA § 7-6-7(A); Rodgers Depo. at 40:11-41:6). <u>See</u> MSJ Response ¶ 14, at 5 (not disputing this fact). The hearing officer may exercise his or her discretion in weighing those factors. <u>See</u> MSJ ¶ 14, at 5 (citing Rodgers Depo. at 40:11-41:6); MSJ Response ¶ 14, at 5 (not disputing this fact).

"Even if the hearing officer rules for the owner, the hearing officer can require payment of storage fees as a condition of the vehicle's release." MSJ ¶ 15, at 5 (citing ROA § 7-6-5(D)). <u>See</u> MSJ Response ¶ 15, at 3, 5 (not disputing this fact). The "default" is that the storage and towing fees are imposed, but those fees "can be waived in unusual cases." MSJ ¶ 15, at 5 (citing Rodgers Depo. at 48:10-15).[5] "Even if the hearing officer rules in favor of the City, the City

---

[5]The City of Albuquerque purports to dispute this fact, by citing a response from Rodgers' deposition that, "<u>in the majority of cases</u>, it's more an order of them being waived, because if the finding is that the seizure was not valid, then they can waive the towing and storage." MSJ Response ¶ 15, at 5 (citing Rodgers Depo. at 48:2-5)(emphasis in MSJ Response). After reviewing the entire exchange, the Court concludes that there is no genuine dispute. The relevant exchange is repeated below:

> Q. [A]re there cases where the hearing officer orders a vehicle released but also orders payment of fees?
>
> A. Just the towing and storage. That would be the only fees that would be assessed.
>
> . . . .
>
> Q. Is that a decision that's made by the hearing officer, whether to order those fees to be paid?
>
> A. I think in the majority of cases, it's more an order of them being waived, because if the finding is that the seizure was not valid, then they can waive the towing and storage. If there are other circumstances, then -- because there's still the fee for storage and towing, and that's covered in the ordinance, as well, but there have been times where they have dictated that those will be waived.

proceeds to file a forfeiture case in state court." MSJ ¶ 16, at 5 (citing ROA § 7-6-5(D)). <u>See</u>

MSJ Response ¶ 16, at 6 (not disputing this fact). Should the owner prevail in state court, the

state court can still "impose storage fees as a condition of the vehicle's release." MSJ ¶ 17, at 5

(citing ROA § 7-6-7(E)). <u>See</u> MSJ Response ¶ 17, at 3 (not disputing this fact). "Storage fees

accumulate at a rate of $10 per day." MSJ ¶ 18, at 5 (citing Rodgers Depo. at 51:8-9). <u>See</u> MSJ

Response ¶ 18, at 6 (admitting this fact). "The City's Chief Hearing Officer has stated that

'about half of the vehicles that APD seizes are not owned by the offender that we confiscate it

from'"; rather, "'it's the mothers, the fathers, the wives, the girlfriends, the brothers, [and] the

uncles'" who own the vehicles. MSJ ¶ 19, at 6 (quoting Santa Fe Vehicle Forfeiture Conference

at 4:29:05-22 (dated September 10, 2014)(Harada)("Forfeiture Conf.")). <u>See</u> MSJ Response

¶ 19, at 6 (not disputing this fact).

------------------------------------------------

     Q.  I see. So the default would be that the fees would be imposed even when the car is released?

     A. Yes.

     Q. Okay.  And then it would be a more unusual case where the fees would be waived and not imposed?

     A. Correct.

Rodgers Depo. at 47:12-48:15.  Rodgers' testimony is unequivocal that the "default would be that fees" are imposed, and that it would be "unusual" for the fees to be "waived."  Rodgers Depo. at 48:10-15.  The language to which the City of Albuquerque cites -- "I think in the majority of cases, it's more of an order of them being waived," Rodgers Depo. at 48:2-3, taken in context, implies that the hearing officer has to issue an affirmative order to overcome the default presumption that the owner has to pay the fees.  He is not saying that in the majority of cases there is a waiver; he is saying that, in the majority of cases in which there is an order, the order is characterized as an order to waive.  The Court concludes, accordingly, that there is no dispute.

## 2.    __The Forfeiture Program's Revenues.__

Under the Forfeiture Ordinance, "the proceeds must be used to carry out" the Forfeiture Ordinance's "purpose and intent," and thus, by law, "proceeds go first to cover the costs of administering the ordinance, with any excess used for DWI enforcement prevention and education."  MSJ ¶ 20, at 6 (citing ROA § 7-6-5(E)).  See MSJ Response ¶ 20, at 3 (not disputing this fact).  The forfeiture program operates as a "special revenue fund," meaning that the forfeiture program has "a specific revenue funding source and a specific restricted use."  MSJ ¶ 21, at 6 (citing Deposition of Aubrey Thompson at 18:14-19:9 (taken May 4, 2017)(Doc. 67-9)("Thompson Depo.").  See MSJ Response ¶ 21, at 6 (admitting this fact).  The forfeiture program "primarily generates revenue through settlements and auctions."  MSJ ¶ 21, at 6 (citing Thompson Depo. at 22:2-7; Deposition of Linda Cutler-Padilla at 21:1-13 (taken May 16 2017), filed October 16, 2017 (Doc. 67-10)("Cutler-Padilla Depo.")).  See MSJ Response ¶ 21, at 6 (admitting this fact).  Revenue raised from the forfeiture program "is used to pay expenses associated with the program, including employee compensation, tow fees, supplies, and purchases of vehicles and other equipment."  MSJ ¶ 21, at 6 (citing Thompson Depo. at 37:8-23; Cutler Padilla Depo. at 22:5-15).  See MSJ Response ¶ 21, at 6 (admitting this fact).  "The City accounts for revenues and expenses associated with its vehicle forfeiture program using a unique project identification code, which allows it to segregate those revenues and expenses from other city funds."  MSJ ¶ 22, at 6 (citing Gardemal Decl. ¶ 20, at 7; Thompson Depo. at 51:9-15; id. at 53:12-17).  See MSJ Response ¶ 22, at 6 (not disputing this fact).

Purchases for the forfeiture program "are sometimes disallowed because the program has not generated sufficient revenue to pay for them," and, on the other hand if "more revenue comes in," then "expenditures can increase."  MSJ ¶ 23, at 7 (citing Thompson Depo. at 135:20-23; id.

at 136:2-5). See MSJ Response ¶ 23, at 6-7 (not disputing this fact). Forfeiture program expenditures can exceed program revenues, as the forfeiture program may draw upon "the City's general fund for expenses." MSJ Response ¶ 23, at 6-7 (citing Cutler Padilla Depo. at 71:23-72:21; Thompson Depo. at 25:23-26:1; id. at 55:6-12; id. at 57:12-18; id. at 139:8-12). See MSJ Reply ¶ 23, at 3 (not disputing this fact).[6] Between 2015 and 2016, the "General Fund budget has been very, very, very tight." MSJ Reply ¶ 23, at 4 (quoting Thompson Depo. at 148:17-19)(citing Cutler-Padilla Depo. at 72:12-21).[7]

"Revenue over and above expenses carries" from year to year, "and the program is allowed to draw on accumulated surplus to pay expenses in later years." MSJ ¶ 24, at 7 (citing Cutler-Padilla Depo. at 15:6-19; id. at 16:14-17). See MSJ Response ¶ 24, at 7 (not disputing this fact). "Revenue from forfeitures, settlements, and fees exceeded expenses paid from the

---

[6]In the MSJ, Harjo asserts that "[t]he amount of money generated by the [forfeiture] program determines the amount of money available to spend," MSJ ¶ 23, at 7 (emphasis added), which would seem to foreclose the possibility that the forfeiture program could draw upon the City of Albuquerque's general fund to cover expenditures. Nevertheless, in the MSJ Reply, Harjo asserts that she "does not disagree that the City could theoretically pay [forfeiture program] expenses from the general fund." MSJ Reply ¶ 23, at 3. The Court concludes, accordingly, that she does not dispute the City of Albuquerque's asserted fact.

[7]Harjo asserts this new fact in the MSJ reply, so that the Court has context for why she does not dispute the City of Albuquerque's assertion that the forfeiture program can draw upon the City of Albuquerque's General Fund. See MSJ Reply ¶ 23, at 4. Typically, a party cannot introduce new facts in reply. See D.N.M. LR-56.1(b) (noting that an MSJ may assert facts and an MSJ response may assert "additional facts," but not stating that a party may add new facts in reply); SEC v. Goldstone, 2015 WL 5138242, at *8 n.22 (D.N.M. Aug. 22, 2015)(Browning, J.)("[T]he movant may not raise an additional fact in its reply brief."). The Court will, however, accept the fact that the "General Fund budget has been very, very, very tight the last year or two," for two reasons. Thompson Depo. at 148:17-19. First, the fact is a direct quote from the Fiscal Manager for the Albuquerque Police Department, see Thompson Depo. at 6:3-5, an individual who would know whether the City of Albuquerque's budget is constrained. Accordingly, the Court has a high degree of certainty of its validity. Second, the City of Albuquerque has had an opportunity to dispute this fact at the hearing, and, if it wanted, in a surreply, but it did not. Accordingly, the Court will consider the fact.

program's special revenue fund in fiscal years . . . 2010, 2011, 2013, and 2014, meaning the program generated surplus fund balance in each of those fiscal years." MSJ ¶ 25, at 7 (citing Gardemal Decl. ¶ 25, at 9-10; Cutler-Padilla Depo. at 15:9-12).[8] During fiscal years 2009 to 2016, the forfeiture program generated $11.8 million in revenue "in the form of forfeitures, settlements and fees," whereas, during the same period, "the City accounted for a total of $13.5 million in revenue using the program's identification code," meaning that eighty-seven percent of the forfeiture program's revenue "was generated via forfeitures, settlements, and fees." MSJ ¶ 26, at 7 (citing Gardemal Decl. ¶¶ 25-26, at 9-10). See MSJ Response ¶ 26, at 7 (not disputing that fact). "That 87% figure would be even higher if not for the approximately $1.7 million in insurance payments that were accounted for using the program's identification code," which, according to the "City's Executive Budget Analyst . . . , th[e] insurance money was 'kind of separate I believe from the DWI' and that it was deposited in the program's special revenue fund

---

[8]The City of Albuquerque purports to dispute this fact, stating that, "from 2009 to 2016, revenues generated . . . were 11.8 million," and "[d]uring the same period . . . expenses were 13.9 million dollars, exceeding revenue." MSJ Response ¶ 25, at 7 (citing Gardemal Decl. at ¶ 25, at 9-10). There is no dispute, however, because Harjo asserts that, in those individual years, revenue exceeded costs, whereas the City of Albuquerque says that from 2009 to 2016, the combined costs exceeded combined revenues. Both statements are true. The reason that combined costs exceed combined revenues is that, in 2016, there was an unusual $3.5 million dollar difference between revenues and costs skewing the combined costs and combined revenues over the 2009 to 2016 period. See Gardemal Decl. ¶ 25, at 9-10.

The Court notes, however, that Harjo asserts that revenues exceed costs in fiscal year 2009. See MSJ ¶ 25, at 7. The Gardemal Decl. does not support that assertion, because, in that year, revenues were $1,636,806, whereas costs were $2,083,800. See Gardemal Decl. ¶ 25, at 10. Accordingly, the Court does not include 2009 in the above statement of undisputed facts.

The City of Albuquerque also purports to dispute this fact by stating that "expenses would be even more significant than estimated by Gardemal considering that a large portion of DWI enforcement is not funded by the City's forfeiture program." MSJ Response ¶ 25, at 7 (citing email from Aubrey Thompson to Eric Locher at 1 (dated December 17, 2015), filed October 16, 2017 (Doc. 67-27)). There is no genuine dispute, however, because Harjo asserts only that the forfeiture program's revenues exceed the forfeiture program's costs for certain fiscal years and not that the forfeiture program's revenues exceed all DWI enforcement costs for those fiscal years. Accordingly, the Court deems this fact undisputed.

'just to kind of hold it.'" MSJ ¶ 27, at 7 (quoting Cutler-Padilla Depo. at 21:1-13; citing Gardemal Decl. ¶ 26, at 10). See MSJ Response ¶ 27, at 7 (not disputing this fact).

"One of the most significant expenses paid out of program revenues is employee compensation." MSJ ¶ 28, at 7. See MSJ Response ¶ 28, at 7 (admitting this fact). During fiscal years 2009 to 2016, "the City used $3.7 million in program revenues to pay employee compensation," which amounts to twenty-seven percent "of all expenses paid with program revenues." MSJ ¶ 28, at 7-8 (citing Gardemal Decl. ¶ 30, at 12). See MSJ Response ¶ 28, at 7 (admitting this fact). Every fiscal year, "the City makes a lump-sum transfer" out of the forfeiture program's account to pay the entire "salaries and benefits of employees associated with the program." MSJ ¶ 29, at 8 (citing Gardemal Decl. ¶¶ 32-35, at 13-15; Cutler-Padilla Depo. at 22:11-15; id. at 25:13-23; id. at 26:8-20; id. at 29:16-22; City of Albuquerque 2016 Approved Budget, at 53, filed October 16, 2017 (Doc. 67-14)("2016 Budget")). See MSJ Response ¶ 28, at 7 (admitting this fact). The salary transfer covers the "civilian employees at the DWI Seizure Unit and the city attorneys who handle forfeiture cases." MSJ ¶ 29, at 8 (citing Cutler-Padilla Depo. at 25:13-23; Gardemal Decl. ¶¶ 30-35, at 12-15). See MSJ Response ¶ 29, at 7 (admitting this fact).

"The City also uses program revenue to cover the program's non-payroll costs." MSJ ¶ 30, at 8 (citing Gardemal Decl. ¶¶ 31, 44-48, at 12, 18-20). See MSJ Response ¶ 30, at 7 (admitting this fact). For instance, "program revenue goes to pay tow fees, process server fees, and other costs incurred during forfeiture proceedings." MSJ ¶ 30, at 8 (citing Gardemal Decl. ¶ 48, at 20). See MSJ Response ¶ 30, at 7 (not disputing this fact). The City of Albuquerque also "uses program revenues to pay to lease its impound lot"; renting that lot cost the City of

Albuquerque "$1.8 million" in fiscal years 2009 and 2016. MSJ ¶ 30, at 8 (citing Gardemal Decl. ¶ 47, at 19). See MSJ Response ¶ 30, at 7 (admitting this fact).

"Money left over above program expenses is used to fund discretionary purchases"; for example, "over fiscal years 2009 to 2016, the City used $989,719 in program revenues to pay for new police vehicles, $379,894 to pay for radar guns, and $236,322 to pay for advertising in the local newspaper." MSJ ¶ 31, at 8 (citing Gardemal Decl. ¶¶ 55-56). MSJ Response ¶ 31, at 8 (not disputing this fact and admitting that "net revenue may be used for discretionary equipment purchases").[9] In fiscal year 2016, "the City made a lump sum transfer of $3.3 million in accumulated fund balance to pay for additional new vehicles and a new educational building." MSJ ¶ 31, at 8 (citing Gardemal Decl. ¶¶ 52-54, at 21-23). A subsection of a City of Albuquerque policy document entitled "Concept of Operations" states that "[t]he DWI Seizure Unit will provide support to the [Albuquerque Police] Department by administering the City's vehicle nuisance ordinance and provide equipment to field officers to enhance enforcement and education efforts." MSJ Response ¶ 32, at 8 (citing Traffic Division -- DWI Section, at 1 (effective date July 31, 2013), filed October 16, 2017 (Doc. 67-19)).[10]

---

[9]The City of Albuquerque "disputes Plaintiff's implication in fact 31 that there was excess revenue to pay for equipment," contending that, as it did at MSJ Response ¶ 25, at 7, from fiscal years 2009 to 2016, "total revenue did not exceed total expenses," so, according to the City of Albuquerque, there could be no excess revenue from those years. The City of Albuquerque's holistic view of those fiscal years notwithstanding, the Court has already accepted as undisputed that there was excess revenue to pay for equipment during individual fiscal years 2010, 2011, 2013, and 2014. See supra at 10-11, n.8. The Court continues to accept that fact as undisputed. It rejects the implication that there was excess revenue in fiscal years 2009, 2012, 2015, and 2016 for equipment or discretionary spending.

[10]Harjo selectively cites the sentence quoted above as its asserted fact in the MSJ. See MSJ ¶ 32, at 8. In reply, Harjo does not challenge the City of Albuquerque's insistence on quoting the full sentence as the asserted fact. See MSJ Reply at 5. The Court adopts, accordingly, the City of Albuquerque's asserted fact.

- 13 -

"The forfeiture program cannot spend money without an appropriation from the City Council, so every year the City Council includes the program in its appropriations bill." MSJ ¶ 33, at 9 (citing Gardemal Decl. ¶¶ 21-22, at 8; Thompson Depo. at 54:20-22). See MSJ Response ¶ 33, at 8 (not disputing this fact). "The City sets the amount of this appropriation by estimating program revenues for the coming fiscal year." MSJ ¶ 33, at 9 (citing Cutler-Padilla Depo. at 17:18-22). See MSJ Response ¶ 33, at 8 (not disputing this fact).

"As a practical matter, the program's spending is limited by its revenue, not by the City Council." MSJ ¶ 34, at 9 (citing Thompson Depo. at 134:21-136:23).[11] If the forfeiture program has more funds "available than [the] City Council has appropriated, it can spend even more and [the] City Council will pass a clean up bill retroactively authorizing the spending." MSJ ¶ 34, at 9 (citing Cutler-Padilla Depo. at 17:12-18:17). See MSJ Response ¶ 34, at 8 (not disputing this fact). "Every year the City's annual budget includes 'performance measures' for the vehicle forfeiture program." MSJ ¶ 35, at 9 (quoting 2016 Budget at 181)(citing City of Albuquerque FY/15 Approved Budget at 183, filed October 16, 2017 (Doc. 67-15)("2015 Budget"); City of Albuquerque FY14 Approved Budget at 185, filed October 16, 2017 (Doc. 67-16)("2014 Budget"); City of Albuquerque FY 2013 Approved Budget at 192, filed October 16, 2017

---

[11]The City of Albuquerque purports to dispute this fact, noting that the general fund can cover forfeiture programs expenses if there is a shortfall. See MSJ Response ¶ 34, at 8 (citing Cutler-Padilla Depo. at 71:23-72:21; Thompson Depo. at 25:23-26:1; id. at 55:6-12; id. at 57:12-18; id. at 139:8-12). The Court concludes that there is no genuine dispute, because both facts can be true. The forfeiture program may, theoretically or by law, draw upon the general fund to cover costs, but "[a]s a practical matter," the forfeiture program's revenues may still limit its spending. MSJ ¶ 34, at 9. See supra, at 10 (concluding, as undisputed, that "[b]etween 2015 and 2016, the 'General Fund budget has been very, very, very tight.'")(quoting MSJ Reply ¶ 23, at 4). Compare Black's Law Dictionary, at 479 (9th ed. 2009)(defining de facto as "existing in fact") with id. at 490 (defining de jure as "[e]xisting by right or according to law"). Accordingly, there is no genuine dispute.

(Doc. 67-17)("2013 Budget")).  See MSJ Response ¶ 35, at 9 (not disputing this fact).[12]  These

performance measures "set targets for the coming fiscal year for number of vehicles auctioned,

number of vehicles released pursuant to settlements (broken down further between vehicles

released with or without a boot and the accompanying payment of money), and revenue to be

generated selling vehicles at auction."  MSJ ¶ 35, at 9 (citing 2016 Budget at 181; Rodgers Depo.

at 70:8-73:11).  See MSJ Response ¶ 35, at 8 (not disputing this fact).  In fiscal year 2016, "the

City set a target to raise $615,000" and to sell "625 vehicles at auction."  MSJ ¶ 36, at 9 (citing

2016 Budget at 181).  See MSJ Response ¶ 36, at 8 (not disputing this fact).  "The city also set a

target to enter into 600 settlement agreements involving a boot and a payment of money and 350

settlements where the vehicle would be released without a boot for a smaller payment of

money."  MSJ ¶ 36, at 9 (citing 2016 Budget at 181).  See MSJ Response ¶ 36, at 8 (not

disputing this fact).  The DWI Seizure Unit head stated that those performance measures are a

"'forecast of how we think we should do,'" and explained that, "'overall, whether it's the private

or the public sector, you've got to have goals' and that these performance measures provide"

those goals.  MSJ ¶ 37, at 9 (quoting D. Rivera Depo. at 30:7-21).  See MSJ Response ¶ 37, at 8

(not disputing this fact).  The annual budget's performance measure section "also includes data

on the program's actual performance in the prior fiscal year, as well as the targets set for that

prior year," making it "possible to see, at a glance, whether the program is meeting its

_____

[12]The City of Albuquerque does not dispute this fact, but disputes the implication from
this fact, and from the remaining facts in MSJ ¶¶ 35-38, at 9-10, that "the performance measures
are aimed solely at generating revenue from the forfeiture program."  MSJ Response ¶¶ 35-38, at
8.  The Court concludes that MSJ ¶¶ 35-38, at 9-10 do not make such an implication, and, even if
they did, the Court would reject it as it must draw all reasonable inferences in the nonmovant's
favor.  See supra n.3.  The Court concludes, accordingly, that this fact, and the remaining facts
from MSJ ¶¶ 35-38, at 9-10 are undisputed.

- 15 -

performance targets." MSJ ¶ 38, at 10 (citing 2016 Budget at 181; D. Rivera Depo. at 30:7-31:3). See MSJ Response ¶ 38, at 8 (not disputing this fact).

Program personnel, including the city attorneys who handle forfeiture cases, compile these "annual performance measures." MSJ ¶ 39, at 10 (citing Rodgers Depo. at 69:12-18; D. Rivera Depo. at 31:12-20). See MSJ Response ¶ 39, at 9 (not disputing this fact). "The forfeiture program also tracks performance on a monthly basis." MSJ ¶ 40, at 10 (citing DWI Seizure Unit, Month of March, 2016 -- Month of May, 2016 Statistics, at 1-3, filed October 16, 2017 (Doc. 67-18)("DWI Seizure Unit Statistics"); D. Rivera Depo. at 20:9-13). See MSJ Response ¶ 40, at 9 (not disputing this fact). Every month "program personnel update a spreadsheet with the number of vehicles checked into the impound lot, the amount of revenue generated by settlement agreements, and the amount of revenue generated selling vehicles at auction." MSJ ¶ 40, at 10 (citing L. Rivera Depo. at 33:3-43:6). See MSJ Response ¶ 40, at 9 (not disputing this fact). "The spreadsheet then automatically generates a percentage comparison to the same month the year before, providing an immediate check on whether intake and revenue are trending up or down." MSJ ¶ 40, at 10 (citing D. Rivera Depo. at 22:23-23:8). See MSJ ¶ 40, at 9 (not disputing this fact).

"Annual performance evaluations for employees in the DWI Seizure Unit -- which serve to assess individual job performance -- list as an 'Output Measure[]' to 'increase the amount of revenue generated from Seized vehicles.'" MSJ ¶ 41, at 10 (quoting City of Albuquerque Employee Work Plan (Performance and Evaluation) for Lacresia Rivera, at 1 (dated August 30, 2016), filed October 16, 2017 (Doc. 67-21)("L. Rivera Eval."); City of Albuquerque Employee Work Plan (Performance and Evaluation) for Jose Hernandez, at 1 (dated August 30, 2016), filed

October 16, 2017 (Doc. 67-22)("Hernandez Eval.")).[13]  "The head of the DWI Seizure Unit

agreed that these Output Measures serve as a 'measure of the unit's success or failure at meeting

its objectives.'"  MSJ ¶ 41, at 10 (citing D. Rivera Depo. at 29:19-21; L. Rivera Depo. at 55:20-

22; Hernandez Depo. at 30:23-25).[14]  "The City's budget for fiscal year 2016 lists as an

'accomplishment' of the Legal Department: 'Auctioned 570 vehicles . . . generating $471,000 in

_____

[13]The City of Albuquerque purports to dispute this fact, stating that it disagrees with the "Plaintiff's characterization in fact 41 that employee performance is measured by whether they increase the amount of revenue generated from seized vehicles."  MSJ Response ¶ 41, at 9.  As an initial matter, the Court concludes that the City of Albuquerque does not dispute Harjo's MSJ ¶ 41assertion, because she does not contend that employees are measured by whether they increase the amount of revenue generated from seized vehicles; rather, she asserts that DWI Seizure Unit employee evaluations list, as an output measure, "increase the amount of revenue generated from Seized vehicles."  MSJ ¶ 41, at 10.  Based on the attached employee evaluations, those evaluations list, as an output measure, "increase the amount of revenue generated from Seized vehicles."  L. Rivera Eval., at 1; Hernandez Eval. at 1.  The Court concludes, accordingly, that Harjo's fact is undisputed.

The City of Albuquerque disputes, instead, the inference from that fact that the City of Albuquerque evaluates DWI seizure employees based on whether they "increase the amount of revenue from Seized vehicles."  MSJ ¶ 41, at 10.  Harjo does not argue that she is attempting to assert that inference as an undisputed fact.  See MSJ Reply ¶ 41, at 5.  The Court, accordingly, does not list or accept that inference as an undisputed fact.  Moreover, because all inferences must be drawn in the nonmovant's favor, the Court will not draw that inference.

[14]The City of Albuquerque purports to dispute this fact, stating that it "disputes Plaintiff's characterization . . . that employee performance is measured by whether they increase the amount of revenue generated from seized vehicles."  MSJ Response ¶ 41, at 10.  The Court concludes that there is no genuine dispute, because Harjo, via the DWI seizure unit head, asserts that the "Output Measures" embodies the DWI seizure unit's objective and not that the output measures are any one individual employee's objective or that the City of Albuquerque evaluates any individual employee based on those output measures.  MSJ ¶ 41, at 10.

Some of the City of Albuquerque's argument might attack Harjo's assertion; specifically, its statement that "it remains unclear what the evidentiary basis is for claiming forfeiture program staff have any ability to influence seizures or revenue" could cast doubt whether the unit could have an objective to increase revenues if the unit has no power to increase those revenues.  MSJ Response ¶ 41, at 10.  The undisputed facts demonstrate, however, that there is an evidentiary basis for Harjo to claim that forfeiture program staff may influence revenue.  See supra at 6 (concluding, as undisputed, that city forfeiture attorneys have discretion to make a range of settlement offers).  Accordingly, the Court concludes that the City of Albuquerque's argument does not create a genuine dispute.

proceeds to fund law enforcement efforts."  MSJ ¶ 42, at 10 (citing 2016 Budget at 182).  See

MSJ Response ¶ 42, at 11 (not disputing this fact).[15]

"In recent years," the forfeiture program's revenues have "declined, as fewer people are

being caught driving under the influence."  MSJ ¶ 43, at 11 (citing D. Rivera Depo. at 15:22-

16:4).  See MSJ Response ¶ 43, at 11 (not disputing this fact).  "The City ascribes this decline to

a variety of factors, including the rise of companies like Uber and Lyft[16] that make it easier to

drink outside the home without driving."  MSJ ¶ 43, at 11 (citing Rodgers Depo. at 86:24-87:12;

D. Rivera Depo. at 15:22-16:4).  See MSJ Response ¶ 43, at 11 (not disputing this fact).

"Whereas the program generated over $1.8 million in revenue in fiscal year 2010, the program

generated only $760,466 in revenue in fiscal year 2016."  MSJ ¶ 44, at 11 (citing Gardemal Decl.

¶ 25, at 10).  See MSJ Response ¶ 44, at 11 (not disputing this fact).  "In fiscal years 2015 and

2016, the program's expenses exceeded its revenues, and the program was able to make up the

difference only by spending accumulated surplus revenue from past fiscal years."  MSJ ¶ 45, at

11 (citing Cutler-Padilla Depo. at 16:18-17:19; Thompson Depo. at 140:2-5).  See MSJ Response

¶ 45, at 11 (not disputing this fact).  Revenue decline in recent years "has adversely affected

morale in the DWI Seizure Unit."  MSJ ¶ 46, at 11 (citing D. Rivera Depo. at 17:5-10; L. Rivera

Depo. at 48:1-10).  See MSJ Response ¶ 46, at 11 (not disputing this fact).

---

[15]The City of Albuquerque contends that Harjo selectively, and thus, misleadingly, quotes
the 2016 Budget.  See MSJ Response ¶ 42, at 11.  The Court lists as an undisputed fact the full
quote as the City of Albuquerque argues is correct, because Harjo does not challenge the full
quote.  See MSJ Reply at 5.

[16]Uber and Lyft are companies that offer a ride-sharing service that connects riders with
drivers willing to take that rider, for a fee, to their desired destination.  See O'Connor v. Uber
Technologies, Inc., 82 F. Supp. 3d 1133, 1135 (N.D. Cal. 2015)(Chen, J.).

"This decline in revenue has also placed the forfeiture program under financial strain." MSJ ¶ 47, at 11 (citing D. Rivera Depo. at 8:6-7; Cutler-Padilla Depo. at 14:12-19).[17] "The program has already had to cut expenses." MSJ ¶ 47, at 11 (citing D. Rivera Depo. at 17:7-10).[18] "The decline in revenues has also been discussed at citywide budget meetings, and the program will have to make additional cuts going forward." MSJ ¶ 47, at 11 (citing Cutler-Padilla Depo. at 71:23-72:21; id. at 74:13-18; Email from Aubrey Thompson to Lacresia Rivera at 1 (dated November 22, 2016), filed October 16, 2017 (Doc. 67-25)).[19]

"The City's Executive Budget Analyst testified that declines in revenue could affect the job security of program personnel," saying that "'it probably will be a discussion . . . if revenues are going down, do we need all of these positions?'" MSJ ¶ 48, at 11 (quoting Cutler-Padilla Depo. at 77:5-11). See MSJ Response at 20 (admitting this fact).[20] "Declines in program

---

[17]The City of Albuquerque purports to dispute this fact, but instead argues this fact's materiality. See MSJ Response ¶ 47, at 11 ("Plaintiff misconstrues the budgeting process as evidencing an improper financial incentive."); id. ¶ 47, at 12 ("[T]he discussion about the declining number of seizures and lost revenue was really not that important."). The Court concludes, accordingly, that this fact is undisputed.

[18]The City of Albuquerque purports to dispute this fact, but the Court concludes that there is no dispute for the reasons explained, supra n.17.

[19]The City of Albuquerque purports to dispute this fact, but the Court concludes that there is no dispute for the reasons explained, supra n.17.

[20]The City of Albuquerque contends that this evidence "is not competent evidence for consideration on summary judgment," because it is speculation. MSJ Response ¶ 48, at 12 (citing Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 875 (10th Cir. 2004)). The City of Albuquerque later admits, however, the fact it asserts is speculation:

> While the City acknowledges it has considered cost-saving measures in order to maintain DWI enforcement and education efforts in the face of decreasing revenue, which measures might have to include at some point in the future the elimination of positions depending on the extent of any decrease in revenue, that future possibility is purely hypothetical right now.

revenues could also affect the job security of hearing officers who decide forfeiture cases," as "the City eliminated six positions from the office of administrative hearings" in 2012, when the "City ended a red light ticketing program . . . to cover a reduction in operations." MSJ ¶ 49, at 12 (citing 2013 Budget at 137).[21]

"In 2013, an APD officer listed as an '[a]ccomplishment[]' that the program was able to 'maintain[] program revenue despite drop of intake.'" MSJ ¶ 50, at 12 (citing Email from Donovan Rivera to Shane Rodgers, Re: 2013 Accomplishments at 1 (dated August 23, 2013), filed October 16, 2017 (Doc. 67-29); Rodgers Depo. at 78:16-79:23). See MSJ Response ¶ 50, at 12 (not disputing this fact).[22] "In April 2016 . . . monthly data collected by the program shows that vehicle seizures were down 22% from the same time the year before, program revenues were down 9%, and the number of vehicles returned to owners with the minimum possible financial penalty was down a full 58%." MSJ ¶ 51, at 12 (citing DWI Seizure Unite Statistics at 2). See MSJ Response ¶ 51, at 13(not disputing this fact).[23] "Although revenues were down in 2016, the

---

MSJ Response at 20 (emphasis added). The Court concludes, accordingly, that this fact is undisputed. It will consider infra whether the fact is material or whether it may be properly considered on a motion for summary judgment.

[21]The Court concludes that this fact is undisputed for the same reasons states supra n.20, but the Court will consider infra whether the fact is material or whether it may be properly considered on a motion for summary judgment.

[22]The City of Albuquerque asserts that Harjo "takes evidence out of context" in fact 50, but does not ultimately dispute it. MSJ Response ¶ 50, at 12. Rather, it disputes the "implication" from this fact that "revenue was the only or even [the] primary goal of the forfeiture program." MSJ Response ¶ 50, at 13. This purported implication bears on the fact's materiality, which the Court will consider infra in its analysis. Accordingly, the Court concludes that there is no dispute.

[23]In MSJ ¶ 51, at 12, Harjo also asserts, without citation, that, "[i]n other words, seizures were down and program officials were being less lenient with property owners." Harjo has the burden of proof here and, because she chose not to offer evidence in support of her assertion, it is

City's annual targets were not"; the "City Council budgeted for the program to bring in $50[],000 *more* in 2016 than in 2014." MSJ ¶ 52, at 12 (citing Defendant City of Albuquerque's First Supplemental Responses to Plaintiff Arlene Harjo's First Set of Interrogatories, at 3, filed October 16, 2017 (Doc. 67-6)("Suppl. Interrog. Response"); Gardemal Decl. ¶ 22, at 8)(emphasis in MSJ). See MSJ Response ¶ 52, at 13 (not disputing this fact).[24] "The 2016 annual budget, meanwhile, set a 'performance measure' for the program to generate $615,000 selling vehicles at auction -- the *same* goal as in fiscal year 2014 -- even though the program was on track to fall well short of that goal in 2015." MSJ ¶ 52, at 12 (citing 2016 Budget at 181). See MSJ Response ¶ 52, at 13 (not disputing this fact).

### 3.     The Seizure and Attempted Forfeiture of Harjo's Car.

On Saturday, April 23, 2016, Harjo's son "asked if he could borrow Arlene's car to take a trip to the gym with a friend." MSJ ¶ 53, at 12 (citing Declaration of Arlene Harjo in Support of Plaintiff's Motion for Partial Summary Judgment ¶ 9, at 2 (dated October 10, 2017), filed October 16, 2017 (Doc. 67-1)("Harjo Decl.")). See MSJ Response ¶ 53, at 13 (not disputing this fact). Harjo agreed to lend her car, "expecting that he would return within a few hours," and she "became worried when he did not return as expected." MSJ ¶ 53, at 12 (citing Harjo Decl. ¶¶ 9, 15, at 2-3). See MSJ Response ¶ 53, at 13 (not disputing this fact). The next morning, Harjo "learned that her son had lied to her, and had been arrested for DWI while returning from a rendezvous with his girlfriend." MSJ ¶ 54, at 13 (citing Harjo Decl. ¶ 15, at 3). See MSJ

---

not entitled to the presumption of truth. The Court, accordingly, will not consider Harjo's statement an undisputed fact.

[24]Harjo asserts that the City of Albuquerque budgeted $500,000 more in 2016 than in 2014, but a review of her citations reveal that the City of Albuquerque budgeted $50,000 more in 2016 than in 2014. See Suppl. Interrog. Response at 3; Gardemal Decl. ¶ 22, at 8. The Court accordingly uses the $50,000 figure as the undisputed fact.

Response ¶ 54, at 13 (not disputing this fact). On that same morning, Harjo "learned that the City had seized her car for forfeiture." MSJ ¶ 54, at 13 (citing Harjo Decl. ¶ 16, at 4). See MSJ Response ¶ 54, at 13 (not disputing this fact).

"To avoid automatic forfeiture," Harjo "requested a hearing before the City's administrative hearing officer, paying $50." MSJ ¶ 55, at 13 (citing Harjo Decl. ¶ 16, at 4). See MSJ Response ¶ 55, at 13 (not disputing this fact). When Harjo arrived at the hearing "she was put in touch with a city attorney, who then offered to settle the case if Arlene agreed to pay $4,000 and boot her car for 18 months." MSJ ¶ 56, at 13 (citing Harjo Decl. ¶ 17, at 4). See MSJ Response ¶ 56, at 13 (not disputing this fact). "Arlene declined this settlement offer, as she could not afford to pay." MSJ ¶ 56, at 13 (citing Harjo Decl. ¶ 17, at 4). See MSJ Response ¶ 56, at 13 (not disputing this fact). "The city attorney who extended this settlement offer has his entire salary, plus benefits paid out of the vehicle forfeiture program's revenues." MSJ ¶ 57, at 13 (citing Defendant City of Albuquerque's Responses to Plaintiff Arlene Harjo's First Set of Interrogatories at 12, filed October 16, 2017 (Doc. 67-5)("Interrog. Response"); Gardemal Decl. ¶¶ 32-35, at 13-15). See MSJ Response ¶ 57, at 6 (not disputing this fact). "In fiscal year 2016, he was paid $70,776 in program revenues." MSJ ¶ 57, at 13 (citing Interrog. Response at 15). See MSJ Response ¶ 57, at 6 (not disputing this fact).

In the months leading up to Harjo's settlement offer, "this city attorney received multiple emails referencing the fact that program revenues go to pay the salaries of program employees, including city attorneys." MSJ ¶ 58, at 13 (citing Email from Aubrey Thompson to Eric Locher, copying Kyle Hibner and Donovan Rivera, at 1 (dated December 17, 2015), filed October 16, 2017 (Doc. 67-27)("Thompson Email"); Email from Eric Locher to Kyle Hibner, at 1 (dated August 31, 2015), filed October 16, 2017 (Doc. 67-28)("Locher Email")). See MSJ Response

¶ 58, at 13 (admitting this fact).[25]  "Months after this settlement offer . . . this city attorney was tasked to provide an update on the program's progress towards its annual performance measures for settlements, auctions, and auction revenues."  MSJ ¶ 59, at 13 (citing Email from Becky Burnham to Elizabeth Page, Sandra Jamison, Jenica Jacobi, Kyle Hibner, Gabriel Campos, and Tyson Hummell, at 1 (dated July 14, 2016), filed October 16, 2017 (Doc. 67-26)).  See MSJ Response ¶ 59, at 14 (admitting this fact).[26]  The following month, "the City approved a raise" of "over $9,500 for this city attorney 'to reflect exceptional performance'" to be "covered by the DWI Enforcement Fund in FY/18."  MSJ ¶ 60, at 13 (citing Interoffice Memorandum from Jessica Hernandez to Robert Perry at 1 (dated August 24, 2016), filed October 16, 2017 (Doc. 67-23)("Hernandez Memo")).  See MSJ Response ¶ 60, at 14 (admitting this fact).[27]

Because Harjo "turned down the city attorney's settlement offer, she received a hearing before the City's Chief Hearing Officer."  MSJ ¶ 61, at 13 (citing Harjo Decl. ¶ 18, at 4).  See MSJ Response ¶ 61, at 13 (not disputing this fact).  "The Chief Hearing Officer is aware of the financial importance of the forfeiture program"; at a "September 2014 forfeiture conference, he stated that the 'ordinance is written specifically' to provide revenue that must be returned to the

---

[25]The City of Albuquerque disputes "any implication of pressure to increase revenues because" of this fact.  MSJ Response ¶ 58, at 13.  There is no factual dispute, because disputing an implication from a fact does not dispute the fact.  The Court will consider infra whether there was any pressure to increase revenues, as that goes to the heart of the legal dispute.

[26]The City, again, "disputes any implication of pressure to increase revenues because of the request to update budget numbers."  MSJ Response ¶ 59, at 14.  There is no factual dispute, because disputing an implication from a fact does not dispute the fact.  The Court will consider infra whether there was any pressure to increase revenues, as that goes to the heart of the legal dispute.

[27]The City of Albuquerque admits the fact, but "denies any implication the raise was tied to any pressure for Attorney Hibner to increase forfeiture revenue."  MSJ Response ¶ 60, at 14.  There is no factual dispute, because disputing an implication from a fact does not dispute the fact.  The Court will consider infra whether there was any pressure to increase revenues, as that goes to the heart of the legal dispute.

program and that this 'allowed me to resist former mayors wanting to transfer it all to the general fund.'" MSJ ¶ 62, at 14 (citing Forfeiture Conf. at 1:20:30 (Harada); id. at 2:33:05 (Harada)). See MSJ Response ¶ 62, at 6 (not disputing this fact). "When the City sought to negotiate a revenue-sharing agreement with Bernalillo County, city officials consulted with the Chief Hearing Officer about the percentage of program revenues that go to cover the program's costs." MSJ ¶ 63, at 14 (citing Thompson Depo. at 157:14-159:2; Email from Gregory Wheeler to Stan Harada at 1 (dated October 20, 2012), filed October 16, 2017 (Doc. 67-30)). See MSJ Response ¶ 63, at 14 (not disputing this fact). "Of the 1668 hearings" that the Chief Hearing Officer conducted from 2015 to 2016, "a full 1288 (or 77%) were conducted under the City's vehicle forfeiture ordinance." MSJ ¶ 64, at 14 (citing Defendant City of Albuquerque's Response to Arlene Harjo's Third Set of Interrogatories ¶ 15, at 3 (filed October 16, 2017)(Doc. 67-7)("Third Interrog. Response").[28] See MSJ Response ¶ 64, at 14 (not disputing this fact).

At the hearing's conclusion, the "Chief Hearing officer found that Arlene did not carry her burden to establish that she was an innocent owner." MSJ ¶ 65, at 14 (citing Transcript of Vehicle Seizure Hearing at 18:9-12 (held May 25, 2016)(Harada), filed October 16, 2017 (Doc. 67-32)("Seizure Tr.")). See MSJ Response ¶ 65, at 13 (not disputing this fact). After the hearing, the City of Albuquerque filed "a forfeiture complaint in state court." MSJ ¶ 66, at 14 (citing City of Albuquerque v. One (1) 2014 Nissan 4DR Silver, D-202-CV-2016-03614, Forfeiture Complaint ¶ 4, at 1, filed June 10, 2016 (Second Judicial District Court, County of Bernalillo, State of New Mexico), filed in federal court October 16, 2017 (Doc. 67-33)). See MSJ Response ¶ 66, at 13 (not disputing this fact). Harjo contested the forfeiture pro se, "and

---

[28]The MSJ states that the hearing officer conducted 1688 hearings in 2016, but the cited document shows that he conducted 1668 hearings from "the period beginning January 1, 2015 and ending January 1, 2017," Third Interrog. Resp. ¶ 15 at 3, so the Court has updated this fact accordingly.

the City sent her a packet of discovery requests, including several whose relevance the City's 30(b)(6) witness could not explain." MSJ ¶ 66, at 14 (citing Rodgers Depo. at 57:7-58:14; Memorandum from Sue Postlethwait to Arlene Harjo at 10, 13 (dated August 3, 2016), filed October 16, 2017 (Doc. 67-34)("Forfeiture Discovery Req.")). See MSJ Response ¶ 66, at 13 (not disputing this fact). The Forfeiture Discovery Req.'s cover letter, "authored by a paralegal whose salary is paid by forfeiture revenues, invited Arlene to sign a disclaimer giving up the vehicle." MSJ ¶ 66, at 14 (Interrog. Response at 15; Forfeiture Discovery Req. at 1). See MSJ Response ¶ 66, at 14 (not disputing this fact).

"Months later, and only after Arlene filed this case, the City dismissed its forfeiture complaint because it determined that the car was outside the city limits when it was seized." MSJ ¶ 67, at 14 (citing City of Albuquerque v. One (1) 2014 Nissan 4DR Silver, D-202-CV-2016-03614, Stipulated Dismissal of Plaintiff's Forfeiture Complaint ¶¶ 3-4, at 2, filed February 1, 2017 (Second Judicial District Court, County of Bernalillo, State of New Mexico), filed in federal court October 16, 2017 (Doc. 67-35)("Forfeiture Complaint")). See MSJ Response ¶ 67, at 13 (not disputing this fact). "The police report for the seizure included a mile marker number, and the DWI Seizure Unit employee who conducted the background investigation could have used that information to determine if the seizure occurred inside city limits." MSJ ¶ 68, at 15 (citing Hernandez Depo. at 15:21-16:4). See MSJ Response ¶ 68, at 13 (not disputing this fact). "This employee has his entire salary paid by program revenues, and in 2016 he received $80,966 in program revenues as compensation." MSJ ¶ 68, at 15 (citing Interrog. Response at 13-14; Gardemal Decl. ¶¶ 32-35, at 13-15). See MSJ Response ¶ 68, at 15 (not disputing this fact). "The police officer who seized Arlene's car . . . mentioned the mile marker number at the hearing, and the city attorney included the mile marker number in the complaint that he filed in

state court." MSJ ¶ 69, at 15 (citing Seizure Tr. at 6:12-14 (Lafave); Forfeiture Complaint ¶ 4, at 1). See MSJ Response ¶ 69, at 13 (not disputing this fact). "Both the hearing officer and the city attorney could have determined that the seizure did not occur within city limits, if they had consulted a map." MSJ ¶ 69, at 15 (citing Rodgers Depo. at 44:16-25; id. at 54:24-55:1). See MSJ Response ¶ 69, at 13 (not disputing this fact).

"As a result of the City's actions, Arlene suffered damages." MSJ ¶ 70, at 15 (citing Harjo Decl. ¶¶ 24-27, at 5). See MSJ Response ¶ 70, at 13 (not disputing this fact). "Her car was damaged by sitting unused in the City's impound lot for an extended period, and Arlene also had to go without access to her car for eight months -- although she continued to make loan payments for a vehicle that she could not use." MSJ ¶ 70, at 15 (citing Harjo Decl. ¶¶ 24-26, at 5). See MSJ Response ¶ 70, at 13 (not disputing this fact). Harjo's lender "also added its attorney fees in the forfeiture action to the amount owned on her loan." MSJ ¶ 70, at 15 (citing Harjo Decl. ¶ 27, at 15). See MSJ Response ¶ 70, at 13 (not disputing this fact).

## PROCEDURAL BACKGROUND

On August 31, 2016, Harjo filed suit in the Second Judicial District Court, County of Bernalillo, State of New Mexico, alleging that: (i) the Forfeiture Ordinance and forfeiture program violates the Fourteenth Amendment, because it creates an unlawful profit incentive for the City of Albuquerque and its employees; (ii) the Forfeiture Ordinance also violates the Fourteenth Amendment by withholding from car owners a meaningful opportunity to be heard; and (iii) that the New Mexico Forfeiture Act, N.M. Stat. Ann. §§ 31-27-1 to -11 ("NMFA"), preempts the City of Albuquerque's Forfeiture Ordinance. See Harjo v. City of Albuquerque, D-202-CV-2016-05395, Complaint for Declaratory and Injunctive Relief, Restitution, and Attorneys' Fees ¶¶ 72-90, at 16-20 (Second Judicial Court, County of Bernalillo, State of New

Mexico), filed in federal court on October 6, 2016 (Doc. 1-1)("Complaint").  The City of Albuquerque removed the case on the basis of federal-question jurisdiction.  See Notice of Removal ¶ 4, at 1-2, filed October 6, 2016 (Doc. 1).  Harjo subsequently amended the Complaint, but alleges the same claims.  See First Amended Complaint ¶¶ 89-110, at 20-24, filed February 1, 2017 (Doc. 23)("Amended Complaint").  In short, she alleges that: (i) the vehicle forfeiture program's self-funding violates due process, because it generates a personal and institutional incentive for forfeiture program officials to "vigorously pursue forfeitures" even where leniency might be appropriate, Amended Complaint ¶ 99, at 22; (ii) the City of Albuquerque's procedures deprive owners of their due process right to be meaningfully heard, see Amended Complaint ¶¶ 105-08, at 23-24; and (iii) the NMFA preempts the Forfeiture Ordinance, because the NMFA "places the burden on the government to prove that the property owner is guilty of an offense," Amended Complaint ¶ 91, at 20.  See Amended Complaint ¶¶ 89-110, at 20-24.

The City of Albuquerque moved for a judgment on the pleadings to dismiss all claims, contending that: (i) there was no unconstitutional profit incentive, because the forfeiture officials did not directly financially benefit from vehicle forfeitures; (ii) an innocent-owner defense, placing the burden of proof on the owner, is not unconstitutional under Bennis v. Michigan, 516 U.S. 442 (1996); and (iii) the Court should decline to exercise supplemental jurisdiction over the state law claim, but, if the Court is inclined to reach the state law claim, the NMFA does not preempt the Forfeiture Ordinance, because the NMFA applies to laws "that specifically apply the Forfeiture Act," which, according to the City of Albuquerque, the Forfeiture Ordinance does not. Defendant City's Motion for Judgment on the Pleadings and Memorandum in Support at 7, 16,

filed June 5, 2017 (Doc. 44)("Motion for Judgment").  Before the Court ruled on the Motion for Judgment, Harjo filed the MSJ.  See MSJ at 33.

The Court granted in part and denied in part the Motion for Judgment.  See Memorandum Opinion and Order, at 90, 2018 WL 1626099, at *40, filed March 30, 2018 (Doc. 92)("MOO").  It concluded that City of Albuquerque "officials do not have a personal financial interest in prosecuting more cases, pressuring owners into unfavorable settlement of agreements, or seizing more vehicles, simply because the program funds itself."  MOO at 60-61, 2018 WL 1626099, at *28.  While the Court noted that the forfeiture program paid officials' salaries, the Court concluded that fact alone does not produce a personal profit incentive, because that fact does not demonstrate that "officials can increase their salary by prosecuting more cases or that their salary is decreased if they prosecute fewer cases."  MOO at 61, 2018 WL1626099, at *28 ("A profit incentive exists when the officials' level of enforcement can affect how much they are paid.")(citing Marshall, 446 U.S. at 249-50); Connally v. Georgia, 429 U.S. 245, 250 (1978)(per curiam)).

The Court also concluded that the forfeiture program funding itself did not produce an unconstitutional institutional incentive to prosecute more cases.  See MOO at 61-63, 2018 WL1626099, at *28.  It reasoned, in part, that there is no institutional pressure to prosecute because excess funds, under the Forfeiture ordinance, "must be allocated to other programs."  MOO at 62, 2018 WL1626099, at *28 (citing ROA §§ 7-6-5(E), 7-9-3(F), 7-14-5(F)).  Thus, the Court said, "additional penalties assessed do not lead to an increase in the amount of funds the forfeiture program has to spend, so prosecutors, judges, or police officers would not feel pressure to prosecute more cases, find more forfeitures, or seize more cars to secure additional funding."  MOO at 62, 2018 WL1626099, at *28.  The Court also reasoned that there is no institutional

pressure to prosecute, because "officials involved in the vehicle forfeiture program exert little control over how much money is budgeted . . . or how that money is spent."  MOO at 62, 2018 WL1626099, at *28.  Instead, the power to budget and allocate funds to the forfeiture program rested with the City of Albuquerque's Mayor and City Council, so it did not follow that forfeiture program officials overzealously seizing, prosecuting, and raising more money one year would lead to additional funding the following year.  See MOO at 62-63, 2018 WL 1626099, at *28.  Accordingly, the Court concluded that there is no institutional incentive to prosecute.  See MOO at 63, 2018 WL 1626099, at *28.

Despite that ruling, the Court held that the forfeiture program plausibly violated due process, because the forfeiture program not only funded itself, but that it is "dependent on those funds."  MOO at 63, 2018 WL 1626099, at *29.  Accordingly, the Court concluded that, if forfeiture program revenues dropped to certain levels, it is plausible that the City of Albuquerque might cut forfeiture program officials' pay or fire them.  See MOO at 64, 2018 WL 1626099, at *29.  Under Connally v. Georgia, "even a small financial gain achieved through official action implicate[s] due process," so the Court determined that Harjo had plausibly stated a claim on this ground.  MOO at 64, 2018 WL 1626099, at *29 (citing Connally v. Georgia, 429 U.S. at 250).  In a similar vein, the Court ruled that Harjo has plausibly stated an improper incentive claim by alleging that some forfeiture program officials gained the private use of luxury vehicles through enforcing the Forfeiture Ordinance.  See MOO at 66, 2018 WL 1626099 at *30.

The Court denied in part the Motion for Judgment to the extent it contended that Harjo has not stated a procedural due process claim.  See MOO at 67-76, 2018 WL 1626099, at *30-34.  It concluded that the Forfeiture Ordinance, which requires "the vehicle owners to prove their innocence" plausibly violated due process under Mathews v. Eldridge, 424 U.S. 319, 334 (1976).

See MOO at 67-72, 2018 WL 1626099, at *30-32.  It concluded that Harjo has a significant interest in her car, the burden of proof causes a serious risk of erroneous deprivation, and the City of Albuquerque's interest in seizing the car from owners did not outweigh the previous considerations, so Harjo had stated a plausible procedural due process claim.  See MOO at 68-72, 2018 WL 1626099, at *31-32.  The Court also concluded, however, that Harjo had not stated a procedural due process claim vis-à-vis the fees, which the City of Albuquerque collects to store the seized the vehicles, primarily because the risk of an erroneous deprivation was slight.  See MOO at 72-76, 2018 WL 1626099, at *33-34.

Finally, the Court dismissed the state law claim without prejudice.  See MOO at 76-89, 2018 WL 1626099, at *35-39.  Although concluding that the "NMFA preempts the City of Albuquerque's forfeiture ordinance," it also ruled that the "issue is novel as it is both new and notable"; no New Mexico appellate court has considered the issue, and the preemption ruling greatly "implicate[s] the power local authorities have vis-à-vis the state."  MOO at 87, 2018 WL 1626099, at *39.  Because the issue is novel, the Court declined to exercise supplemental jurisdiction, see 28 U.S.C. § 1367(c)(1), and dismissed the claim without prejudice, see MOO at 89-90, 2018 WL 1626099, at *39-40.

1.     **MSJ.**

Harjo now moves for summary judgment on her claims that the forfeiture program creates an unlawful profit incentive and that the Forfeiture Ordinance violates procedural due process.  See MSJ at 1.  Regarding the unconstitutional-profit-incentive claim, she argues that, because "the revenues generated by the forfeiture action[s] are used to pay the expenses of the forfeiture program," both "enforcement personnel and the City's hearing officers . . . are subject to an institutional financial incentive because of their involvement with the City's self-funding

forfeiture program, while enforcement personnel are also subject to a direct, personal incentive, as their salaries are paid with program revenues."  MSJ at 16.  According to Harjo, those "financial incentive[s] -- both institutional and personal -- violate[] due process."  MSJ at 16.

She contends that, for three reasons, "the retention of forfeiture revenues . . . gives rise to a 'realistic possibility that [officials'] judgment will be distorted."  MSJ at 18 (quoting <u>Marshall</u>, 446 U.S. at 250)(brackets in MSJ).  First, she argues that the forfeiture program depends on the "maintenance of a high level of penalties."  MSJ at 18.  Second, she argues that "the City budgets for future forfeiture revenues and evaluates the program based on the amount of revenue that it generates."  MSJ at 18.  Third, she concludes that the prior two realities affect "city officials who exercise discretion to return or forfeit property, including city attorneys who have their entire salaries paid by forfeiture revenues and a hearing officer whose docket is largely made up of forfeiture cases."  MSJ at 18.

Harjo argues that the undisputed facts support her contention that the forfeiture program depends on a high level of penalties.  <u>See</u> MSJ at 19.  First, she argues that the forfeiture program's "settlements, auctions, and related fees make up a full 87% of revenues associated with the program," including "major expenses."  MSJ at 19-20 (citing Gardemal Decl. ¶¶ 2-3, 25-26, 30, 32-34, 44-48 at 1-2, 9-10, 12-15, 18-20; Cutler-Padilla Depo. at 22:5-15; <u>id.</u> at 25:13-23; <u>id.</u> at 26:8-20; <u>id.</u> at 29:16-22).  Next, Harjo contends that it is undisputed that, "if forfeiture revenues were no longer able to cover those expenses, it would become necessary to find room elsewhere in the City's already thinly-stretched budget."  MSJ at 20 (citing Thompson Depo. at 139:8-20; <u>id.</u> at 149:14-20).  Third, she argues, that, according to the City of Albuquerque's Budget Analyst, a drop in forfeiture revenues would result in a drop in expenditures, including a

possible "cut [in] personnel from the program." MSJ at 20 (citing Cutler-Padilla Depo. at 14:12-19; id. at 77:5-25).

Harjo asserts that the undisputed facts also demonstrate that the revenues generated controls how much the City of Albuquerque allocates to the forfeiture program. See MSJ at 20-23. According to Harjo, the City Council, in practice, "appropriates the program's budget based on projected forfeiture revenue." MSJ at 21 (citing Gardemal Decl. ¶¶ 21-22, 58-61, at 8, 25-26; Thompson Depo. at 54:20-22; id. at 134:21-136:23; Cutler-Padilla Depo. at 17:12-18:8). She adds that "[a]ctual spending then adjusts to reflect actual forfeiture revenue." MSJ at 21-22 (citing Thompson Depo. at 136:2-23)("If more revenue comes in, then yes, our expenditures can increase. . . . If less revenue comes in, then we don't -- we have less availability to expend funds."). According to Harjo, the increase in spending, which comes from an increase in revenue generation, funds more than just "the program's necessary expenses," and is used "to pay for bonus equipment and supplies -- purchases the City might not otherwise be able to afford." MSJ at 22 (citing Gardemal Decl. ¶¶ 52-56, at 21-24). She also argues that, under the Forfeiture Ordinance, the forfeiture program and its officials are assured that they will "benefit from the revenue" generated, because the Forfeiture Ordinance "provides that revenue must be used first to pay program expenses and then to fund related DWI enforcement efforts." MSJ at 21 (citing ROA § 7-6-5(E)). Harjo contends that the City "ramps up" the incentives to raise more forfeiture funds in other ways as well: (i) "[t]he City's annual budget includes 'performance measures' setting targets for the number of seizures, the number of vehicles returned, via settlement, and the amount of money raised at auction"; (ii) "[e]very annual budget . . . includes the program's actual performance . . . as well as that last year's goals"; (iii) "the program tracks . . . monthly performance"; (iv) "[a]nnual performance evaluations for

program personnel list 'increas[ing] the amount of revenue generated from Seized vehicles"; and (v) "the City's 2016 budget openly list[s] as an 'accomplishment[]' that the program 'generat[ed] $471,000 in proceeds."  MSJ at 22-23 (citing 2013 Budget at 192; 2014 Budget at 185; 2015 Budget at 183; 2016 Budget at 181; DWI Seizure Unit Statistics; Rodgers Depo. at 69:12-18; id. at 70:3-73:11; D. Rivera Depo. at 20:9-13; id. at 22:23-23:8; id. at 29:13-21; id. at 30:7-31:3; L. Rivera Depo. at 21:18-22:14; id. at 55:17-22; Hernandez Depo. at 30:5-8; id. at 30:23-25; L. Rivera Eval. at 1; Hernandez Eval. at 1).

Harjo asserts that there is also a personal financial incentive on the personnel level.  See MSJ 23-28.  She argues that City of Albuquerque attorneys "have latitude to set the financial consequences associated with vehicle seizures" through setting settlement terms, so, according to Harjo, those attorneys must be free from any bias.  MSJ at 24 (citing Rodgers Depo. at 19:20-21:25; id. at 23:5-25:25; id. at 36:3-21; D. Rivera Depo. at 42:13-43:6; id. at 62:5-63:1; L. Rivera Depo. at 35:4-10).  According to Harjo, however, those City of Albuquerque attorneys have a financial incentive to boost revenues, because those attorneys know that the forfeiture revenues pay their "entire annual salaries . . . plus benefits like health insurance."  MSJ at 24-25 (citing Gardemal Decl. ¶ 34, at 14-15; Cutler-Padilla Depo. at 26:8-20; id. at 29:16-22; Locher Email at 1; Thompson Email at 1).  Harjo argues that the City of Albuquerque attorney who prosecuted her case also reaped the forfeiture program's revenues, as he earned $70,776 from the forfeiture program during the fiscal year in which he prosecuted Harjo's case and he earned a $9,500 raise that year "to be paid for by forfeiture revenues."  MSJ at 25 (citing Interrog. Response at 15; Hernandez Memo. at 1).

She contends that other forfeiture program enforcement personnel also have an unconstitutional personal incentive.  See MSJ at 26.  According to Harjo, enforcement personnel

"are responsible for conducting the only investigation following a seizure, including verifying . . . [whether] the seizure falls within city limits." MSJ at 26 (citing D. Rivera Depo. at 45:16-46:1). Harjo argues that, because the forfeiture program revenue funds these officials' salaries, there is an unlawful incentive for those enforcement personnel to be less diligent with their investigations, as a poor investigation, especially about whether the car is seized within city limits, could result in "the City making a profit -- even though [the car] was not subject to forfeiture." MSJ at 26.

She argues that hearing officers suffer from the same personal unconstitutional incentive. See MSJ at 27. According to Harjo, "[t]he hearing officer" who adjudicated her case "is aware of the importance of forfeiture revenues to the forfeiture program," and, also according to Harjo, although that "hearing officer is not formally part of the forfeiture program, his job is still inextricably bound up with the program." MSJ at 27 (citing Forfeiture Conf. at 1:20:30 (Harada); id. at 2:33:05 (Harada)). Harjo argues that seventy-seven percent of the hearings that her hearing officer holds are related to the Forfeiture Ordinance, and, according to Harjo, "[if] the program were to go away -- for instance, because it was financially unsustainable -- the hearing officer's stream of cases would dry up as well," impacting the "hearing officer personally." MSJ at 27-28 ("When the City shut down its red light ticketing program in 2013, the City cut six positions from the administrative hearing office as a result.")(citing Third Interrog. Response at 3; 2013 Budget at 137).

Harjo argues that the forfeiture program also violates procedural due process, because the "City places the burden on property owners to prove their own innocence." MSJ at 28. She argues that Nelson v. Colorado controls this case and points the Court to holding unconstitutional the Forfeiture Ordinance. See MSJ at 29 ("If people who have previously been convicted of a

crime cannot be required to prove their own innocence, then people who have never been convicted of anything certainly cannot be put to such a burden."). Accordingly, Harjo asserts that the Court should invalidate the Forfeiture Ordinance. See MSJ at 32.

2.     The MSJ Response.

The City of Albuquerque responds. See MSJ Response at 1. The City of Albuquerque argues that "the fact that forfeiture programs generate financial dividends cannot, in itself, violate the Constitution," otherwise "no forfeiture program" -- of which there are many -- "would survive constitutional challenge." MSJ Response at 16. The City of Albuquerque contends that hearing officers are not paid with forfeiture revenues, do not have "any responsibility for generating revenue," have no "control over the City's budget," and do not "have any decision-making authority as to how much money will be allocated for their salaries." MSJ Response at 17. The City of Albuquerque acknowledges that hearing officers may be aware of how important forfeiture revenues are, but it argues that such knowledge does not translate into an improper incentive. See MSJ Response at 17. Thus, according to the City of Albuquerque, hearing officers cannot have an unconstitutional incentive to generate forfeiture profits. See MSJ Response at 17.

The City of Albuquerque also argues that the hearing officers, prosecutors, and other forfeiture program employees have no direct, pecuniary interest in generating forfeiture program revenue. See MSJ Response at 18. It contends that "[t]here is no evidence any program employees receive compensation above their regular salary if the forfeiture program generates more revenue." MSJ Response at 18. See id. ("[S]alaries are not correlated to revenue."); id. at 20 ("[W]hile Plaintiff points to a significant decline in revenue in recent years, she offers no evidence of a corresponding cut in personnel or in salaries."). The City of Albuquerque argues,

accordingly, that there is no impermissible incentive for any of those officials.  <u>See</u> MSJ Response at 24.

The City of Albuquerque asserts that there is also no institutional incentive to prosecute, because "the City is able to access its general fund to subsidize the forfeiture program."  MSJ Response at 19.  The City of Albuquerque argues that no one has incentivized forfeiture program officials to "act more zealously in enforcing the forfeiture ordinance in light of decreasing revenues."  MSJ Response at 20.  It contends that evidence of "bonus equipment and supplies" do not demonstrate an institutional bias, because such equipment and supplies do not personally benefit forfeiture program officials.  MSJ Response at 21-22.  According to the City of Albuquerque, evidence of "annual budgeting targets" does not demonstrate an institutional bias, because "[e]stimating revenue, tracking performance, and comparing actual performance among various fiscal years is part of any normal budgeting process."  MSJ Response at 23 ("The fact that employees report or review budgeting metrics routinely also is a necessary part of any budgeting process.").  It contends similarly that, although employee evaluations have "form language" about seizure or revenue targets, "there is no evidence that employees were either charged with generating revenue or evaluated on it."  MSJ Response at 23.

The City of Albuquerque argues that its attorneys' and other enforcement officials' discretion either to prosecute cases or conduct investigations do not demonstrate an unconstitutional bias.  <u>See</u> MSJ Response at 24.  It argues that, even if city attorneys have discretion to settle cases, without evidence that those city attorneys' salaries are tied to revenue generation, "their prosecutorial discretion" does not violate the Constitution, nor is there any evidence that any prosecutor abused his or her discretion to generate revenue.  MSJ Response at 24.  The City of Albuquerque avers that enforcement officials' power to perform a "lackluster

investigation" does not amount to a constitutional claim, because there is no evidence that those officials' salaries are linked to revenue generated. MSJ Response at 24.

The City of Albuquerque argues that the forfeiture program does not violate procedural due process. See MSJ Response at 27-33. The City of Albuquerque argues that, because it has the burden first to prove probable cause that the car was involved in a DWI incident, that the Forfeiture Ordinance requires Harjo to prove her innocence as an "affirmative defense" does not violate due process. MSJ Response at 29 (citing United States v. Lot Numbered One (1) of Lavaland Annex, 256 F.3d 949, 956 (10th Cir. 2001); United States v. Various Tracts of Land in Muskogee and Cherokee Ctys., 1996 WL 563847, at *1 (10th Cir. 1996)(unpublished)). The City of Albuquerque contends that Nelson v. Colorado, the Supreme Court of the United States' decision upon which Harjo relies, is inapposite, because Nelson v. Colorado does not concern an affirmative defense. See MSJ Response at 30. The City of Albuquerque concludes that the Court should deny Harjo's MSJ. See MSJ Response at 33.

### 3.     The MSJ Reply.

Harjo replies that the City of Albuquerque has conceded key facts demonstrating that there is an unlawful incentive: (i) "that forfeiture revenues are directed to a 'uniquely designated special revenue fund,'" MSJ Reply at 1 (quoting MSJ Response at 6); (ii) "that this fund 'is used to pay direct expenses associated with the program,'" MSJ Reply at 1 (quoting MSJ Response at 6); (iii) "'the dependence of the City's DWI enforcement efforts on the revenue generated by the forfeiture program,'" MSJ Reply at 1 (quoting MSJ Response at 20); (iv) "that revenue goes to pay the salaries of program personnel," MSJ Reply at 1 (citing MSJ Response at 20); and (v) "declines in program revenues may require 'the elimination of positions depending on the extent of any decrease in revenue,'" MSJ Reply at 1 (quoting MSJ Response at 20). Harjo

asserts that the City of Albuquerque is incorrect in its assertion that, should the Court invalidate this forfeiture program, it "would invalidate *any* forfeiture program." MSJ Reply at 7 (citing MSJ Response at 27)(emphasis in MSJ Reply). She argues that not every forfeiture program "relies on forfeiture revenue to pay fixed expenses, budgets for forfeiture revenue before it is received, or pays salaries with forfeiture money," as the City of Albuquerque does. MSJ Reply at 7. Harjo also argues that, as a practical matter, the City of Albuquerque could avoid any constitutional issue "by directing forfeiture revenue to its general fund." MSJ Reply at 8.

Harjo argues that the City of Albuquerque erroneously asserts that the standard is whether officials have an actual bias. See MSJ Reply at 8. Harjo contends that the correct standard is whether there is a "'*realistic possibility* that [an enforcement official's] judgment will be distorted by the prospect *of institutional gain*.'" MSJ Reply at 8 (quoting Marshall, 446 U.S. at 250)(emphasis and brackets only in Reply). See MSJ Reply at 9 ("The [Supreme] Court explained that objective standards are required because of the 'difficulties of inquiring into actual bias, and the fact that the inquiry is often a private one.'")(quoting Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 883 (2009)). Harjo asserts that, under that standard, there is an unconstitutional incentive, because forfeiture revenues pay "the *entire* annual salaries and benefits" of forfeiture program officials. MSJ Reply at 9-10 (emphasis in original). Harjo argues that the incentive here is exacerbated, because the City of Albuquerque admits that it may need to eliminate positions "'depending on the extent of any decrease in revenue.'" MSJ Reply at 11 (quoting Response at 20).

Harjo argues that there is also an unconstitutional institutional incentive, because the forfeiture program is dependent on forfeiture revenues. See MSJ Reply at 11-12 (citing MSJ Response at 20 (conceding that the forfeiture program is dependent on revenues generated)).

Harjo argues that, although the City of Albuquerque notes that it could use the general fund to cover forfeiture program costs, the undisputed facts show that reliance on the general fund is not practical.  See MSJ Reply at 12 ("[T]he general fund is already very, very, very tight.").  Harjo also argues that, even if the City of Albuquerque could use the general fund, that fact is irrelevant, because the City of Albuquerque could always choose "to eliminate the incentive." MSJ Reply at 12.  Harjo argues that, although the City of Albuquerque contends that the general fund pays for two of its police officers who work on the forfeiture program, the majority of the forfeiture program officials' salaries are paid from forfeiture revenues.  See MSJ Reply at 13.

Harjo reiterates that the hearing officers face an unconstitutional incentive.  See MSJ Reply at 15 (citing Ward v. Village of Monroeville, 409 U.S. 57 (1972)).  She argues that hearing officers are "dependent on a steady stream of forfeiture cases," and that the City of Albuquerque previously eliminated hearing officer positions when the red-light ticketing program ceased.  MSJ Reply at 16.  She argues that, from those facts, it follows that hearing officers would be tempted to favor the City of Albuquerque in forfeiture hearings.  See MSJ Reply at 16.

Harjo argues that there is also a procedural due process violation, because the City of Albuquerque places the burden of proof on the car owners.  See MSJ Reply at 16.  She argues that the usual affirmative defense rules that allow the burden of proof to be placed on the defendant are irrelevant, because, for that rule to apply, the government must first "prove some wrongful act by the defendant."  MSJ Reply at 17 (citing Martin v. Ohio, 480 U.S. 228, 233-34 (1987)).  She also argues that any cases the City of Albuquerque cites, which predate Nelson v. Colorado, do not control.  See MSJ Reply at 17.

4.      **Motion to Strike.**

The City of Albuquerque moves to strike the Gardemal Decl., as inadmissible under rule 702 of the Federal Rules of Evidence.  See Motion to Strike at 1-4.  First, the City of Albuquerque argues that Gardemal's opinion that the City of Albuquerque has a financial interest in forfeiture proceedings is inadmissible, because that issue "is not in dispute," so Gardemal's opinion "will not assist the trier of fact to determine a fact in issue."  Motion to Strike at 6 (citing Gardemal Decl. ¶ 9, at 4).  The City of Albuquerque also argues that Gardemal's opinion "that the City's financial interest creates a personal incentive" for forfeiture program revenues is inadmissible, because that "opinion is not based on any particular methodology or technique."  Motion to Strike at 7.  According to the City of Albuquerque, because that opinion is not "based on scientific knowledge," it cannot be considered on a summary judgment motion.  Motion to Strike at 7.  The City of Albuquerque also argues that opinion is inadmissible, because it "is directly contrary to the evidentiary record, which reflects that compensation is not tied to the amount of forfeiture revenue generated."  Motion to Strike at 8.  See id. at 9 ("For example, there is no evidence that salaries decreased or positions were eliminated in years of revenue decline.").  The City of Albuquerque contends that Gardemal's opinion that, "if revenues decline significantly enough, positions will have to be eliminated" is "purely speculative," so, according to the City of Albuquerque, the Court must not admit that evidence either.  Motion to Strike at 10.

The City of Albuquerque asserts that the Court should strike Gardemal's opinion that "the City's financial interest [in forfeiture revenues] creates an institutional incentive to generate revenue."  Motion to Strike at 11 (citing Gardemal Decl. ¶ 10, at 4).  It contends that such an opinion is inadmissible, because it is not based on specialized knowledge, independent

calculations, independent analysis, a particular methodology or technique, it is speculative, it is incapable of being tested, and it is contrary to record evidence. See Motion to Strike at 11.

The City of Albuquerque argues that Gardemal's opinion that the City of Albuquerque's institutional incentive to generate forfeiture revenue "is evidenced by the City's budgeting process in that the City sets annual targets for revenue and tracks revenue on a monthly basis" is inadmissible. Motion to Strike at 12 (citing Gardemal Decl. ¶ 11, at 4). It contends that the Court should not admit that opinion, because: (i) Gardemal has no studies or data supporting his position; (ii) the evidence refutes such a conclusion; (iii) Gardemal has not used a technique or methodology to support his conclusions; and (iv) a jury could consider the facts and conclude, without any aid, whether the City of Albuquerque has an improper incentive. See Motion to Strike at 13-14.

Finally, the City of Albuquerque asserts that the Court should strike Gardemal's opinion that "performance evaluations," which rate performance on ability to generate forfeiture revenues, and "performance measures," which include "annual revenue targets for the forfeiture program." Motion to Strike at 14. The City of Albuquerque argues that such opinions are inadmissible, because: (i) the jury can decide that issue without an opinion; and (ii) his opinion is not factually grounded. See Motion to Strike at 14-15. The City of Albuquerque requests, accordingly, that the Court exclude Gardemal's opinions and strike the Gardemal Decl. See Motion to Strike at 16.

5.    **Motion to Strike Response.**

Harjo responds to the Motion to Strike. See Plaintiff's Response to Defendant's Motion to Strike the Declaration of Joseph T. Gardemal at 1, filed November 13, 2017 (Doc. 78)("Motion to Strike Response"). Harjo contends that Gardemal supplies the Court

"important factual information about the nature and extent of the City's financial interest" to help the Court address the ultimate legal issues. Motion to Strike Response at 2-3. Specifically, she contends that he supplies facts about "the percentage of revenue associated with the forfeiture program," in addition to "extensive insight into the types of expenses paid with program revenues," and information on the "program's budgeting, accounting, and revenue-tracking procedures." Motion to Strike at 3 (citing Gardemal Decl. ¶¶ 25-26, 30-41, 44-50, 58-66, at 9-10, 12-21, 25-28). Harjo argues that, contrary to the City of Albuquerque's position that jurors do not need an opinion to aid them in determining the ultimate issues, Gardemal conducted "significant, detailed analysis" of the City of Albuquerque's financial data, distilling complicated information, which would aid jurors in their ultimate determination. Motion to Strike at 5 ("[T]he City suggests that its thousands of pages of raw accounting data somehow speak for themselves. . . . [T]his data would look to a layperson like nothing more than a random assortment of numbers and letters."). According to Harjo, Gardemal's distillation of information "is an appropriate function of expert testimony, and indeed courts routinely admit expert testimony from Certified Public Accountants analyzing financial documents." Motion to Strike at 6 (citing In re Beery, 680 F.2d 705,718 (10th Cir. 1982)). Harjo contends that the Gardemal Decl. is also properly considered on a motion for summary judgment, because Gardemal brings specialized knowledge on relevant issues. See Motion to Strike at 7. She argues that the Court does not need to exclude Gardemal's Decl. for lack of a "technique or methodology," because "an expert may testify based on specialized knowledge and experience." Motion to Strike at 7 (citing United States v. Goxcon-Chagal, 886 F. Supp. 2d 1222, 1246-48 (D.N.M. 2012)(Browning, J.) aff'd 757 F.3d 1092).

Harjo also contends that the City of Albuquerque is incorrect that Gardemal's opinions are contrary to record evidence.  See Motion to Strike at 9-12.  Harjo agrees with the City of Albuquerque that many of the facts, which Gardemal asserts are not in dispute, and, because there is a lack of dispute, the Court should grant summary judgment.  See Motion to Strike at 9 ("That lack of a dispute is a reason to grant summary judgment, not a reason to strike undisputed facts from the record."); id. at 11.  Harjo concludes, accordingly, that the Court should deny the Motion to Strike.  See Motion to Strike at 12.

6.      **Motion to Strike Reply.**

The City of Albuquerque concedes that Gardemal has "specialized, financial knowledge," but argues that Gardemal performs no analysis whether "the City or its employees have a financial incentive to maximize forfeiture proceeds."  Reply Supporting Defendant's Motion to Strike Declaration of Joseph T. Gardemal III at 1, filed November 21, 2017 (Doc. 81)("Motion to Strike Reply").  The City of Albuquerque argues that Gardemal makes an "unsupported leap in reasoning" that, "if there is a financial interest, there is also a financial incentive to maximize revenues."  Motion to Strike Reply at 4.  According to the City of Albuquerque, forfeiture program officials must have some power to impact revenue for there to exist a financial incentive to maximize revenues, but, also according to the City of Albuquerque, Gardemal did not inquire or address that issue when coming to his conclusions.  See Motion to Strike Reply at 4-6.  The City of Albuquerque also argues that Gardemal "unilaterally disregarded evidence" demonstrating that there is no financial incentive, including evidence that declining revenue did not impact salaries.  Motion to Strike at 6.  The City of Albuquerque argues that the Court should strike Gardemal's opinions, because he ignores significant contrary evidence and does not test his theory.  See Motion to Strike at 8-9.

The City of Albuquerque contends that Gardemal's testimony about the City of Albuquerque's financial interest in forfeiture revenue is improper rule 702 evidence, as it is an undisputed issue. See Motion to Strike at 10-11. The City of Albuquerque also contends that such testimony is inadmissible under rule 403, because it would confuse the jury by conflating the inquiry between whether the City of Albuquerque has a financial interest in forfeiture revenue and whether the forfeiture program creates a personal or institutional incentive to prosecute forfeitures for forfeiture revenues. See Motion to Strike at 11.

**7.     The Motion.**

Harjo moves the Court to reconsider a portion of the MOO. See Motion at 1. Specifically, Harjo

> seeks modification and/or reconsideration of the Opinion's statement . . . that "additional penalties assessed do not lead to an increase in the amount of funds the forfeiture program has to spend, so prosecutors, judges, or police officers would not feel pressure to prosecute more cases, find more forfeitures, or seize more cars to secure additional funding."

Motion at 1 (quoting MOO at 62, 2018 WL 1626099, at *28). She also moves the Court to modify or reconsider "the factual analysis" in support of the above conclusion. Motion at 1 (citing MOO at 62-63, 2018 WL 1626099, at *28).

Harjo argues that the Court should reconsider the above conclusion, because it "disregards the allegations of the Complaint." Motion at 4. According to Harjo, the Court disregards the allegation that, "'[b]ecause forfeiture revenues increase the amount of money available to spend, program personnel directly benefit from increased forfeiture revenues.'" Motion at 4 (quoting Amended Complaint ¶ 19, at 5). She concludes that, because the Court is required to accept all of the complaint's allegations as true on a motion for judgment on the pleadings, the Court erred. See Motion at 4.

Harjo argues that the Court's interpretation and application of the Forfeiture Ordinance, which the Court uses to discount Harjo's factual allegation in the MOO, is an improper application of judicial notice. See Motion at 5. According to Harjo, the Court may judicially notice the Forfeiture Ordinance's text, but it may not properly "interpret[] and appl[y]" the Forfeiture Ordinance. Motion at 5. Harjo argues that the Court erred, because it interpreted and applied the Forfeiture Ordinance. See Motion at 5 ("The challenged portion of the Opinion goes beyond a recitation of the City's Ordinance.").

Harjo also argues that the Court improperly interpreted the Forfeiture Ordinance. See Motion at 3. According to Harjo, the Forfeiture Ordinance says that "'proceeds that exceed the costs of administering this article shall be used for DWI enforcement, prevention and education,'" Motion at 6 (quoting ROA § 7-6-5(E)), but, also according to Harjo, there are three reasons why that language does not mean that "[e]xcess funds collected must be allocated to other programs," Motion at 6-7 (quoting MOO at 62, 2018 WL 1626099, at *28)(brackets in Motion)(emphasis from Motion omitted). First, she argues that "the ordinance allows the forfeiture program to recover 'the costs of administering this article,' and nothing in the ordinance prevents the program from claiming a share of increased revenues by increasing its 'costs.'" Motion at 7 (quoting ROA § 7-6-5(E)). Second, she argues that the forfeiture program qualifies as "DWI enforcement," so, although excess funds must go to "DWI enforcement, prevention and education" the forfeiture program can reap those excess funds as a DWI enforcement program. Motion at 7 (citing Thompson Depo. at 37:8-17). Third, she argues that the forfeiture program also qualifies as "DWI education," so, again, she argues that the forfeiture program can use those excess funds. Motion at 8 (citing D. Rivera Depo. at 17:6-10; Rodgers Depo. at 81:1-82:9).

Harjo also asserts that the Court erred by concluding that the forfeiture program "cannot benefit from increased revenues, because its spending is constrained by the budget." Motion at 9. She argues that the evidence demonstrates that the City of Albuquerque always appropriates money based on the forfeiture program's revenues, so, according to Harjo, the forfeiture program "can increase its appropriations by generating an upward trend in revenue." Motion at 9-10. Harjo also asserts that the "forfeiture program stands to benefit from increased revenues," because, as a practical matter, "the program cannot spend money" that the program does not raise. Motion at 10. Harjo also argues that the budget is not a constraint, because in fiscal years 2014-2016 the City Council appropriated far more than what was spent. See Motion at 11-12. Harjo also argues that the budget does not constrain spending, because the forfeiture program can spend more than its appropriation. See Motion at 12 (citing Cutler-Padilla Depo. at 17:23-18:5; Suppl. Interrog. Response at 3); id. ("This evidence establishes that the true constraint on the program's spending is its ability to generate revenue, not the budgeting process.").

Harjo also argues that, even if the Mayor and City Council want to limit the forfeiture program's spending, it could not, because "the program would be able to draw on unused appropriations from past fiscal years." Motion at 13 (citing Thompson Depo. at 125:20-126:3). Thus, according to Harjo, because the forfeiture program spent less than its appropriations in 2014-2016, the Mayor and City Council would not be able to meaningfully limit the forfeiture program, so long as the cost did not exceed total appropriations. See Motion at 13.

Harjo argues that, contrary to the Court's conclusion that forfeiture program officials have "'little control over . . . how [program] money is spent,'" some forfeiture program officials have authority to "approve expenditures," such as for supplies or other office needs. Motion at 14 (citing Thompson Depo. at 43:18-44:2). She argues that the only barrier for other

expenditures is the Albuquerque Police Department Fiscal Manager, who reviews the proposed expenditure for legal compliance and to make sure "that there [is] funding available to pay for it." Motion at 14 (citing Thompson Depo. at 45:12-15; id. at 46:6-13; id. at 108:18-24). Thus, according to Harjo, the evidence demonstrates that "the head of the forfeiture program exercises significant authority to initiate expenditures of program funds." Motion at 14. Harjo contends that the APD Fiscal Manager is more likely to ratify expenses which the forfeiture program head proposes if the forfeiture program revenues increase. See Motion at 14-15 (citing Thompson Depo. at 135:20-136:8). Harjo concludes, accordingly, that the Court should not have resolved these issues on the pleadings, and should grant their Motion, so that the Court can decide the issue on summary judgment. See Motion at 16-17.

### 8. **The Response.**

The City of Albuquerque responds. See Defendant's Response in Opposition to Plaintiff's Motion for Modification and/or Reconsideration at 1, filed May 11, 2018 (Doc. 98)("Response"). The City of Albuquerque argues that Harjo's Motion does not meet the Court's reconsideration standards, because: (i) the parties already thoroughly addressed the arguments raised in the Motion; (ii) Harjo has not provided new controlling authority; (iii) the record evidence that Harjo raises is immaterial to the Court's MOO; and (iv) there is no clear indication that the Court erred. First, the City of Albuquerque argues that the parties spent considerable time briefing the issues Harjo raises, and the Court spent "an entire section" of the MOO addressing it, demonstrating that reconsideration and alteration is not proper. Response at 3-4. Second, the City of Albuquerque contends that Harjo presents no new controlling authority, but instead relies on the same cases that she presented earlier. See Response at 4. Third, the City of Albuquerque contends that, on a motion for judgment on the pleadings, the Court cannot

consider factual evidence, and the majority of Harjo's Motion improperly asks the Court to consider record evidence. See Response at 5-6. The City of Albuquerque adds that the Court's interpretation of the Forfeiture Ordinance is proper as a matter of legal interpretation. See Response at 5-7. Fourth, the City of Albuquerque argues that the Court did not clearly err, as there is no indication that forfeiture program officials have control over whether excessive funds are returned to the forfeiture program. See Response at 7. The City of Albuquerque also argues that, contrary to Harjo's assertion that the statute may be interpreted to mean that excess funds are kept within the forfeiture program, the Amended Complaint "expressly asserts that excess revenue is distributed for purposes other than the forfeiture program." Response at 8 (citing Amended Complaint ¶ 15, at 4). The City of Albuquerque contends, moreover, that the City Council and Mayor are the ones who have statutory authority to authorize additional funds to the forfeiture program and not forfeiture program officials. See Response at 9 (citing 11 ROA §§ 2-11-6, 2-11-8, 2-11-10 to 11). It concludes, accordingly, that the Court should deny Harjo's Motion. See Response at 9.

**9. Reply.**

Harjo replies. See Reply in Support of Plaintiff's Motion for Modification and/or Reconsideration at 1, filed May 24, 2018 (Doc. 99)("Reply"). Harjo argues that her Motion does not, as the City of Albuquerque contends, rest on evidentiary material; rather, according to Harjo, the MOO is contrary to the Amended Complaint's allegations. See Reply at 2. She reiterates that, because the MOO asserts one thing, while the Amended Complaint asserts the opposite, the Court erred. See Reply at 2-3.

Harjo also argues that its arguments grounded in evidentiary material "bolster the primary argument that the Opinion erred by disregarding the Complaint." Reply at 3. Harjo contends

that she cited evidentiary material not so the Court would "*depart* from the allegations in the Complaint," but so the Court would "*conform* the Opinion to the Complaint." Reply at 3 (emphasis in original). Harjo contends that this record evidence shows that the MOO rests on "a series of factual assumptions" as opposed to legal interpretations. Reply at 3. She argues that the Court's factual assumptions are not properly judicially noticed, because, as the record evidence demonstrates, the Court's assumed facts "are subject to reasonable dispute." Reply at 5-6. She also argues that the evidence presented demonstrates that the Amended Complaint's allegation is true, so "the Opinion erred twice over by disregarding allegations that are actually confirmed by the evidence." Reply at 6. She contends that she should not need to amend her complaint to include the additional factual evidence that she has uncovered in discovery, because the Amended Complaint already includes enough information, and the Court has instructed that a plaintiff does not need to "'allege each piece of evidence he or she plans to introduce'" to defeat a motion to dismiss. Reply at 6 n.2 (quoting Lane v. Page, 727 F. Supp. 2d 1214, 1234 n.12 (D.N.M. 2010)(Browning, J.)). Harjo notes, however, that, should the Court disagree, she "stands ready to file a motion to amend." Reply at 6 n.2.

Finally, Harjo contends that her arguments have not been subject to extensive briefing, because the City of Albuquerque argued previously only that "the possibility" of the forfeiture program "benefitting from increased revenues . . . is legally irrelevant." Reply at 7 (citing Motion for Judgment at 10). Harjo contends that the issue here is different: whether the forfeiture program can benefit from increased revenues and not whether such a benefit is legally relevant. See Reply at 7. She concludes that her Motion is a narrow request to modify only a page or two of the MOO, so that the Court can consider all of the relevant factual issues. See Reply at 7-8.

10.    **The Hearing.**

The Court held a hearing.  See Draft Transcript of Motion Proceedings at 1:2 (taken June 13, 2018)(Court)("Tr.").[29]  Harjo opened by arguing that her procedural due process argument is "a pure legal issue," of which the Court already disposed in the MOO, so she asked the Court to grant summary judgment on that issue "for all the reasons that are stated in the Court's opinion." Tr. at 3:4-15 (Johnson).  She contends that the profit incentive claim is still relevant, even if the Court grants summary judgment on the procedural due process claim, because the two claims deal with different damages; according to Harjo, the procedural due process claim covers only damages "that arose after the hearing," but Harjo sustained a month's worth of damages between the date of seizure and the date of the hearing.  Tr. at 3:16-24 (Johnson).

On the improper incentive theory, Harjo argues that the City of Albuquerque "admits" that the forfeiture program is "dependen[t] . . . on the revenue generated by the forfeiture program," and that, because the forfeiture program is dependent on that revenue, the program violates due process  Tr. at 4:1-25 (Johnson).  Harjo contends that, even without that concession, the testimony of the City of Albuquerque's executive analyst, the declining budget appropriations, and that forfeiture revenues pay the forfeiture program officials' salaries demonstrate that the forfeiture program is dependent on forfeiture revenues.  See Tr. at 5:1-19 (Johnson).

Harjo contends that all three of the City of Albuquerque's responses to Harjo's arguments fail.  First, she contends that it is not true, as the City of Albuquerque argues, that, "if this [forfeiture program] is illegal, then any forfeiture program would be illegal."  Tr. at 6:18-19

---

[29]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  If a final transcript is made, it contain slightly different page and/or line numbers.

(Johnson).  According to Harjo, a forfeiture program funded through the government's general fund would be constitutional.  See Tr. at 8:2-6 (Johnson).  She also notes that federal guidelines prohibit all of the City of Albuquerque's forfeiture processes, and yet the federal government's forfeiture program survives constitutional muster.  See Tr. at 6:16-25 (Johnson).  She contends that the constitutional issue with the City of Albuquerque's program is that "there is a link between how much . . . the program is able to generate and how much it's able to spend."  Tr. at 8:7-11 (Johnson).

The Court inquired whether there would be a constitutional issue if a forfeiture program received its funding from the general fund, but the funds appropriated from the general fund were consistently equal to the amount the forfeiture program generated.  See Tr. at 9:10-17 (Court).  Harjo responded that such a pattern might "raise difficult constitutional questions," and in that case, a plaintiff would have to "show a practice" that the general fund appropriation equaled revenue raised, which would place a "higher evidentiary burden" on the plaintiff.  Tr. at 9:18-10:2 (Johnson).  The Court expressed reservation about Harjo's conclusion, because, in the Court's opinion, it foreclosed any city from attempting to run a budget-neutral forfeiture program, and, ultimately, Harjo's argument did not present the City of Albuquerque a way to run a constitutional program.  See Tr. at 10:8-20 (Court).  Harjo responded that a city could cure any constitutional difficulties by "budgeting based on cost, not based on respective revenue":

> There's no reason to think that if revenue goes up from 800,000 to 900,000 . . . that the program's costs go from 800 to 900,000 as well.  The cost of the program, say, are about 700,000, and the program should be budgeted at 700,000.  And anything above that should simply go into the general fund.  And, similarly, if there's a shortfall, the program shouldn't be in a situation where, you know, it has to worry that, because they've not generated the amount of revenue [needed to cover costs that they] aren't going to be able to pay for salaries and other fixed expense[s].

Tr. at 10:21-11:8 (Johnson). Harjo continued that all she wants is for the program "to be funded like any law enforcement program." Tr. at 11:15-16 (Johnson). The Court responded that, unlike other law enforcement programs, "it's a program that probably nobody has an incentive to run if it's going to be under water." Tr. at 11:21-25 (Court). Harjo countered that such an argument proved her point that, if the forfeiture program's only incentive is to pay for itself, or if the program's law enforcement goals are not worth it if the program does not fund itself, the program is unconstitutional. Tr. at 12:3-13:2 (Johnson). The Court observed that it could not see "a limiting principle for your arguments." Tr. at 13:3-10 (Court).

The City of Albuquerque responded that there are factual issues that preclude summary judgment, including that police officers who seize vehicles are paid out of the general fund. See Tr. at 19:17-19 (Walz). The City of Albuquerque also argued that the Court is correct that Harjo does not provide a limiting principle, but the Court responded that the City of Albuquerque could "run a deficit program," if it concluded that asset forfeiture "deters crime so much" that it is worth running a program that needs constant funding from the general fund. Tr. at 20:22-21:2 (Court). See Tr. at 20:2-11 (Walz). The City of Albuquerque conceded the Court's point, but argued that if a city strived for "fiscally responsible policies and procedures" such a concern would not raise constitutional concerns. Tr. at 21:3-16 (Walz).

The City of Albuquerque contended that there is no institutional bias, because the budget is designed to be "revenue neutral," but that the City of Albuquerque could, at any time, decide to make the forfeiture program "revenue negative." Tr. at 23:9-14 (Grubel). The City of Albuquerque also argued that forfeiture program funds used to pay for "equipment, training programs to the public, and that type of expenditure . . . cannot, as a matter of law, show either an institutional financial incentive or [a] personal financial incentive." Tr. at 24:17-23 (Walz).

Responding to the Court, Harjo clarified that the forfeiture program account, from which all forfeiture program expenses are paid, is not a separate checking account, but it has a different accounting notation such that, if an item is budgeted to be paid out of the forfeiture fund, there must be money in that forfeiture fund to pay for it. See Tr. at 27:13-22 (Johnson). Harjo also noted that, in fiscal year 2019, the City has, for the first time, appropriated money from the general fund to cover the forfeiture program's costs. See Tr. at 30:10-17 (Johnson); id. at 31:2-11 (Johnson). The Court observed that the 2019 budgeting transfer undermines Harjo's argument that the forfeiture program is dependent on its own funds, to which Harjo responded that such a reality does not undercut her theory, because the forfeiture program's budget "has fallen far more than what the city has been able to make up with its supplementation." Tr. at 32:11-24 (Court, Johnson). See id. at 33:13-15 ("[T]he Supreme Court never suggested that it has to be 100 percent of the budget coming from forfeiture revenues for there to be a profits violation."). Harjo also argued that the budget data from before 2019 shows an institutional incentive to prosecute forfeitures, because, as revenues drop, appropriations drop as well. See Tr. at 31:12-32:10 (Johnson).

Harjo argued that the Court should grant summary judgment on her procedural due process claim under Colorado v. Nelson. See Tr. at 36:15-37:4 (Johnson). The Court asked whether Harjo would concede that Colorado v. Nelson is in tension with previous Supreme Court cases about affirmative defenses shifting the burden of proof, to which Harjo argued that Colorado v. Nelson is not in tension with previous cases, because in previous cases, the government still held the burden to prove that the defendant did something wrong first before the burden shifts, whereas, here, the City of Albuquerque has no burden to prove that the owner did

something wrong before the burden shifts. <u>See</u> Tr. at 37:5-25 (Court, Johnson); <u>id.</u> at 38:11-19 (citing <u>Martin v. Ohio</u>, 480 U.S. 228, 233 (1987)).

The City of Albuquerque countered that the probable cause showing it has to make with respect to the car being connected to the DWI "provides the requisite constitutional due process." Tr. at 39:16-40:9 (Walz). The City of Albuquerque argued that probable cause has been "long recognized" as a proper "threshold" procedure for a "preliminary determination as to whether a criminal activity has occurred." Tr. at 41:14-19 (Walz). Accordingly, the City of Albuquerque asked the Court to reconsider its conclusion about this claim in the MOO. <u>See</u> Tr. at 41:1-5 (Walz). Harjo responded that probable cause cannot be enough, because facts showing probable cause center on only the person who is driving the car and not, at least in this case, the vehicle's owner. <u>See</u> Tr. at 43:13-44:4 (Johnson).

On the Motion to Strike, the Court signaled that it is inclined to consider many of Gardemal's more factual points, but that it will discount Gardemal's points that cross the line into legal opinion. <u>See</u> Tr. at 45:2-9 (Court). The City of Albuquerque responded that it finds the Court's solution acceptable: "If it's the Court's inclination to deny the motion, but to take a close look and see what you may want to use out of the affidavit or reject, that is certainly the Court's province." Tr. at 47:10-13 (Walz). Harjo also agreed with the Court's plan. <u>See</u> Tr. at 48:6-9 (Johnson)("[T]o the extent that the Court . . . intend[s] to disregard any statements that . . . cross[] the line into a legal conclusion, . . . that's fine.").

As to the Motion, Harjo reiterated her arguments from the briefing that it is a narrowly tailored motion that the Court erred in a conclusion that is "directly contrary to the allegations" in the Amended Complaint. Tr. at 54:7-20 (Johnson). The City of Albuquerque contended, for the first time, that the Motion was untimely filed. <u>See</u> Tr. at 54:24-25 (Walz). The City of

Albuquerque also contended that the Court cannot properly reconsider the Motion, because it thoroughly considered the point and concluded against Harjo. See Tr. at 56:6-21 (Walz). Harjo countered that the Motion is timely, as there is no timing requirement for a motion to reconsider an interlocutory order, and that, even if the Motion is untimely, the City of Albuquerque waived the argument by asserting it for the first time at the hearing. See Tr. at 56:25-57:12 (Johnson). Harjo clarified that her Motion seeks to ensure that the Court was not "hamstrung" from considering all the relevant facts which the MSJ briefing raises, because of one conclusion in the MOO. Tr. at 58:4-12 (Johnson). The City of Albuquerque rejoined that it had made the timeliness argument in its briefing, because it argues that the Court should not reconsider an opinion if a motion to reconsider is based on evidence that was previously available to the movant. See Tr. at 58:23-59:3 (Walz).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the

pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, No. 2:11-cv-757, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[30] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the

---

[30]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)("Schuylkill"); Vitkus v. Beatrice Co., 11

F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those

facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The United States Court of Appeals for the Tenth Circuit applied this doctrine in

Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),] explained that the

blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M.

2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

## LAW REGARDING UNCONCSTITUTIONAL PROFIT INCENTIVE

"The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." Marshall, 446 U.S. at 242. "This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process." Marshall, 446 U.S. at 242. Due process does "not permit any procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused." Marshall, 446 U.S. at 242. See Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. at 877-880 ("Due process requires an objective inquiry into whether the contributor's influence on the election under all the circumstances would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true."); Ward v. Village of Monroeville, 409 U.S. at 60. "It is sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes." Gibson v. Berryhill, 411 U.S. 564, 579 (1973). See Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 824 (1986)("Lavoie")(concluding that there was a due process violation where an Alabama justice received $30,000.00 from settling a case in which he decided, in a highly similar case, an issue on appeal).

The Supreme Court has recognized several factors that bear on whether a law, procedure, or program unconstitutionally biases an official: (i) whether the amount of penalties or prosecutions affects an official's salary; (ii) the official's authority over allocating the penalty funds; (iii) the percentage of the budget that the fees and penalties constitute; and (iv) whether

surplus funds are allocated to the program or to other programs.  See Marshall, 446 U.S. at 245-46, 250-41.  See also Ward v. Village of Monroeville, 409 U.S. at 58 (concluding that a mayor's impartiality was sufficiently compromised to violate due process when a substantial portion of the "village income is derived from the fines, forfeitures, costs, and fees imposed by him in his mayor's court").

The test for impartiality is less strict when the official performing the duty "act[s] in a prosecutorial or plaintiff-like capacity."  Marshall, 446 U.S. at 248.

> Our legal system has traditionally accorded wide discretion to criminal prosecutors in the enforcement process, and similar considerations have been found applicable to administrative prosecutors as well. . . .  In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law.  The constitutional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated if it is the prosecutor, and not the judge, who is offered an incentive for securing civil penalties.

Marshall, 446 U.S. at 248-49 (internal citations omitted).  Although providing a lower standard, the due process clause still imposes "limits on the partisanship of administrative prosecutors." Marshall, 446 U.S. at 249.  "A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions."  Marshall, 446 U.S. at 249-50.  Such personal interest can take the form of economic profit or "the prospect of institutional gain as a result of zealous enforcement efforts."  Marshall, 446 U.S. at 250.

## LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive

due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons. See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)). "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.). The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972). "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)). The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for

"the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men.  In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process.  Goldberg v. Kelly, 397 U.S. 254 . . . [(1970)].  See Flemming v. Nestor, 363 U.S. 603, 611 . . . [(1960)].  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 . . . [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 . . . [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576–77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents

of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. at 334. The Supreme Court has explained that

> the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an

employee who has a constitutionally protected property interest in his employment.

. . . .

[T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545(footnote omitted).

The United States Court of Appeals for the Second Circuit has stated:

The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] . . . (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335, 96 S. Ct. 893). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335. . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose. See Mathews v. Eldridge, 424 U.S. at 335. For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate." Clark v. City of Draper, 168 F.3d at 1189. See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has previously considered procedural due process violations several times. For example, in See <u>A.M. through Youngers v. New Mexico Department of Health</u>, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.), the Court concluded that the New Mexico Department of Health violated due process when it afforded a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it afforded her no process for deprivation. See <u>A.M. through Youngers v. New Mexico Department of Health</u>, 2015 WL 13668431, at *37-43. The Court has also concluded that a tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing. See <u>Salazar v. City of Albuquerque</u>, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win."). See <u>also</u> <u>Duprey v. Twelfth Judicial Dist. Court</u>, 760 F. Supp. 2d 1180, 1215 (D.N.M. 2009)(Browning, J.)(denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers."); <u>Camuglia v. City of Albuquerque</u>, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.), <u>aff'd</u>, <u>Camuglia v. City of Albuquerque</u>, 448 F.3d 1214, 1220-21 (10th Cir. 2006)("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

## LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in

determining the factual issues it must decide." United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert v. Merrell Dow Pharmaceuticals, Inc., whether the opinion testimony is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224. "Daubert v. Merrell Dow Pharmaceuticals, Inc. requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

      1.    **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."). An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank,

374 F.3d 917, 928 (10th Cir. 2004). The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion"). See United States v. Edwards, No. CR 16-3068, 2017 WL 4857441, at *13 (D.N.M. 2017)(Browning, J.).

### 2. The Daubert v. Merrell Dow Pharm., Inc. Standard.

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)). The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested;

(ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95. The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence. See Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . . ). This obligation involves a two-part inquiry. Id. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" Id. (quoting Daubert, 509 U.S. at 592 . . . ). In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid . . . ." Id. (quoting Daubert, 509 U.S. at 592-93 . . . ). Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand." Daubert, 509 U.S. at 597 . . . .

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (footnote omitted). "The second inquiry is related to the first. Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case . . . . The evidence must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert v. Merrell Dow

Pharm., Inc., 509 U.S. at 591). If the expert's proffered testimony fails on the first prong, the court does not reach the second prong. See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.

In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert v. Merrell Dow Pharm., Inc., to non-scientific expert testimony. See Kumho Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow Pharm., Inc., will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., a court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595). "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations and internal quotation marks omitted). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury. See Norris v. Baxter Healthcare

Corp., 397 F.3d at 881.  The Tenth Circuit noted in Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances . . . .  Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d at 1206.  The United States Court of Appeals for the Ninth Circuit noted in Claar v. Burlington N.R.R. Co., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method.  Certainly, scientists may form initial tentative hypotheses.  However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (Dec. 15, 2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion.

See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated

connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.").  A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans.").  Courts have excluded experts' opinions when the experts depart from their own established standards.  See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").  See United States v. Edwards, 2017 WL 4857441, at *14-15.

**3.** **Necessity of Evaluating an Issue Under** **Daubert v. Merrell Dow Pharm., Inc.**

The restrictions in Daubert v. Merrell Dow Pharm., Inc. apply to both "novel" expert testimony and "well-established propositions."  509 U.S. at 593 n.11 ("Although the Frye[31]

---

[31]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from

decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert. . . ." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology,[32] and in fact some courts have indicated their acceptance of it."). See United States v. Edwards, 2017 WL 4857441, at *16; United States v. Harry, 20 F. Supp. 3d 1196, 1226 (D.N.M. 2014)(Browning, J.); United States v. Chapman, 59 F. Supp. 3d 1194, 1212-13 (D.N.M. 2014)(Browning, J.).

---

which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014.

[32]PCR stands for polymerase chain reaction, which the expert witness used to replicate bacteria DNA, "a process that would allow her to identify whether such bacteria were present in various environmental samples." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.

## ANALYSIS

The Court concludes that the City of Albuquerque's forfeiture officials have an unconstitutional institutional incentive to prosecute forfeiture cases, because forfeiture revenues are set in a special fund, and the forfeiture program can spend, without meaningful oversight, all of the excess funds it raises from previous years. Should the forfeiture program spend more than appropriated, the City of Albuquerque will approve that spending after the fact, as long as previous revenues cover the costs. Accordingly, the forfeiture program has de facto power over its spending, and thus, the more revenue it raises, the more revenue it can spend. Forfeiture program officials, however, do not have an unconstitutional personal incentive to prosecute, because, taking the evidence in the light most favorable to the City of Albuquerque, their continued employment or salary is not contingent on the forfeiture program revenues. The Forfeiture Ordinance independently violates due process by depriving car owners of their property unless they prove their innocence. Finally, the Court will not strike the Gardemal Decl., because the statements upon which the Court relies in the Gardemal Decl. are based on admissible evidence. Accordingly, the Court grants the MSJ in part and denies it in part, denies the Motion to Strike, and grants the Motion.

## I.     THE CITY OF ALBUQUERQUE HAS AN UNCONSTITUTIONAL INSTITUTIONAL INCENTIVE TO PROSECUTE FORFEITURE ACTIONS.

Harjo argues that enforcement officials have an unconstitutional institutional incentive to prosecute. See MSJ at 19-20. In Tumey v. Ohio, 273 U.S. 510, 532 (1927)("Tumey"), the Supreme Court recognized that a due process violation may arise should a judicial officer have an institutional incentive to favor one party over another. See 273 U.S. at 532-32. In Marshall, the Supreme Court extended that framework to prosecutors, ruling that an institutional incentive exists when there is "a realistic possibility that the [prosecutor's] judgment will be distorted by

the prospect of institutional gain as a result of zealous enforcement efforts." Marshall, 446 U.S. at 250.

Thus, in Marshall, the Supreme Court considered whether there was an institutional incentive for assistant regional administrators of the Department of Labor's Employment Standard Administration ("ESA") to prosecute and collect civil penalties from companies that violate federal child labor laws. See 446 U.S. at 239. The Supreme Court concluded that there was no institutional incentive for several reasons. First, the civil penalties collected represented "substantially less" than one percent of the ESA's budget. 446 U.S. at 250. Second, "the amount of the ESA's budget that was returned to the treasury was substantially greater than the amount collected as civil penalties." 446 U.S. at 250-51. Third, the ESA's national officer, and not any assistant regional administrator, determined "how to allocate civil penalties," so no administrator was assured "that the penalties they assessed will be returned to their offices." 446 U.S. at 251. Finally, the ESA allocated the civil penalties to each regional office based on the program's costs instead of the program's revenues. See 446 U.S. at 251. Thus, according to the Supreme Court,

> even if an assistant regional administrator were to act on the assumption that civil penalties would be returned to his office in any given year, his decision to assess an unjustifiable large penalty in a particular case would be of no benefit to his office, since that decision would not produce an increase in the level of expenses.

446 U.S. at 251.

The undisputed facts of this case sharply contrast with those in Marshall. Whereas, in Marshall, the fees collected represented less than one percent of the program's budget, the forfeiture program revenues pay all of the program's major expenses. See supra at 12-13 (citing MSJ ¶¶ 29-31, at 8); Suppl. Interrog. Response at 4. In Marshall, the amount of the program's budget returned to the Department of Treasury's general fund greatly outweighed the funds

raised via prosecution, but here, no money is returned to the general fund. Rather, "[m]oney left over above program expenses is used to fund discretionary purchases." Supra at 13 (citing MSJ ¶ 31, at 8); id. at 12-13 ("If the forfeiture program has more funds 'available than [the] City Council has appropriated, it can spend even more and [the] City Council will pass a clean up bill retroactively authorizing the spending.'")(quoting MSJ ¶ 34, at 9). Those discretionary purchases in part are police vehicles for the Albuquerque Police Department, which, according to the Albuquerque Police Department fiscal manager, are vehicles that the police need, but do not have the budget to purchase. See supra at 13 (citing MSJ ¶ 31, at 8); Thompson Depo. at 149:9-13. Other discretionary purchases have been radar guns, advertising, and a new educational building. See supra at 13 (citing MSJ ¶ 31, at 8).[33] Finally, whereas, in Marshall, a detached centralized authority determined how to allocate the program's budget and decided to allocate funds based on costs, as opposed to revenues raised, the situation here diverges. Although the City Council -- a detached authority -- by law, has the authority to appropriate funds to the forfeiture program, the City Council sets its appropriation to estimated revenues, as opposed to estimated costs. See supra at 14 (citing MSJ ¶ 33, at 9). It is undisputed that "[t]he City sets the amount of [the forfeiture program] appropriation by estimating program revenues for the coming fiscal year." MSJ ¶ 33, at 9. See supra at 14. Indeed, according to the City of Albuquerque's Executive Budget Analyst, if "we think we're going to get a million dollars in revenue, we'll allow them to spend a million in expenditures." Cutler-Padilla Depo. at 17:20-22. See MSJ

---

[33]The City of Albuquerque argues that these discretionary purchases are not relevant, because they are not "for personal benefit," but are "work-related." MSJ Response at 21. The Court concludes that, in terms of an institutional incentive, such discretionary purchases are relevant, as they benefit the program, and ultimately the government, which is precisely the incentives the Supreme Court had in mind when holding that an institutional incentive can violate due process. See Ward v. Village of Monroeville, 409 U.S. at 60; Tumey, 273 U.S. at 532-33.

¶ 33, at 9; supra at 14. Moreover, it is undisputed that the forfeiture program can spend even more than appropriated, as long as the forfeiture program raises the revenues, and the City Council will retroactively authorize the spending. See supra at 14 (citing MSJ ¶ 34, at 9).[34]

The Court concludes, on these facts, that there is a due process violation. Most relevant to the Court's conclusion is the undisputed facts that the City Council retroactively approves spending over the appropriation amount, and that the forfeiture program can spend as much as it raises. On those facts, there is a realistic possibility that the forfeiture program prosecutors' judgment will be distorted, because in effect, the more revenues the prosecutor raises, the more money the forfeiture program can spend. Cf. Ward v. Village of Monroeville, 409 U.S. at 60 ("Plainly that possible temptation may also exist when the mayor's executive responsibilities for

_____

[34]The Court notes that Harjo raises additional facts, which she contends "ramps up" the institutional incentives. MSJ at 22-23. For example, she comments that the City of Albuquerque's annual budget sets targets for numbers of seized vehicles, and that it also tracks monthly vehicle intake, among other statistics. See MSJ at 22 (citing MSJ ¶ 35, at 9). She adds that "[p]rogram personnel are acutely aware of these numbers," and that the City of Albuquerque treats revenue generation as an "explicit objective." MSJ at 22-23 (citing MSJ ¶ 40, at 10; L. Rivera Depo. at 21:1-22:15). To support her contention that the City of Albuquerque treats revenue as an objective, she notes that annual performance evaluations list "increas[ing] the amount of revenue generated from Seized vehicles" as one of the program's "Output Measures," "City policy documents describe 'provid[ing] equipment' as the program's 'Concept of Operations,'" and the "2016 budget openly listed as an 'accomplishment[]' that the program 'generat[ed] $471,000 in proceeds to fund law enforcement efforts." MSJ at 23.
     The Court concludes that these do not create or contribute to an unconstitutional institutional incentive, because none of them demonstrate that there is "a prospect of institutional gain as a result of zealous enforcement efforts." Marshall, 446 U.S. at 250 (emphasis added). There is no indication that keeping track of forfeiture statistics, setting goals, or that stating revenue is a forfeiture program objective mean that, should the enforcement officials more zealously prosecute, it will lead to an institutional gain -- i.e., increased budget or some other boon. That program officials may have received verbal praise for hitting goals does not violate the Constitution. Cf. Marshall, 446 U.S. at 249 ("Prosecutors need not be entirely neutral and detached."). As to the hearing officers, while the standard may be lower, the Court likewise cannot discern any institutional gain, i.e., some benefit apart from praise, for the hearing office. Accordingly, the Court does not find an unconstitutional incentive arising from those facts.

- 77 -

village finances may make him partisan to maintain the high level of contribution from the mayor's court.").

In its MOO, which took its facts from Harjo's Amended Complaint and not from evidentiary submissions, the Court reached a contrary conclusion, because the Amended Complaint, the Forfeiture Ordinance's face, and the evidence now before the Court paint different pictures. As the Court noted in the MOO, by statute, a central authority -- the City Council and the Mayor -- exercised ultimate control over the forfeiture program's budget. See MOO at 62, 2018 WL 1626099, at *28. After discovery, however, the undisputed facts demonstrate that the central authority has ceded its official statutory control such that the forfeiture program officials are in de facto control of how its revenue is spent. See supra at 14 ("'As a practical matter, the program's spending is limited by its revenue, not by the City Council.'")(quoting MSJ ¶ 34, at 9); supra at 14 ("If the forfeiture program has more funds 'available than [the] City Council has appropriated, it can spend even more and [the] City Council will pass a clean up bill retroactively authorizing the spending.'")(quoting MSJ ¶ 34, at 9). As the City of Albuquerque's Executive Budget Analyst testified, should the forfeiture program raise "extra revenues" one year, those funds are "dropped" into a "fund balance" such that, in subsequent years, if the appropriation is less than spending, the City of Albuquerque will use the excess balance accrued to cover that additional spending. Cutler-Padilla Depo. at 15:9-19 ("[W]e call it a cleanup, where we've taken from fund balance and made it whole again."). Thus, although the appropriation is nominally the forfeiture program's legal-spending limit, in reality, it is not, because the City of Albuquerque approves extra-appropriation spending:

> [B]ecause we think we're going to get a million dollars in revenue, we'll allow the[ forfeiture program] to spend a million in expenditures. So . . . we'll appropriate the million dollars, but if in that year they actually spend a million

> one hundred, we have to then go back and appropriate another hundred. . . . And
> as long as they have the fund balance, you know, we can do that.

Cutler-Padilla Depo. at 17:17-18:5. See Cutler Padilla Depo. at 19:15-16 ("So if the appropriation is less than what they've spent, we have to clean it up."); id. at 19:22-25. Thus, in practice, no central authority checks forfeiture program spending; the more excess revenues raised one year will be saved to cover additional spending in subsequent years. See Thompson Depo. at 136:4-5 ("If more revenue comes in, then yes, our expenditures can increase."). Thus, the forfeiture program described in the pleadings and on the Forfeiture Ordinance's face is constitutional, but the forfeiture program that this case's discovery reveals is not. The Court concludes, accordingly, that there is an unconstitutional institutional incentive.[35]

In so ruling, the Court is mindful of analogous cases. For example, the Honorable James Gritzner, Senior United States District Judge for the Southern District of Iowa, concluded that facts similar to those here were highly relevant in an unconstitutional profit incentive claim. See Flora v. Southwest Iowa Narcotics Enforcement Task Force, 292 F. Supp. 3d 875, 902-03 (S.D. Iowa 2018)(Gritzner, J.)("Flora"). In Flora, Iowa police officers stopped the plaintiff -- Flora -- on the highway for speeding and, later -- after a police dog alerted to drugs in the vehicle -- discovered $120,090.00 in the car. See 292 F. Supp. 3d at 881-84. A special Iowa police task force charged with, among other things, drug investigation, enforcement, and civil asset forfeiture, seized Flora's cash. See 292 F. Supp. 3d at 884-85. Flora challenged the seizure, asserting that the task force had an unconstitutional profit incentive. See 292 F. Supp. 3d at 884-85. Under an agreement with the county attorney's office, the task force distributed ten percent

---

[35]The Court's holding is retrospective. That the City of Albuquerque has ceded fiscal control over forfeiture program revenues does not mean that the City of Albuquerque will continue to cede control moving forward. Thus, that the Court concludes that there is a due process violation here does not mean that the forfeiture program is doomed to violate due process. See infra at 81.

of any successful civil forfeiture to the county attorney's office, twenty percent to the state, and the remaining funds back to the task force. See 292 F. Supp. 3d at 904. In considering that forfeiture program, Judge Gritzner denied the task force's summary judgment motion on the profit incentive claim, because: (i) the profit-sharing agreement did not "limit forfeiture shares to expenses accrued by the Task Force and the [county attorney's office] in pursuing the forfeitures"; and (ii) whether the task force received excessive funds from its seizures "rest[ed] on the sole determination of the Task Force Unit Supervisor." 292 F. Supp. 3d at 904. Thus, Judge Gritzner concluded that "the Task Force and [the county attorney's office] are guaranteed to profit economically." 292 F. Supp. 3d at 904. Although the Court's task diverges from Judge Gritzner in that the Court must rule on a plaintiff's motion for summary judgment, whereas Judge Gritzner ruled on a defendants' motion for summary judgment, Judge Gritzner's ruling does not appear to have been a close case or one where a tie broke toward the plaintiffs; rather, Judge Gritzner's ruling is based on the plaintiff's strong evidence and the defendants' lack of evidence. See Flora, 292 F. Supp. 3d at 904 ("Defendants have failed to produce sufficient evidence on the factors the Supreme Court held were relevant in Marshall."). The Court concludes that Judge Gritzner's ruling is relevant in that he based his determination on the task force's power to determine whether it received excess funds. Here, the forfeiture program has a similar power.

The City of Albuquerque contests the Court's conclusion on several grounds. First, it argues that there is no constitutional violation when a program is merely "self-funded" or when "the revenues generated offset program expenses." MSJ Response at 16. See id. at 17. The Court agrees that there is not necessarily a constitutional violation if a program is self-funded, or, put another way, if a program is budget neutral. See MOO at 63, 2018 WL1626099, at *28

("Thus, that the program funds itself does not create an institutional incentive for prosecutors to prosecute more cases or for officers to seize more vehicles."). The forfeiture program here goes beyond mere self-funding, however, because the forfeiture program has the control to spend all it takes in, and it has done so. See supra at 13-14 (citing MSJ ¶¶ 31, 34, at 8-9); Thompson Depo. at 136:4-5 ("If more revenue comes in, then yes, our expenditures can increase.").

The City of Albuquerque also contends that, if its forfeiture program is unconstitutional, every forfeiture program is unconstitutional. See MSJ Response at 16. To the contrary, the City of Albuquerque could craft a constitutional forfeiture program by altering how it funds the program. For example, the City of Albuquerque could -- instead of placing forfeiture revenues in a special fund -- place forfeiture revenue directly into its general fund and then appropriate money from that fund to pay for the forfeiture program's expenses. Should the City of Albuquerque continue its practice of mechanically approving the forfeiture program's after-the-fact spending,[36] there might still be constitutional concerns, but with the revenues placed in the general fund, there is far less reason to think that the City of Albuquerque would be a rubber stamp, given its many financial obligations. Accordingly, the City of Albuquerque's forfeiture program could pass constitutional muster with some changes.[37]

---

[36]The Court notes that, while the City of Albuquerque formally sets the forfeiture program's appropriation limits, it appears to do so completely based on the Albuquerque Police Department's recommended number. See Cutler Padilla Depo. at 20:1-7; Thompson Depo. at 135:15-19. This is another area that, should the City of Albuquerque's City Council, or an independent entity, assert more control, constitutional problems would be lessened.

[37]The Court's conclusions in the MOO do not foreclose its conclusion here, so altering the MOO is unnecessary. The Court's only previous holding foreclosing a theory of liability is that the City of Albuquerque cannot be liable under Harjo's theory that, "because the vehicle forfeiture program funds itself, it violates due process." MOO at 90, 2018 WL 1626099, at *40. As explained above, that is not Harjo's theory here. Moreover, any tension between the undisputed facts on summary judgment and the MOO's factual analysis is immaterial, because, on a motion for judgment on the pleadings, the Court takes its facts from the complaint and

draws legal conclusions based on an assumption that those facts are true. That the summary judgment record reveals additional facts upon which the Court rests its conclusion does not require Harjo's Amended Complaint to be amended, because it still gives the City of Albuquerque "fair notice of what the . . . claim is and the grounds upon which it rests." Burnett v. Mortgage Electronic Registration Systems, Inc., 706 F.3d 1231, 1235 (10th Cir. 2013).

Although not necessary to reach its holding, the Court concludes that it will alter three sentences of its MOO. Harjo contends that the Court erred, because it stated in the MOO that "additional penalties assessed do not lead to an increase in the amount of funds the forfeiture has to spend" whereas, according to Harjo, her amended complaint alleged "the opposite," i.e., "'forfeiture revenues increase the amount of money available to spend.'" Motion at 4 (citing Amended Complaint ¶ 19, at 5). Thus, again according to Harjo, the Court erred, because it must accept "the allegations of the Complaint as true." Motion at 4 (citing Isengard v. N.M. Pub. Educ. Dep't, 2009 WL 2105947, at *4 (D.N.M. June 16, 2009)(Browning, J.)). Harjo is not entirely correct, because the Court must accept as true "[a]ll well-pleaded facts, as distinguished from conclusory allegations." Teigen v. Renfrow, 511 F.3d 1072, 1078 (10th Cir. 2007). See Khalik v. United Airlines, 671 F.3d 1188, 1191 (10th Cir. 2012)("[I]n examining a complaint under Rule 12(b)(6), we will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest that the defendant is liable."). Nevertheless, the Court concludes that, because her allegation that "forfeiture revenues increase the amount of money available to spend" is not conclusory, the Court must accept it as true.

In the MOO, the Court concluded that "excess funds collected must be allocated to other programs" notwithstanding Harjo's contrary allegation, because the plain language of the Forfeiture Ordinance requires that excess funds be allocated to other programs. See MOO at 62, 2018 WL 1626099, at *28 (citing ROA §§ 7-6-5(E) ("Any proceeds that exceed the costs of administering this article shall be used for DWI enforcement, prevention and education.")). Moreover, the Court concluded as it did, because at least one of the Amended Complaint's allegations acknowledges that excess funds collected must be allocated to other programs. See MOO at 62, 2018 WL 1626099, at *28 (citing Amended Complaint ¶ 15, at 4). Thus, on the one hand, Harjo alleges that "[m]oney collected through the forfeiture program is distributed to other purposes only if there is any surplus left over after paying the expenses of the forfeiture program," and, on the other hand, alleges, "forfeiture revenues increase the amount of money available to spend." Amended Complaint ¶¶ 15, 19 at 4-5. There is some tension in those two allegations. The Amended Complaint acknowledges that "surplus left over after paying the expenses of the forfeiture program" must go to other programs, yet she contends that there is no such thing as a surplus that must go to other programs, because the more the forfeiture program raises, the more it can spend. Nevertheless, that reality does not mean that the Court can disregard Harjo's allegation that "forfeiture revenues increase the amount of money available to spend," because the Federal Rules of Civil Procedure let her plead -- even facts -- inconsistently. See Fed. R. Civ. P. 8(d)(2); Wright and Miller, § 1283, at 724 ("Under Rule 8(d)(2), a party is permitted to set forth inconsistent statements either alternatively or hypothetically within a single count or defense."). Moreover, the Court, when construing a motion for judgment on the pleadings, is required to view the allegations in the light most favorable to the non-movant, drawing all reasonable inferences in his or her favor. See Mayfield v. Bethards, 826 F.3d 1252, 1255 (10th Cir. 2016). The two allegations are compatible if one infers that forfeiture officials can increase forfeiture program costs such that there is never

## II. FORFEITURE OFFICIALS DO NOT HAVE AN UNCONSTITUTIONAL PERSONAL INCENTIVE.

The Court concludes that none of the forfeiture officials have an unconstitutional personal incentive to favor the City of Albuquerque over car owners. When evaluating whether

surplus revenue to be distributed to other programs. For the same reason, the Court must accept Harjo's allegation even though it contradicts ROA § 7-6-5(E).

Notwithstanding any contradictions or lack thereof, a Court may discount an allegation if it is conclusory. See Ashcroft v. Iqbal, 556 U.S. at 681. "Bare assertions . . . amount[ing] to nothing more than a formulaic recitation of the elements" are conclusory allegations. Ashcroft v. Iqbal, 556 U.S. at 681. See Hunt v. Central Consol. School Dist., 951 F. Supp. 2d 1136, 1224 (D.N.M. 2013)(Browning, J.)("[M]uch of the Plaintiffs' allegations are conclusory, formulaic recitations of a conspiracy claim's elements, and are not entitled to the presumption of truth."). Thus, in Ashcroft v. Iqbal, plaintiff Javaid Iqbal's allegations that John Ashcroft, former Attorney General of the United States of America, and Robert Mueller, then-Director of the Federal Bureau of Investigation "'knew of, condoned, and willfully and maliciously agreed to subject [Iqbal]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no penological purpose'" were conclusory assertions, amounting to nothing more than a recitation of the "elements of a constitutional discrimination claim." Ashcroft v. Iqbal, 556 U.S. at 680-81. Following the Supreme Court's lead, the Court has concluded allegations such as "the Defendants had actual and/or constructive notice" of discrimination amount to conclusory allegations, and thus "are not entitled to the presumption of truth." Hunt v. Central Consol. School Dist., 951 F. Supp. 2d at 1224. Harjo's full allegation is that, "[b]ecause forfeiture revenues increase the amount of money available to spend, program personnel directly benefit from increased forfeiture revenues." Her allegation's first clause -- "forfeiture revenues increase the amount of money available to spend" -- is sufficiently factual, i.e., it is not a recitation of a legal element, such that it is not conclusory, so the Court must accept it as true. The statement that forfeiture revenues increase the amount of money available to spend is not an element of an unlawful profit incentive claim; rather, it is a factual assertion about the forfeiture program. The second clause is conclusory, however, so the Court need not accept its truth.

The Court, accordingly, alters three sentences on page 62 of its MOO. Alterations are included below with deletions stricken through:

> ~~The Court still discerns no unconstitutional institutional pressure to prosecute, however, because excess funds collected must be allocated to other programs. See 6 ROA §§ 7-6-5(E), 7-9-3(F), 7-14-5(F); Amended Complaint ¶ 15, at 4. Thus, additional penalties assessed do not lead to an increase in the amount of funds the forfeiture program has to spend, so prosecutors, judges, or police officers would not feel pressure to prosecute more cases, find more forfeitures, or seize more cars to secure additional funding.~~ Although the forfeiture revenues increase the amount of money available to spend, officials involved in the vehicle forfeiture program exert little control over how much money is budgeted to the vehicle forfeiture program or how that money is spent.

- 83 -

a governmental program engenders unconstitutional incentives in its officials, a court must first determine the official's nature, i.e., whether the official's function is judicial or prosecutorial. See Marshall, 446 U.S. at 248. The inquiry must begin there, because judicial or quasi-judicial officers are held to a higher standard than prosecutorial officials. See Marshall, 446 U.S. at 248-50. "[T]he strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime." Marshall, 446 U.S. at 250.

If the official is judicial or quasi-judicial, an unconstitutional incentive exists if a procedure or a program "offer[s] a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused." Tumey v. Ohio, 273 U.S. at 532. See Marshall, 273 U.S. at 242. Such a possible temptation exists if the judge "has a direct, personal, substantial pecuniary interest in reaching a conclusion against [a criminal defendant] in his case." Tumey, 273 U.S. at 523. See Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 876 (2009)("[Tumey's] rule reflects the maxim that '[n]o man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity.'")(quoting The Federalist No. 10, at 59 (James Madison)(J. Cooke Ed. 1961)). Thus, in Tumey, the Supreme Court determined that an unconstitutional incentive existed where a mayor, who acted as a judge in certain criminal cases where there was no jury, received about twelve dollars for every conviction he secured, but no money for acquittals. See 273 U.S. at 523, 531-32. The Supreme Court reasoned that "[i]t is certainly not fair to each defendant brought before the mayor for the careful and judicial consideration of his guilt or innocence that the

prospect of such a prospective loss by the mayor" -- $12 per conviction and "about $100 a month" -- "should weigh against [the criminal defendant's] acquittal." Tumey, 273 U.S. at 532. See Connally v. Georgia, 429 U.S. at 246, 250 (holding that a procedure in which a justice of the peace received $5.00 per search warrant issued, but no money per warrant denied, violates due process by creating an unconstitutional "direct, personal, substantial, pecuniary" incentive). In a more recent decision, the Supreme Court again considered the direct, pecuniary rule's boundaries. See Lavoie, 475 U.S. at 822-23. In that case, the primary issue was whether a justice on the Supreme Court of Alabama had a direct, pecuniary interest in a case where he had cast the deciding vote to uphold a punitive damages award against an insurance company, when the justice simultaneously was the lead plaintiff in a nearly identical class-action lawsuit pending in Alabama's lower courts. See Lavoie, 475 U.S. at 822-23. See Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. at 879. The Supreme Court ruled that the Alabama justice had a direct, pecuniary interest in the case he had decided on appeal, because his decision "had the clear and immediate effect" of raising "the settlement value of his own case." Lavoie, 475 U.S. at 824. The Supreme Court also considered whether the rest of the Supreme Court of Alabama's justices, who "might conceivably have had a slight pecuniary interest" as potential unnamed class action plaintiffs in suits against insurance companies, had a direct, pecuniary interest in the case, implicating due process. Lavoie, 475 U.S. at 825-26. The Supreme Court concluded that those justices did not have such an interest, because "[a]ny interest that they might have had . . . was clearly highly speculative and contingent"; the trial court had yet to certify a class "let alone award[] any class relief of a pecuniary nature." Lavoie, 475 U.S. at 826.

If the official resembles a prosecutor, "the strict requirements of *Tumey* and *Ward* [v. Monroeville] are not applicable," because "the constitutional interests in accurate finding of facts

and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated if it is the prosecutor, and not the judge, who is offered an incentive." Marshall, 446 U.S. at 243, 248. Although the Supreme Court has not "sa[id] with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function," the Supreme Court has suggested that a program violates due process if a prosecutor "stands to profit economically." Marshall, 446 U.S. at 250. Thus, in Marshall, prosecutorial officials whose "salar[ies were] . . . fixed by law" had no direct, pecuniary interest in prosecuting cases, and therefore there was no unconstitutional personal incentive to prosecute. 446 U.S. at 250.

Here, there are three types of officials: the hearing officers, enforcement personnel from the forfeiture program, and the city attorneys who prosecute the seizures. The Court concludes that the hearing officers have no direct, pecuniary interest in the forfeiture program, because any connection between their salaries and holdings against the car owners or DWI offenders is too attenuated to be a due process violation. The Court determines that the forfeiture attorneys and other officials also do not have an unlawful personal incentive, because, taking the evidence in the light most favorable to the City of Albuquerque, the general fund would cover any forfeiture program shortfalls to maintain officials' salaries. Accordingly, the Court denies summary judgment on this ground.

A. **THE HEARING OFFICERS DO NOT HAVE A DIRECT, PECUNIARY INTEREST OR AN INSTITUTIONAL INTEREST IN THE FORFEITURE PROGRAM.**

The hearing officers are judicial in nature. As the undisputed facts demonstrate, hearing officers "hear[] . . . witnesses," "rule[] on . . . disputed factual or legal questions," and exercise discretion in coming to conclusions. Marshall, 446 U.S. at 247. See MSJ ¶ 14, at 5 ("The

hearing officer is responsible for determining whether the owner has proved" his or her innocence, and a "number of factors" go into those decisions, including "the number of prior incidents and the time elapsed" since the most recent incident)(citing ROA § 7-6-7(A); Rodgers Depo. at 40:11-41:6). See also supra at 7. Accordingly, hearing officers are judicial, so they are held to the higher Tumey standard. See Marshall, 446 U.S. at 247.

Harjo contends that the hearing officer who adjudicated her case has an institutional incentive to promote the forfeiture program. See MSJ at 28; MSJ Reply at 15-16. The Court concludes that her argument implicates both the institutional incentive inquiry and the personal incentive inquiry, so it considers both prongs.[38] According to Harjo, if the forfeiture "program were to go away -- for instance, because it became financially unsustainable -- the hearing officer's stream of cases would dry up as well, and that could impact the hearing officer personally," i.e., the hearing officer could lose his job. The Court concludes Harjo's argument here implicates the personal incentive prong, because it bears on the hearing officer's salary and continued employment. See, e.g., Tumey, 273 U.S. at 523; Lucky Dogs LLC v. City of Santa Rosa, 913 F. Supp. 2d 853, 861 (N.D. Cal. 2012)(Breyer, J.).

Although implicating a personal incentive, the Court will not grant summary judgment on this ground. Because the hearing officer is judicial, the question is whether the forfeiture program's financial realities "offer[s] a possible temptation to the average man as a judge" to abandon neutrality and favor the City of Albuquerque over the vehicle owners. Tumey, 273 U.S. at 532. The inquiry is, thus, objective -- i.e., whether a reasonable judge would possibly be tempted. See Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. at 883. Actual bias or temptation need not be shown. See Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. at 883.

---

[38]The institutional incentive inquiry is considered infra, at 90-93.

The undisputed facts demonstrate that Harjo's hearing officer had a high forfeiture program docket for two years and that, six years ago, the City of Albuquerque "eliminated six positions from the office of administrative hearings," because the City of Albuquerque ended a separate revenue-generating program. MSJ ¶¶ 49, 62-64, at 12, 14. The Court concludes that, on those facts, a reasonable hearing officer would not be tempted to favor the government, because the likelihood of losing his job is too "speculative and contingent" to reach constitutional proportions. Lavoie, 475 U.S. at 826.

This case strikingly differs from several of the Supreme Court decisions considered above. In Tumey and Connally v. Georgia, for example, the judges in those cases were assured of a pecuniary gain if they favored the government over private citizens. See Tumey, 273 U.S. at 523, 531-32 (detailing that a judge received $12.00 per conviction secured); Connally v. Georgia, 429 U.S. at 246, 250 (noting that a judge received $5.00 per search warrant issued). Even in Lavoie, in which the judge at issue was not certain to receive funds should he hold a particular way, it was highly likely the judge would receive a pecuniary benefit in the form of a settlement, given that his personal lawsuit against an insurance company was "very similar" to the case before the Supreme Court of Alabama. Lavoie, 475 U.S. at 822. See Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. at 789 (describing the two lawsuits in Lavoie -- the judge's personal suit and the suit in front of the Supreme Court of Alabama -- as "nearly identical").

Here, in contrast, Harjo's hearing officer -- indeed, no hearing officer -- is assured a monetary boon by ruling in the City of Albuquerque's favor. There is no bonus should the hearing officer hold for the City of Albuquerque. See MSJ at 27. The situation also diverges from Lavoie, in that the Alabama Justice in Lavoie was highly likely to receive the settlement, whereas it is not that likely that Harjo's hearing officer will lose his salary. First, hearing

officer's salaries are not paid from revenues raised by the forfeiture program.  See MSJ at 27.

Thus, a drop in forfeiture cases does not overtly bear on salary.  Second, on Harjo's facts, it is

not apparent that any hearing officer's job is in jeopardy.  To that point, Harjo argues that,

because the City of Albuquerque previously eliminated positions when facing the abolition of a

revenue-generating program, the City of Albuquerque will eliminate positions again.  See MSJ

27-28.  It is unclear, however, whether the City of Albuquerque in fact fired any hearing officers

in 2012, as the undisputed fact states that "the City eliminated six positions from the office of

administrative hearings."  MSJ ¶ 49, at 12 (emphasis added).  See 2013 Budget at 137.  Those

positions could be hearing officers, or they could be support staff, or they could be something

else.  Moreover, eliminating positions does not mean that those individuals were fired.  See

Cutler-Padilla Depo. at 78:2-6 (noting that the last time the City of Albuquerque laid off workers

was "back in 2001 or 2002").  It is possible the City of Albuquerque transferred those employees

elsewhere.  See Cutler-Padilla Depo. at 77:15-16 ("[H]opefully there would be another job they

could transfer into.").  Consequently, that fact does not demonstrate that Harjo's hearing officer's

job is at risk, even if the forfeiture program's numbers plummet.

The other fact upon which Harjo relies to argue that the hearing officer's salary is at risk

is that he had a high concentration of vehicle seizure hearings in 2015 and 2016.  See MSJ at 27.

That fact tells the Court little, however.  Those high hearing numbers for those two years could

be aberrations.  Moreover, that he had a concentration of a case type does not necessarily make it

likely that the City of Albuquerque would fire him should the forfeiture program end or shrink.

See Cutler-Padilla Depo. at 77:14-17 ("[T]he city doesn't like to lay people off.").  Many

variables bear on a decision to fire an employee.  For example, seniority might affect the City of

Albuquerque's decisionmaking.  Harjo's hearing officer is the chief hearing officer, which makes

it less likely that the City of Albuquerque would fire him or that a reasonable hearing officer in his position would feel that his job or salary was in jeopardy.  See Third Interrog. Response at 3. Caseload projections might also dictate whether the City of Albuquerque would reduce the number of hearing officers.  Thus, should the need for vehicle seizure hearings decrease, but the need for other hearings rise, the City of Albuquerque might not fire hearing officers.  Another variable is how busy the hearing officers are.  If they are overworked, a reduction in a case type would not necessarily lead to layoffs.  The Court recognizes that its analysis draws upon inferences, but, on a motion for summary judgment, it must draw all reasonable inferences in the nonmovant's favor.  See Scott v. Harris, 550 U.S. 372, 378 (2007).  Thus, a possible temptation to favor the City of Albuquerque to preserve his salary is fairly remote, as he would know that his salary or job would be at risk only if several other facts, not established here, indicated that the City of Albuquerque was prepared to make pay cuts or fire some of its employees.

    For similar reasons there is no institutional incentive for Harjo's hearing officer or any hearing officer to favor the City of Albuquerque.  In general, there is a presumption that "administrators serving as adjudicators are . . . unbiased."  Wolkenstein v. Reville, 694 F.2d 35, 41 (2d Cir. 1982)(Friendly, J.)(citing Schweker v. Mclure, 456 U.S. 188, 195 (1982)).  Harjo argues that her hearing officer's awareness of the forfeiture revenue's importance coupled with his high concentration of forfeiture hearings and that the City of Albuquerque previously cut six positions in a different revenue-generating program shows that an unlawful institutional incentive exists.  See MSJ at 27-28 (citing Ward v. Monroeville, 409 U.S. at 58-60).  Harjo's reliance on Ward v. Monroeville is misplaced, because the Supreme Court concluded there that, in addition to the high percentage of revenues from the mayor's court used to fund the town, it

was the mayor's dual responsibilities as both mayor and judge that led to an unlawful institutional incentive. See 409 U.S. at 60.

> [T]he test is whether the mayor's situation is one which would offer a possible temptation to the average man as a judge. . . . Plainly that possible temptation may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. This, too, is a situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial.

409 U.S. at 60 (citations omitted). Hearing officers have no dual responsibility here. The record shows that they act only as judicial officials. Thus, the temptation that the mayor had in Ward v. Monroeville to boost revenues to satisfy his other responsibilities is missing with the hearing officers.

Harjo's other arguments do not demonstrate an institutional incentive. Awareness of the importance of a program's revenue does not, on its own, nullify the presumption of neutrality. Judicial officers are often aware of and tasked with deciding issues affecting important sources of governmental revenue, but the presumption of neutrality is not disturbed there. See, e.g., Gurley v. Rhoden, 421 U.S. 200, (1975)(adjudicating to whom the federal excise tax on gasoline applied); United States v. Equitable Life Assurance Society of the United States, 384 U.S. 323, 324-27 (1966)(holding that a federal tax lien is superior to a state tax lien). Cf. South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2088 (2018)(deciding whether states may impose a sales tax on sellers without a physical presence in the state). Awareness of a program's importance may tip the balance toward a due process violation if coupled with other salient facts, but the facts here do not point toward a constitutional violation.

First, that the City of Albuquerque may have fired other hearing officers from an analogous program bears on a personal incentive which hearing officers might have -- i.e., to not get fired -- and not on an institutional incentive. How or why other hearing officers' job security

is relevant under an institutional incentive analysis is not immediately apparent. There might be an argument that hearing officers, for institutional reasons, would want to preserve the number of hearing officers employed. That argument involves many inferences, however, that the Court cannot draw at this time. One inference is that the City of Albuquerque would fire hearing officers should forfeiture hearings plummet. As explained above, that inference is not entirely sound, because many variables bear on a decision to fire an employee, particularly in the public sector. See supra 89-90. That inference is even less sound here, because it is not clear that most hearing officers have a high concentration of forfeiture cases. It is undisputed that Harjo's hearing officer had a high concentration of forfeiture cases in 2015 and 2016, but there are no facts about the other hearing officers' caseload concentration. The available evidence supports an inference that those hearing officers do not have a high concentration of vehicle seizure cases. The 2016 Budget shows that the City of Albuquerque projected 1,200 vehicle seizure hearing in 2016 and estimated 1,013 vehicle seizure hearings in 2015. See 2016 Budget at 181. Thus, Harjo's hearing officer's 1,288 vehicle seizure hearings from 2015 through 2016 amount to over half the total number of vehicle seizure hearings in that period, making it unlikely that the majority of other hearing officers' dockets would comprise vehicle seizure hearings. Furthermore, the Court notes that the actual vehicle seizure hearings in 2016 were about half of the estimated 1,200: 576. See City of Albuquerque Approved Budget Fiscal Year 2018, at 178 (2018) available at http://documents.cabq.gov/budget/fy-18-approved-budget.pdf ("2018 Budget"). See also MOO at 64 n.12, 2018 WL1626099, at *29 n.12 (taking judicial notice of the 2018 Budget). It follows that Harjo's hearing officer held about eighty percent of the City of Albuquerque's vehicle forfeiture hearings over that period, making it even less likely that other hearing officers' dockets comprise a majority vehicle seizure cases. That evidence suggests that

there is not a high possibility that hearing officers would be tempted to rule for the City of Albuquerque over vehicle owners for institutional reasons. Accordingly, the Court concludes that there is no unconstitutional institutional incentive for the hearing officers.

### B. ENFORCEMENT PERSONNEL DO NOT HAVE A PERSONAL INCENTIVE TO PROSECUTE.

The enforcement personnel do not have a personal incentive to prosecute more cases, so there is no due process violation. The Court concludes that, although those officials are not city attorneys, enforcement personnel are prosecutorial in nature, because their main task is to investigate facts underlying forfeiture seizures and aid the city attorneys in prosecuting vehicle forfeitures. See MSJ ¶¶ 4-7, at 3-4, 26; California Pacific Bank v. FDIC, 885 F.3d 560, 573 (9th Cir. 2018)(concluding that investigators for prosecutors are held to the Marshall standard). Accordingly, the Court will apply the Marshall standard. See Marshall, 446 U.S. at 249-50.

Harjo contends that three facts show a direct, personal incentive. First, enforcement personnel receive and use office equipment purchased with forfeiture revenues. See MSJ at 26 (citing Hernandez Depo. at 36:12-37:9). Second, enforcement personnel have their salaries paid with forfeiture program revenues. See MSJ ¶¶ 28-29, 68, at 7-8, 15, 26-27. Third, those personnel are "aware of the importance of forfeiture revenues." MSJ at 26 (citing Hernandez Depo. at 34:16-4). Harjo argues, accordingly, that the forfeiture program presents a direct financial incentive, because enforcement personnel "face personal . . . consequences if forfeiture revenues falter." MSJ at 23.

The Court concludes that those facts do not demonstrate a direct, personal benefit reaching constitutional dimensions. Receipt of office equipment does not satisfy the personal incentive test, because there is no evidence that enforcement personnel can take office supplies home or use them for their private, personal benefit. See MSJ at 26 (citing Hernandez Depo. at

36:12-37:9 ("Q. Does it make the day-to-day experience of your <u>job</u> better to have a new computer?  A. Yes, sir.")(emphasis added)).  That the forfeiture program revenues are used to pay enforcement personnel salaries is also insufficient to state a due process claim.  <u>See</u> MOO at 61, 2018 WL 1626099, at *28 ("Although the vehicle forfeiture program pays for the prosecuting attorneys' and their staff's salaries, that alone does not generate a 'profit' incentive for the official.")(quoting <u>Marshall</u>, 446 U.S. at 250).  Awareness of the program's importance, even coupled with the fact that salaries are paid from forfeiture revenues, does not give rise to a due process violation, because there is still no evidence "that officials can increase their salary by prosecuting more cases or that their salary is decreased if they prosecute fewer cases."  MOO at 61, 2018 WL 1626099, at *28.[39]  Accordingly, the Court does not grant summary judgment on this ground.

### C.  CITY ATTORNEYS DO NOT HAVE A DIRECT, PERSONAL INCENTIVE TO PROSECUTE.

The Court concludes that the City attorneys have no direct, personal incentive to prosecute.  The City attorneys, as prosecutors, are held to the <u>Marshall</u> standard.  <u>See</u> 446 U.S. at 249-50.  Harjo contends that the following shows an unlawful direct, personal benefit: (i) "these attorneys are aware of the fiscal importance of forfeiture revenues"; (ii) forfeiture program revenues pay these attorneys' salaries; and (iii) the attorney responsible for settlement negotiations in Harjo's case received a $9,500 raise four months after the City of Albuquerque seized Harjo's car.  MSJ ¶¶ 29, 57-60, at 8, 13, 24-25.  Just as with the enforcement personnel, awareness coupled with the fact that forfeiture program revenues fund attorneys' salaries does not give rise to a due process violation.  <u>See</u> <u>supra</u>, at 94.

---

[39]The Court considers below whether enforcement personnel have a personal incentive, under the theory that their continued employment depends on forfeiture revenue.

That an attorney received a raise also does not give rise to a due process violation in this case. If there was evidence that a raise was held out as a potential reward for increasing the number of prosecutions or settlements the attorney had secured, such a fact could give rise to a due process violation, see, e.g., Connally v. Georgia, 429 U.S. at 246, 250, but there is no such evidence here. Rather, the memorandum approving that City attorney's raise specifies that the attorney received the raise to "reflect exceptional performance amidst an increase in litigation duties as well as additional assigned duties, and to bring the rate of pay closer in line with other attorneys in similar positions and level of experience." Hernandez Memo at 1. See MSJ ¶ 60, at 13 (citing Hernandez Memo at 1). A plain reading of that language signals that the City of Albuquerque granted a raise, because (i) that attorney had accumulated more work; and (ii) other attorneys with similar responsibilities have higher pay. Perhaps an inference could be drawn that he received a raise, because he had brought in a significant amount of forfeiture revenues. See Hernandez Memo at 1 ("This [pay raise] is necessary in order to reflect exceptional performance. . ."). That inference is not the only reasonable one, however. As with many memoranda or contracts governing situations that arise with some frequency, such language could be form language with no meaning bearing on forfeiture revenues. See, e.g., SFX React-Operating LLC v. Eagle Theater Entertainment, LLC, 2017 WL 3616562, at *5 (E.D. Mich. Aug. 23, 2017)(Hood, C.J.)(recognizing that companies enter "identical contracts" with similarly situated individuals). The comment about exceptional performance could also relate to any number of actions that he took as an attorney or qualities which he exhibits that do not relate to forfeiture revenues. For example, perhaps he has consistently displayed excellent oral advocacy skills. Because the Court must draw all reasonable inferences in the non-moving party's favor, the Court will not grant summary judgment for Harjo on this ground.

Harjo also contends that the forfeiture program is dependent on forfeiture funds. See MSJ at 20 ("[T]he program depends on forfeiture revenue to pay its bills."). It is undisputed that forfeiture revenues pay forfeiture officials' salaries. See supra at 9 (citing MSJ ¶ 21, at 6). Thus, according to Harjo, it follows that forfeiture program officials -- both enforcement personnel and attorneys -- have an unconstitutional personal incentive, because, should revenues drop, the City of Albuquerque might cut pay or fire forfeiture program personnel. See MSJ at 20 ("[I]t might even become necessary to cut personnel from the program.")(citing Cutler-Padilla Depo. at 14:12-19; id. at 77:8-11). The Court recognized previously that such dependence on revenues leading to layoffs or pay decreases could amount to a constitutional violation. See MOO at 65, 2018 WL 1626099, at *29 ("With a plausible effect on official salary correlated with a decrease in forfeiture revenue, the Court concludes that the vehicle forfeiture program plausibly violates due process."); State v. Decosimo, 2018 WL 733218, at *17 (Tenn. Crim. App. February 6, 2018). Cf. Marshall, 446 U.S. at 250 ("No governmental official stands to profit economically from vigorous enforcement. . . . The salary of the assistant regional administrator is fixed by law.").

The Court concludes that taking the evidence in the light most favorable to the City of Albuquerque, the prospect of dismissals or salary cuts is not so great as to warrant summary judgment in Harjo's favor. As noted, forfeiture program revenues pay for employee compensation. See MSJ ¶ 21, at 6 (citing Thompson Depo. at 37:8-23; Cutler Padilla Depo. at 22:5-15). Nevertheless, it is undisputed that the general fund could, theoretically, cover expenses, such as forfeiture program salaries. See supra, at 10 (citing MSJ Response ¶ 23, at 6-7). See also Cutler-Padilla Depo. at 14:20-25 ("[T]heir General Fund budget will absorb any expenditures that exceed the revenues that they're getting."). While the general fund budget has

been tight -- at least in 2015-2016, see MSJ Reply ¶ 23, at 4 -- there is evidence that: (i) the City of Albuquerque has historically not had much, if any, concern about revenues covering salaries, see Cutler Padilla Depo. at 15:10-13 ("[P]revious years . . . they've had extra revenues, more revenues than expenditures at the end of the fiscal year."); (ii) one forfeiture program official received a raise during the year Harjo's car was seized, see MSJ ¶ 60, at 13 (citing Hernandez Memo at 1); (iii) the first year that there was ever any concern about covering costs was fiscal year 2018, after Harjo's vehicle seizure prosecution, see Cutler-Padilla Depo. at 15:17-19; (iv) in fiscal year 2019, the City of Albuquerque proposed to use general fund money to cover forfeiture program expenses, see 2019 Proposed Budget at 2, filed June 8, 2018 (Doc. 105-2); Tr. at 30:10-13 (Johnson); (v) "the city doesn't like to lay people off," Cutler-Padilla Depo. at 77:17; (vi) salaries are prioritized if there is a shortfall, see Thompson Depo. at 136:20-23; and (vii) the last time the City of Albuquerque laid employees off was 2001 or 2002, see Cutler-Padilla Depo. at 78:3-4. Accordingly, the Court concludes that the possibility of job layoffs or salary reductions is too remote to implicate due process, at least on a motion for summary judgment.

## III. THE FORFEITURE PROGRAM'S HEARING PROCEDURES CREATE AN UNCONSTITUTIONAL RISK OF AN ERRONEOUS DEPRIVATION.

In the MOO, the Court concludes that the forfeiture program's procedure requiring a car owner to prove his or her innocence once the City of Albuquerque has shown that it has probable cause to seize the vehicle creates such a risk of erroneous deprivation that it violates procedural due process. See MOO at 68-72, 2018 WL 1626099, at *31-32. Harjo contends that her argument on this score is a legal issue that the Court already decided in the MOO and that the Court should, for all the reasons that it concluded in the MOO, grant summary judgment in her favor here. See Tr. at 3:5-15 (Johnson). The Court agrees with Harjo and will grant summary judgment in her favor.

Under the Mathews v. Eldridge test: (i) Harjo has "an obvious and significant interest in her car," MOO at 68, 2018 WL 1626099, at *31 (citing Stypmann v. City and Cty. Of San Francisco, 557 F.2d 1338, 1342-43 (9th Cir. 1977)); (ii) there is a risk of erroneous deprivation, because of the "Forfeiture Ordinance's requirement that A. Harjo prove her innocence," and because the City of Albuquerque's probable-cause burden with respect to the car was not a sufficient burden to alleviate the risk, see MOO at 68-70, 2018 WL 1626099, at *31-32 (citing Nelson v. Colorado, 137 S. Ct. at 1256); (iii) the City of Albuquerque's interest in seizing and impounding the vehicle to protect its interest is slight "when confronted with an innocent owner or an owner not involved in the DWI, because there is little to no evidence that the car is dangerous in that owner's hand -- at least the car is no more dangerous than a car is in anyone's hands," MOO at 71-72, 2018 WL 1626099, at *32. See United States v. James Daniel Good Real Property, 510 U.S. 43, 56 (1993)(applying the Mathews v. Eldridge test in a civil forfeiture case).

The City of Albuquerque attacks the Court's risk-of-erroneous-deprivation conclusion. See MSJ Response at 29; Tr. at 38:24-40:11 (Walz); id. at 41:9-42:1 (Walz). It contends that the probable-cause showing is sufficient to mitigate a risk of erroneous deprivation. See Tr. at 41:14-19 (Walz). It also argues that the innocent owner defense is an affirmative defense, which, according to the City of Albuquerque, the defendant always has the burden to prove. See MSJ Response at 29. As the Court concludes in the MOO, however, "[t]he difference between this affirmative defense and typical affirmative defenses . . . is that the government typically has a robust burden of proving the defendant's guilt first." MOO at 71, 2018 WL 1626099, at *32 (citing Martin v. Ohio, 480 U.S. 228, 233 (1987)). Relevant here is that the City of Albuquerque's probable-cause burden requires the City of Albuquerque to prove nothing about

the car owner.  Rather, the City of Albuquerque must show probable cause that a "motor vehicle" was

   (A)   Operated by a person in the commission of a DWI offense . . . and has, on at least one prior occasion, been arrested, summonsed or convicted for (i) an offense of driving under the influence of an intoxicating liquor or drugs in any jurisdiction, or (ii) homicide by vehicle or great bodily harm by vehicle . . . while under the influence of intoxicating liquor or while under the influence of any drug, and /or

   (B)   Operated by a person whose license is suspended or revoked as a result of conviction for driving while intoxicated or suspended or revoked as a result of a driving while intoxicated arrest.

ROA § 7-6-2.  See ROA 7-6-5(D).  Thus, as the Court held previously, Nelson v. Colorado governs.  There, a defendant's conviction was vacated, but the State of Colorado withheld money it had seized from the defendant as a result of the now-vacated conviction.  See Nelson v. Colorado, 137 S. Ct. at 1253.  Colorado would return the money only if the defendant proved by clear-and-convincing evidence that she was innocent.  See 137 S. Ct. at 1254.  As is the case here, Colorado had not proven anything about the defendant.  See 137 S. Ct. at 1257.  Thus, the Supreme Court determined that the "defendants should not be saddled with any proof burden . . .  [T]hey are entitled to be presumed innocent."  137 S. Ct. at 1256.  Accordingly, the Supreme Court concluded that "there is a risk of erroneous deprivation . . . for [Colorado] conditions refund on defendants' proof of innocence by clear and convincing evidence."  137 S. Ct. at 156.

   When confronted with an argument similar to the City of Albuquerque's that there are sufficient procedures to mitigate any risk, the Supreme Court rejected it.  See 137 S. Ct. at 1257.  Colorado contended that numerous procedures -- such as probable cause to support criminal charges, the jury-trial right, and the State's burden to prove guilt beyond a reasonable doubt -- "adequately minimize the risk of erroneous deprivation of property."  137 S. Ct. at 1257.  The

Supreme Court rejoined that none of those procedures mattered, because they did not bear on a defendant whose conviction had been invalidated. See 137 S. Ct. at 1257. Similar reasoning applies here.

The City of Albuquerque has determined that innocent owners -- owners who could not have reasonably foreseen that their vehicle would be used in a way that would subject the vehicle to forfeiture -- have a right to keep their vehicles. See ROA § 7-6-7(A). Thus, the City of Albuquerque has a constitutional obligation, under Mathews v. Eldridge, to implement accurate procedures for determining an owner's innocence. The City of Albuquerque's hearing procedures do not discharge that obligation, because proving that the City of Albuquerque has probable cause to seize a vehicle does not reveal anything about what the vehicle's owner could or could not have reasonably foreseen. See ROA § 7-6-7(A). Thus, the City of Albuquerque's hearing procedures are constitutionally inadequate, and, accordingly, the Court will not revise its MOO, and it will grant summary judgment in Harjo's favor.[40]

---

[40]Although the Court grants summary judgment in Harjo's favor on two of her theories of liability, the Court does not grant the permanent injunctive relief she requests, because she lacks standing for that relief. See Amended Complaint at 24. The parties do not raise the standing issue, but "whenever standing is unclear," a court "must consider it *sua sponte* to ensure there is an Article III case or controversy." Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1126 (10th Cir. 2013)(italics in original). When a plaintiff seeks "prospective relief -- such as an injunction -- . . . 'the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future.'" Colorado Cross Disability Coalition v. Abercrombie & Fitch Co., 765 F.3d 1205, 1211 (10th Cir. 2014)(quoting City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983)). Thus, for example, that police officers had inflicted an unlawful chokehold on a man in City of Los Angeles v. Lyons did not mean that the man had standing for prospective injunctive relief, because there were no facts to establish that the man "would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." City of Los Angeles v. Lyons, 461 U.S. at 105. Moreover, the man's allegation that "the police in Los Angeles routinely apply chokeholds . . . falls far short of the allegations that would be necessary to establish a case or controversy between these parties." City of Los Angeles v. Lyons, 461 U.S. at 105.

## IV. THE COURT ACCEPTS THE GARDEMAL DECL.'S FACTUAL STATEMENTS.

The City of Albuquerque moves the Court to strike the Gardemal Decl. arguing that it proffers improper opinions.  See Motion to Strike at 1.  At the hearing, however, the parties agreed that the Court may deny the Motion to Strike, and that it may determine on a opinion-by-opinion basis what statements from the declaration it would and could consider.  See Tr. at 47:10-13 (Walz); id. at 48:6-9 (Johnson).  Under rule 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  See S.E.C. v. Smart, 678 F.3d 850, 856 (10th Cir. 2012).  Rule 56(c)(4)'s personal knowledge requirement is construed in tandem with rule 602 of the Federal Rules of Evidence.  See Bryant v. Farmers Ins. Exchange, 432 F.3d 1114, 1123 (10th Cir. 2005)("Bryant").  Rule 602 reads: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602.  Rule 602's advisory notes state:

---

Here, Harjo has not presented facts to establish that she is suffering a continuing injury or is under a real and immediate threat of being injured in the future.  The City of Albuquerque returned her car, so there is no continuing injury.  Any chance that the City of Albuquerque will seize her car again under the Forfeiture Ordinance is too attenuated to give rise to standing.  She would need to have plans to drink and drive or to give her car to her son to drive it drunk.  Harjo presents no such facts in her MSJ.  See Brammer-Hoelter v. Twin Peaks Charter Academy, 602 F.3d 1175, 1182 (10th Cir. 2010)("[T]he summary judgment record [must] support[] a conclusion that the plaintiffs have standing.").  Accordingly, the Court concludes that Harjo does not have standing for injunctive relief.  Cf. ACLU of New Mexico v. City of Albuquerque, 2008-NMSC-045, ¶ 23, 188 P.3d 1222, 1230 (concluding that a man who challenged the City of Albuquerque's Forfeiture Ordinance lacked standing for an injunction under analogous state-law standing principles, because the threat of future injury "is simply too speculative").  She has standing for damages and declaratory relief to the extent that the declaratory relief sought is retrospective as to what occurred to her.  See American Humanist Assoc., Inc. v. Douglas Cty School District RE-1, 859 F.3d 1243, 1253 n.3 (10th Cir. 2017); Faustin v. City, Cty. of Denver, 268 F.3d 942, 948 (10th Cir. 2001).

> This rule does not govern the situation of a witness who testifies to a hearsay statement as such, if he has personal knowledge of the making of the statement. Rules 801 and 805 would be applicable. This would, however, prevent him from testifying to the subject matter of the hearsay statement, as he has no personal knowledge of it.

Fed. R. Evid. 602 (1972 Advisory Committee Notes). See Bryant, 432 F.3d at 1123. Thus, should a summary-judgment declaration rely on hearsay statements of which the declarant has personal knowledge, "the objection would not be that she lacked personal knowledge." Bryant, 432 F.3d at 1123 ("Since she personally examined these audit reports, she had personal knowledge of their content."). "The proper objection would be hearsay, as the documents are out-of-court statements offered for the truth of the matter asserted." 432 F.3d at 1123. Therefore, should a declaration assert factual information based on hearsay of which the declarant has personal knowledge, a court may consider that factual information if the hearsay is otherwise admissible. See Bryant, 432 F.3d at 1123. The Court may disregard legal opinions in an expert declaration. See, e.g., Anderson v. Suiters, 499 F.3d 1228, 1237 (10th Cir. 2007).

In its analysis, the Court does not rely on any statements from the Gardemal Decl. See supra, at 74-100. The Court relies, however, on some undisputed facts that cite the Gardemal Declaration. See supra at 74-100, citing MSJ ¶¶ 22, 25-31, 33, 44, 52, 57, 68, at 6-9, 11-13, 15. The portions of the Gardemal Decl. cited are, for the most part,[41] factual assertions that rely

---

[41]There are two paragraphs that contain legal opinion, as opposed to factual assertion, which the Court will and has disregarded. See Gardemal Decl. ¶ 44, at 19 ("The use of program revenues to pay program expenses gives rise to a financial incentive."); id. ¶ 54, at 23 ("The use of program revenues to supplant other sources of funding provides an additional institutional incentive to the Defendant in the outcome of the forfeiture proceedings."). That there is legal opinion embedded in some of the paragraphs cited does not require the Court to reconsider its determinations of undisputed fact. The two undisputed facts that cite to Gardemal Decl. ¶¶ 44, 54, at 19, 23, simultaneously cite to Gardemal Decl. paragraphs that are admissible factual assertions. See supra at 12-13. Gardemal offers extrapolations from evidence in two other places, but both extrapolations are arithmetic calculations, neither of which constitutes an

upon: City of Albuquerque Budgets, depositions of City of Albuquerque employees, City of Albuquerque statements in response to interrogatories, and a financial spreadsheet that the City of Albuquerque produced that it referred to as its forfeiture program general ledger. See Gardemal Decl. ¶¶ 8, 20-22, 25-26, 30-35, 44-48, 52-56, at 3-4, 7-10, 12-15, 18-24. Each of those documents are admissible evidence. The City of Albuquerque Budgets, its interrogatory responses, and general ledger are admissible as statements by a party opponent. See Fed. R. Evid. 801(d)(2)(A). Its employees' depositions are also admissions by a party opponent. See Fed. R. Evid. 801(d)(2)(D).[42] Accordingly, the Court may properly consider those undisputed facts on a motion for summary judgment. See Bryant, 432 F.3d at 1123.

   **IT IS ORDERED** that: (i) the requests in the Plaintiff's Motion for Partial Summary Judgment and Supporting Memorandum, filed October 16, 2017 (Doc. 67), are granted in part and denied in part; (ii) the Defendant's Motion and Supporting Memorandum to Strike Declaration of Joseph T. Gardemal III In Support of Plaintiff's Motion for Partial Summary

---

impermissible opinion. See Gardemal Decl. ¶¶ 26, 34, at 10, 14-15; Bryant, 432 F.3d at 1124 ("A mathematical calculation" is a permissible "lay opinion under Fed. R. Evid. 701.").

   [42]The depositions meet 801(d)(2)(D)'s specific requirements that the statements were "on a matter within the scope of that [employment] relationship" and were made "while [the relationship] existed." Each of the depositions was taken while the individual was still a City of Albuquerque employee. See Thompson Depo. at 6:3-5 (stating that his "current position" is "Fiscal Manager for the Albuquerque Police Department"); Cutler-Padilla Depo. at 6:3-5 (stating that her "current position" with the "City of Albuquerque" is "Executive Budget Analyst"). Moreover, the statements from those depositions upon which Gardemal relies are statements about matters within the scope of their respective employments. For example, Gardemal relies upon the Executive Budget Analyst's deposition testimony about how she constructs yearly operating budgets, the revenue associated with the forfeiture program, and how transfers between different City of Albuquerque accounts cover different costs. See Gardemal Decl. ¶¶ 22, 26, 32-33, at 8, 10, 13-14 (citing Cutler-Padilla Depo. at 11:1-17; id. at 12:1-18:25; id. at 21:1-13; id. at 22:5-23:25). To give another example, Gardemal relies upon the APD Fiscal Manager's deposition testimony about what the APD bought with forfeiture program funds and other forfeiture program costs. See Gardemal Decl. ¶¶ 47-48, 55, at 19-20, 23 (citing Thompson Depo. at 37:18-20; id. at 38:2-38:16; id. at 113:1-25).

- 103 -

Judgment, filed October 30, 2017 (Doc. 73), is denied; (iii) the Plaintiff's Motion for Modification and/or Reconsideration, filed April 27, 2018 (Doc. 97), is granted. The Court grants summary judgment in Plaintiff Arlene Harjo's favor on the theory that the forfeiture personnel have an unconstitutional institutional incentive to prosecute forfeitures. The Court also grants summary judgment in Harjo's favor on her claim that the Forfeiture Ordinance's procedures violate procedural due process. The Court denies summary judgment on all other grounds. Although the Court grants summary judgment on those two grounds, it denies prospective declaratory or injunctive relief for lack of standing. The Court alters the Memorandum Opinion and Order, 2018 WL 1626099, filed March 30, 2018 (Doc. 92), to conform, as specified, supra n.37.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Arash Kashanian
Law Offices of Arash Kashanian
Albuquerque, New Mexico

-- and --

Charles Brad Lane Cates
Law Offices of Charles Brad Lane Cates
Fairacres, New Mexico

-- and --

Justin Pearson
Institute for Justice
Miami, Florida

-- and --

Robert Frommer
Robert Johnson
Institute for Justice
Arlington, Virginia

       *Attorneys for the Plaintiff*

Jeffrey Butler Driggers
Kyle Jordan Hibner
Eric Jon Locher
Philomena M. Hausler
    Assistant City Attorneys
City Attorney's Office
City of Albuquerque
Albuquerque, New Mexico

-- and --

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

       *Attorneys for the Defendant*